# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

| | |
|---|---|
| **BRIAN CARR**, *et al.*, | |
| **Plaintiffs,** | **No. 2:14-cv-00001-WTL-MJD** |
| **v.** | |
| **MARK S. INCH, DIRECTOR, FEDERAL BUREAU OF PRISONS,** | |
| **Defendant.** | |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE....................................................... 2

    I.     The Parties .................................................................................................... 2

    II.    The Plaintiffs' Religious Beliefs....................................................................... 3

    III.   Halal Certifying Organizations ......................................................................... 6

    IV.   The BOP's Current Meal Options...................................................................... 7

           A.     The Mainline Diet..................................................................................... 8

           B.     The No-Flesh Diet..................................................................................... 9

           C.     The Certified Religious Diet ...................................................................... 9

           D.     The BOP's Additional Dietary Accommodations ................................... 11

    V.    The BOP's Ability to Purchase Food Meeting Plaintiffs' Beliefs....................... 12

           A.     Available Vendors Providing Prepackaged Halal Meals that Could
                  Satisfy Plaintiffs' Religious Needs .......................................................... 12

           B.     Procurement Regulations Applicable to Purchases of Halal-
                  Certified Food for Plaintiffs.................................................................... 16

           C.     The BOP's Prior Purchases of Sealed, Prepackaged Halal-Certified
                  Meals for Plaintiffs ................................................................................. 18

    VI.   Plaintiffs' Administrative Remedy Requests..................................................... 20

ARGUMENT ....................................................................................................................... 21

    I.     The BOP is Substantially Burdening Plaintiffs' Religious Exercise. .................. 23

           A.     Plaintiffs' Religious Beliefs Are Sincerely Held. .................................... 23

            B.     Denying Inmates Food that Accords with Their Religious Beliefs
                  Places a Substantial Burden on Their Religious Exercise. ...................... 26

           C.     The BOP Does Not Provide Plaintiffs with Food that Comports
                  with Their Faith....................................................................................... 27

    II.    Burdening Plaintiffs' Religious Exercise Is Not the Least Restrictive
        Means of Furthering a Compelling Government Interest. ................................... 29

            A.     The BOP Fails to Identify Any Compelling Interest that Would Be
                  Affected by Providing Meals that Meet Plaintiffs' Religious
                  Needs...................................................................................................... 30

           B.     Multiple Vendors Provide Meals that Meet Plaintiffs' Religious
                  Dietary Requirements, and the BOP Is Able to Order from Them.......... 34

    CONCLUSION.............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

CASES

Abdulhaseeb v. Calbone,
  600 F.3d 1301 (10th Cir. 2010) ............................................. 28

Alston v. City of Madison,
  853 F.3d 901 (7th Cir. 2017) ................................................. 21

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)............................................................... 21

Beerheide v. Suthers,
  286 F.3d 1179 (10th Cir. 2002) ............................................. 31

Burwell v. Hobby Lobby Stores, Inc.,
  134 S. Ct. 2751 (2014)................................................... passim

Caruso v. Zenon,
  No. 95-mk-1578, 2005 WL 5957978 (D. Colo. July 25, 2005)........................................ 25, 26

City of Boerne v. Flores, 521 U.S. 507 (1997) ............................ 1

Cutter v. Wilkinson,
  544 U.S. 709 (2005)............................................................... 24

Farrell v. Butler Univ.,
  421 F.3d 609 (7th Cir. 2005) ................................................. 21

Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,
  546 U.S. 418 (2006).................................................. 22, 29, 33

Grayson v. Schuler,
  666 F.3d 450 (7th Cir. 2012) ................................................. 25

Holt v. Hobbs,
  135 S. Ct. 853 (2015)...................................................... 29, 32

Hudson v. Dennehy,
  538 F. Supp. 2d 400 (D. Mass. 2008), aff'd sub nom. Crawford v. Clarke, 578
  F.3d 39 (1st Cir. 2009)........................................................... 26

Hunafa v. Murphy,
  907 F.2d 46 (7th Cir. 1990) ................................................... 33

*Kay v. Bemis*,
    500 F.3d 1214 (10th Cir. 2007) ............................................................... 24

*Koger v. Bryan*,
    523 F.3d 789 (7th Cir. 2008) ................................................... 22, 25, 26

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) .......................................................... 22, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................. 21

*McAllen Grace Brethren Church v. Salazar*,
    764 F.3d 465 (5th Cir. 2014) ................................................................. 33

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
    703 F.3d 781 (5th Cir. 2012) ...................................................... 24, 25, 31

*Nelson v. Miller*,
    570 F.3d 868 (7th Cir. 2009) ................................................. 22, 24, 25, 26

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ............................................................................ 29

*Rich v. Sec'y, Fla. Dep't of Corr.*,
    716 F.3d 525 (11th Cir. 2013) .............................................................. 32

*Schlemm v. Wall*,
    784 F.3d 362 (7th Cir. 2015) ........................................................... 29, 30

*Strong v. David*,
    297 F.3d 646 (7th Cir. 2002) ................................................................. 24

*Thomas v. Ramos*,
    130 F.3d 754 (7th Cir. 1997) ................................................................. 21

*United States v. Sec'y, Fla. Dep't of Corr.*,
    828 F.3d 1341 (11th Cir. 2016) ............................................................ 26

*United States v. Sec'y, Fla. Dep't of Corr.*,
    No. 12-22958-CIV, 2015 WL 1977795 (S.D. Fla. Apr. 30, 2015) ........... 26

*West v. Grams*,
    607 F. App'x 561 (7th Cir. 2015) ......................................................... 32

*Willis v. Comm'r, Ind. Dep't. of Corr.*,
753 F. Supp. 2d 768 (S.D. Ind. 2010) ...................................................................... 31

*Woodford v. Ngo*,
548 U.S. 81 (2006) .................................................................................................. 24

*Yellowbear v. Lampert*,
741 F.3d 48 (10th Cir. 2014) .................................................................................. 32

**STATUTES**

42 U.S.C. § 2000bb .................................................................................................. 1

42 U.S.C. § 2000bb–1 ......................................................................................... 1, 22

42 U.S.C. § 2000bb–2 .............................................................................................. 25

42 U.S.C. § 2000cc–3 .............................................................................................. 25

42 U.S.C. § 2000cc–5 .............................................................................................. 25

**OTHER AUTHORITIES**

Inmate Locator, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last
visited November 8, 2017) ....................................................................................... 3

S. Rep. No. 103-111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900 .................... 32

**RULES**

Fed. R. Civ. P. 56 ..................................................................................................... 21

**REGULATIONS**

28 C.F.R. § 542.14 ................................................................................................... 24

48 C.F.R. § 13.003 ................................................................................................... 17

48 C.F.R. § 13.201 ................................................................................................... 17

48 C.F.R. § 6.302-1 .................................................................................................. 17

**INTRODUCTION**

Plaintiffs Brian Carr, Mark Crenshaw, Trone Kent, and John Wilson (collectively, "Plaintiffs"), are four Muslim inmates in the custody of the Federal Bureau of Prisons (the "BOP"). Each Plaintiff sincerely believes that his religion commands him to eat halal meals, including halal meat. The BOP, however, does not provide a halal-certified diet, and it summarily rejected Plaintiffs' administrative grievances requesting a halal-certified diet, taking the (incorrect) position that the BOP's existing *Kosher*-certified meals were sufficient to satisfy Plaintiffs' religious beliefs. Plaintiffs accordingly filed this suit under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, which prohibits the government from "substantially burden[ing] religious exercise without compelling justification." *Id.* § 2000bb(a)(3); *accord* § 2000bb–1.

Plaintiffs are entitled to summary judgment under RFRA. It is beyond dispute that Plaintiffs' beliefs are sincerely held and that the BOP does not provide Plaintiffs with meals that align with those beliefs. And it is well-established under RFRA that denying inmates food that conforms to the strictures of their religion imposes a substantial burden on religious exercise. RFRA therefore shifts the burden to the BOP to satisfy the "most demanding test known to constitutional law" and prove that refusing to accommodate Plaintiffs' beliefs is the least restrictive means of furthering a compelling government interest. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The BOP cannot meet that burden here.

The BOP has argued that offering a new type of diet to Plaintiffs would pose insurmountable security or administrative obstacles. But the undisputed record shows that the BOP already provides numerous special diets to individuals or small groups of inmates, and there is *zero* evidence that doing so has ever caused *any* difficulties, much less insurmountable ones. The BOP, for example, currently accommodates Orthodox Jewish inmates at several

institutions by providing them with Kosher meals meeting a stricter Kosher standard than the Kosher meals otherwise offered by the BOP, and the BOP's witnesses have conceded that it could use the same procedures to accommodate Plaintiffs here. Indeed, the BOP *has in fact* used existing procedures to purchase meals *for these Plaintiffs*. Those meals were not certified to meet Plaintiffs' religious requirements, but the BOP's actions squarely refute any assertion that accommodating Plaintiffs would somehow be unworkable.

The BOP has also asserted that there are no vendors of halal-certified food that meet the Plaintiffs' religious requirements and the BOP's requirements. The undisputed record again refutes that claim. No fewer than six vendors of halal food have informed the BOP that they could potentially provide halal-certified meals that satisfy Plaintiffs' religious beliefs and the BOP's needs. Indeed, the BOP's Acting National Food Services Administrator recently testified unequivocally that one of those vendors "can provide meals that meet both [the BOP's] needs and [P]laintiffs' beliefs." Statement of Material Facts Not in Dispute ¶ 47.a.

The legal principles governing this case are settled, and the material facts are not in dispute. The Court should grant summary judgment to Plaintiffs.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

### I. The Parties

1.  Plaintiffs Brian Carr, Mark Crenshaw, Trone Kent, and John Wilson are adult men currently confined to the custody of the BOP.[2]

2.  When Plaintiffs initiated this action on January 4, 2014, all four were housed at the U.S. Penitentiary ("USP") Terre Haute, in Terre Haute, IN.[3]

---

[1] All exhibits referenced herein are attached to the accompanying Declaration of David J. Leviss.

[2] Am. Compl. ¶¶ 8–11, Dkt. 18; Def.'s Answer to Am. Compl. ("Answer") ¶¶ 8–11, Dkt. 19; *see also* Ex. 32, Decl. of Brian E. Carr, ¶ 1; Ex. 33, Decl. of Mark K. Crenshaw, ¶ 1; Ex. 34, Decl. of Trone Kent, ¶ 1; Ex. 35, Decl. of John H. Wilson, ¶ 1.

[3] Am. Compl. ¶¶ 8–11; Answer ¶¶ 8–11.

3.    Plaintiffs have since been transferred to other BOP institutions; currently, Carr is housed at USP Atlanta in Atlanta, GA; Crenshaw is housed at USP Florence in Florence, CO; Kent is housed at Federal Correctional Institution ("FCI") Memphis in Memphis, TN; and Wilson is housed at FCI Cumberland, in Cumberland, MD.[4]

4.    The Defendant is Mark S. Inch, Director of the BOP, sued in his official capacity.[5]

## II.    The Plaintiffs' Religious Beliefs

5.    All Plaintiffs are practicing Muslims: Carr and Crenshaw have been practicing Muslims since 1994; Wilson had been a practicing Muslim since 2000; and Kent has been a practicing Muslim since 2007.[6]

6.    Carr, Crenshaw, and Kent identify as Sunni Muslims and follow the Hanafi school of jurisprudence as it relates to food.[7]  Wilson identifies as a Shia Muslim and follows both the Hanafi and Ja'fari schools of jurisprudence as they relate to food.[8]

7.    According to Plaintiffs' religious beliefs, all food falls into one of two categories: halal (that which is permissible to consume) or haram (that which is forbidden to consume).[9]

8.    Pursuant to their religious beliefs, Plaintiffs are required to eat a halal diet, and avoid consuming food that is haram.[10]  If it is unclear or doubtful whether an item is halal, Plaintiffs' religious beliefs deem the item to be haram and forbidden.[11]

---

[4] Inmate Locator, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited November 8, 2017); *see also* Ex. 1, Tr. of Dep. of Brian Carr ("Carr Tr.") at 23:24–24:20; Ex. 2, Tr. of Dep. of Mark Crenshaw ("Crenshaw Tr.") at 16:5–17:3; Ex. 4, Tr. of Dep. of John Wilson ("Wilson Tr.") at 13:11–14:16.

[5] *See* Order Amending Caption, Dkt. 208.

[6] *See* Ex. 32 ¶ 2; Ex. 33 ¶ 2; Ex. 34 ¶ 2; Ex. 35 ¶ 2; *see also* Ex. 1, Carr Tr. at 30:20–21; Ex. 2, Crenshaw Tr. at 21:10–22:22; Ex. 3, Tr. of Dep. Trone Kent ("Kent Tr.") at 12:11–20; Ex. 4, Wilson Tr. at 18:1–20.

[7] *See* Ex. 32 ¶ 4; Ex. 33 ¶ 4; Ex. 34 ¶ 4; *see also* Ex. 1, Carr Tr. at 35:1–2, 36:2–3; Ex. 2, Crenshaw Tr. at 28:5–10; Ex. 3, Kent Tr. at 13:20–22.

[8] *See* Ex. 35 ¶ 4; *see also* Ex. 4, Wilson Tr. at 28:16–18.

[9] *See* Ex. 32 ¶¶ 5–6; Ex. 33 ¶¶ 5–6; Ex. 34 ¶¶ 5–6; Ex. 35 ¶¶ 5–6; *see also* Ex. 1, Carr Tr. at 42:10–14; Ex. 2, Crenshaw Tr. at 31:10–32:5; Ex. 3, Kent Tr. at 17:2–18:4; Ex. 4, Wilson Tr. at 32:9–12.

[10] *See* Ex. 32 ¶ 5; Ex. 33 ¶ 5; Ex. 34 ¶ 5; Ex. 35 ¶ 5.

[11] *See* Ex. 32 ¶ 6; Ex. 33 ¶ 6; Ex. 34 ¶ 6; Ex. 35 ¶ 6; *see also* Ex. 1, Carr Tr. at 93:12–16; Ex. 2, Crenshaw Tr. at 31:24–32:13; Ex. 3, Kent Tr. at 32:11–13; Ex. 4, Wilson Tr. at 31:12–32:12.

9. In order to be considered halal in accordance with all of Plaintiffs' religious beliefs, food must satisfy the following criteria:

    a.    All meat (or any product of animal origin) must be of a species that is considered halal, and must be slaughtered and prepared appropriately. Pork, for example, is impermissible in any form.[12]

    b.    Furthermore, all meat (or other animal products) must come from an animal slaughtered in the following manner:

        i.    The animal must be slaughtered individually, by hand, by a sane adult Muslim who invokes the name of Allah upon the animal and slaughters it without delay;

        ii.    The slaughterer must believe in all the essential matters of faith as described by Imam Al-Tahawi; and

        iii.    The slaughterer must cut horizontally, sever at least three of four main vessels below the Adam's apple, and use a knife sharp enough to ensure that the slaughter is swift and the animal suffers minimally.[13]

    c.    Intoxicants, including wine or other alcohols, are considered haram, and cannot be used in cooking or preparation.[14]

    d.    Food is ritually impure if it is tainted by the presence of certain substances, including, *e.g.*, alcohol, animal blood, or byproducts from the carcasses of non-halal

---

[12] *See* Ex. 32 ¶ 6(c)–(e); Ex. 33 ¶ 6(c)–(e); Ex. 34 ¶ 6(c)–(e); Ex. 35 ¶ 6(c)–(e); *see also* Ex. 1, Carr Tr. at 42:19–23; *id.* at 44:10–23 (listing haram species as including "[p]igs, reptiles, dogs, [and] cats," as well as any "animals who were gored to death, or died as a result of falling from a height, if they . . . died as a result of being mauled to death from another animal"); Ex. 2, Crenshaw Tr. at 32:6–13; Ex. 3, Kent Tr. at 66:1–3; Ex. 4, Wilson Tr. at 32:14–22.

[13] *See* Ex. 32 ¶ 6(e); Ex. 33 ¶ 6(e); Ex. 34 ¶ 6(e); Ex. 35 ¶ 6(e); *see also* Ex. 1, Carr Tr. at 42:15–43:13, 48:22–49:1; Ex. 2, Crenshaw Tr. at 34:23–35:13; Ex. 3, Kent Tr. at 17:8–20; Ex. 4, Wilson Tr. at 38:14–39:17.

[14] *See* Ex. 32 ¶ 6(a); Ex. 33 ¶ 6(a); Ex. 34 ¶ 6(a); Ex. 35 ¶ 6(a); *see also* Ex. 1, Carr Tr. at 75:3–4; Ex. 2, Crenshaw Tr. at 32:14–16; Ex. 3, Kent Tr. at 25:25–26:2; Ex. 4, Wilson Tr. at 42:14–22.

slaughtered animals.[15]

    e.    Food may not contain ingredients—such as gelatin, animal shortening, and certain emulsifiers, enzymes, and flavorings—that are derived from haram sources, including animals not slaughtered in the manner described above.[16]

10.  In addition, food may become haram through exposure to haram foods or ingredients through cross-contamination.[17]

11.  Plaintiffs' beliefs regarding the consumption of food are derived from their interpretation of Islam's holy texts, including the Holy Quran and the Sunnah, the record of the life and teachings of the Prophet Muhammad, as well as commentaries interpreting those texts, including Tafsir ibn Kathir and the Sahih al-Bukhari collection of hadiths.[18]

12.  Because the Prophet Muhammad consumed meat and spoke about the consumption of meat, Plaintiffs believe that they should consume halal meat on a regular basis in order to follow his example.[19]

13.  The inability to follow a diet that conforms to these principles directly affects Plaintiffs'

---

[15] *See* Ex. 32 ¶ 6; Ex. 33 ¶ 6; Ex. 34 ¶ 6; Ex. 35 ¶ 6; *see also* Ex. 1, Carr Tr. at 44:12–23; Ex. 2, Crenshaw Tr. at 31:18–19; Ex. 3, Kent Tr. at 50:18–24; Ex. 4, Wilson Tr. at 32:4–8.

[16] *See* Ex. 32 ¶ 6(b)–(c); Ex. 33 ¶ 6(b)–(c); Ex. 34 ¶ 6(b)–(c); Ex. 35 ¶ 6(b)–(c); *see also* Ex. 1, Carr Tr. at 74:16–23, 114:9–115:6; Ex. 2, Crenshaw Tr. at 32:14–16, 66:16–67:7; Ex. 3, Kent Tr. at 65:2–66:6; Ex. 4, Wilson Tr. at 58:20–62:3; Ex. 24, Brian Carr's Resp. to Def.'s 1st Set of Interrogs. (Aug. 26, 2016), at 3; Ex. 25, Mark Crenshaw's Resp. to Def.'s 1st Set of Interrogs. (Aug. 26, 2016), at 3; Ex. 26, Trone Kent's Resp. to Def.'s 1st Set of Interrogs. (Aug. 26, 2016), at 3; Ex. 27, John Wilson's Resp. to Def.'s 1st Set of Interrogs. (Aug. 30, 2016), at 3.

[17] *See* Ex. 32 ¶ 6(b)–(c); Ex. 33 ¶ 6(b)–(c); Ex. 34 ¶ 6(b)–(c); Ex. 35 ¶ 6(b)–(c); *see also* Ex. 1, Carr Tr. at 44:25–45:4, 53:22–54:1, 105:1–14; Ex. 2, Crenshaw Tr. at 38:21–39:2, 100:3–15; Ex. 3, Kent Tr. at 25:8–9; Ex. 4, Wilson Tr. at 32:13–22, 66:10–17.

[18] *See* Ex. 32 ¶ 5; Ex. 33 ¶ 5; Ex. 34 ¶ 5; Ex. 35 ¶ 5.

[19] *See* Ex. 32 ¶ 5 (discussing Ayah 87 in Surah Al-Ma'idah of the Quran and other passages that discuss the consumption of meat); Ex. 33 ¶ 5 (same); Ex. 34 ¶ 5 (same); Ex. 35 ¶ 5 (same); *see also* Ex. 1, Carr Tr. at 48:18–21 (testifying that being a vegetarian is "not consistent with the correct and traditional Islamic practices" because the Prophet Muhammad "wasn't a vegetarian"); Ex. 2, Crenshaw Tr. at 61:17–62:15 ("Muslims follow the example of the [P]rophet, . . . and the [P]rophet himself wasn't a vegetarian."); Ex. 3, Kent Tr. at 59:15–60:8 ("Q. . . . [W]hy do you allege that you're forbidden . . . from being vegetarian? A. Because the Prophet Mohammad he ate meat and he said whoever doesn't approve his ways are not of him."); Ex. 4, Wilson Tr. at 43:6–44:22 ("[T]he Prophet Mohammad, peace be upon him, he ate meat . . . . He says that if you try to be a straight vegetarian, then you're not of me because there's balance, you have to eat meat, you have to eat vegetables and things like that, so there ha[s] to be a middle course in all the things you do.").

ability to adhere to their religious beliefs.[20]

      a.     According to all Plaintiffs' religious beliefs, the consumption of haram food could hinder a blessing from God, due to Imam Al-Nawawi's Forty Hadith, Hadith No. 10's indication that a man who is "nourished unlawfully" cannot be answered by God.[21]

      b.     According to Carr's religious beliefs, consumption of haram food also renders his prayers ineffective, and a person nourished with haram food will be unable to enter paradise. Consumption of haram food makes him feel spiritually weakened.[22]

      c.     According to Crenshaw's religious beliefs, not being able to consume food that accords with his religious beliefs also "results in anger and distraction in prayer, and means that [his] prayers will be ineffective."[23]

14.  Plaintiffs' religious beliefs regarding these dietary restrictions are sincerely held.[24]

15.  The BOP concedes that it has no "reason to doubt" the sincerity of Plaintiffs' religious beliefs regarding dietary restrictions.[25]

### III.    Halal Certifying Organizations

16.  Dietary certification by an independent religious certifying entity is necessary to ensure that inmates with certain religious dietary restrictions receive meals that comport with their religious beliefs.[26]

---

[20] *See* Ex. 32 ¶ 9; Ex. 33 ¶ 9; Ex. 34 ¶ 9; Ex. 35 ¶ 9.

[21] Ex. 32 ¶ 9(a); Ex. 33 ¶ 9(c); Ex. 34 ¶ 9(a); Ex. 35 ¶ 9(a).

[22] Ex. 32 ¶ 9(b).

[23] Ex. 33 ¶ 9(b).

[24] *See* Ex. 32; Ex. 33; Ex. 34; Ex. 35; *see also* Ex. 20, Administrative Remedy Request of Brian Carr (Feb. 8, 2010); Ex. 21, Administrative Remedy Request of Mark Crenshaw (May 7, 2012); Ex. 22, Administrative Remedy Request of Trone Kent (Feb. 6, 2012); Ex. 23, Administrative Remedy Request of John Wilson (Feb. 8, 2012); Ex. 72, Additional Administrative Remedy Requests of Brian Carr.

[25] Ex. 5, Tr. of Dep. of Heidi Kugler ("Kugler Tr.") at 264:11–265:5.

[26] *See* Ex. 11, Tr. of Dep. of Rabbi Abraham Richter ("Richter Tr.") at 113:17–114:5 (testimony of BOP-employed rabbi that it would be "impossible" for the BOP to determine if food was kosher without "a rabbinical certification," explaining that, "You can't just read ingredients and say, hey, this is kosher. You don't know where this was produced. How it was produced. You must rely solely on the bona fide religious certification to tell you whether something is kosher or not"); Ex. 16, Tr. of Dep. of Eric Lawton ("Lawton Tr.") at 179:21–180:7 ("[B]eing

17. Only bona fide halal certifying organizations can independently and objectively assess whether a manufacturer is complying with religious requirements, and can verify the source of ingredients that may render a product haram.[27]

18. Any halal certifying organization, so long as it "faithfully and rigidly applies the standards" set forth above, could certify that food accords with Plaintiffs' religious beliefs.[28]

19. At least five certifying organizations are capable of certifying that food was prepared in accordance with Plaintiff's religious beliefs as described above: Halal Advocates of America, and its sister organization Halal Food Standard Alliance of America (collectively, "HA/HFSAA"); the American Halal Foundation ("AHF"); Islamic Services of America ("ISA"); Islamic Society of the Washington Area ("ISWA"); and Islamic Food and Nutrition Council of America ("IFANCA").[29]

## IV. The BOP's Current Meal Options

20. The BOP has established a uniform national menu for inmates that it implements at each of its correctional institutions.[30]

---

a food service employee does not make you an expert in religious diet accommodation, so the fact that somebody who . . . is certifying that this meets somebody's religious dietary needs is . . . important."); Ex. 6, Tr. of Dep. of Karen Stiltner ("Stiltner Tr.") at 62:11–63:12; Ex. 15, Tr. of Dep. of Mustafa Boz ("Boz Tr.") at 130:5–9 ("If someone requests [a] strictly halal religious diet meal, [in] my opinion, [the] BOP should have a[n] . . . independent religious halal certification agency verify . . . whether it is halal or not.").

[27] *See* Ex. 32 ¶ 7 ("In order to be confident that the food I consume adheres to my specific religious beliefs, I rely upon halal certifying organizations to ensure that the meat was slaughtered in accordance with my beliefs and that the food is otherwise free of haram ingredients or additives."); Ex. 33 ¶ 7 (same); Ex. 34 ¶ 7 (same); Ex. 35 ¶ 7 (same); *see also* Ex. 15, Boz Tr. at 87:9–15 (BOP Imam agreeing that "the way to make sure the food meets those halal standards is through reliable halal certification"); *id.* at 23:7–26:25; Ex. 6, Stiltner Tr. at 277:19–278:1; Ex. 17, Decl. of Hamzah Maqbul ("Maqbul Decl.") ¶¶ 18–19, 32, 34 ("Certification is necessary to ensure that both meat and non-meat food items meet Islamic dietary standards and are Halal.").

[28] Ex. 24 at 5; Ex. 25 at 5; Ex. 26 at 5; Ex. 27 at 5; Ex. 28 at 2; Ex. 29 at 2; Ex. 30 at 2; Ex. 31 at 2; *see also* Ex. 32 ¶ 7; Ex. 33 ¶ 7; Ex. 34 ¶ 7; Ex. 35 ¶ 7.

[29] *See* Ex. 28 at 2–3; Ex. 29 at 2–3; Ex. 30 at 2–3; Ex. 31 at 2–3; Ex. 1, Carr Tr. at 89:22–90:3, 94:5–10. In addition to certifying food that meets Plaintiffs' beliefs, Plaintiffs understand that AHF may also certify poultry that does not accord with the traditional hand-slaughtering practices required to comply with Plaintiffs' beliefs, and that ISA, ISWA, and IFANCA may likewise certify some food products that do not meet their religious needs. Ex. 28 at 2–3; Ex. 29 at 2–3; Ex. 30 at 2–3; Ex. 31 at 2–3.

[30] Ex. 62, BOP Food Service Manual (Sept. 13, 2011), at EMAIL00003731; *see also* Ex. 16, Lawton Tr. at 165:3–9; Ex. 9, Tr. of Dep. of Jason Langford ("Langford Tr.") at 16:23–17:14.

21. The national menu provides inmates with three meal options. Beyond the mainline diet, which is the default option for inmates, the BOP's religious diet program includes the "no-flesh diet" (or other self-selection from the mainline diet), and the certified foods component (the "certified diet program").[31]

### A. The Mainline Diet

22. The mainline diet contains a mixture of meat, poultry, and fish items, along with fruits, vegetables, and other non-meat items.[32] It includes pork products, and other items that could contain or could have been processed with haram ingredients.[33]

23. None of the food served on the mainline menu is certified as halal.[34]

24. The BOP, including its former Director, have repeatedly acknowledged that items on the mainline menu are at a risk of cross-contamination with haram foods.[35]

25. Plaintiffs have personally witnessed food on the mainline being cross-contaminated with haram food.[36]

26. Due to the lack of halal certification and the risk of cross-contact with haram foods, the

---

[31] *See* Ex. 62 at EMAIL00003737–41; Ex. 71, BOP Program Statement P5360.09, Religious Beliefs and Practices (June 12, 2015), at BOP041289–90; Ex. 15, Boz Tr. at 57:20–58:12; Ex. 5, Kugler Tr. at 81:17–82:1.

[32] *See* Ex. 59, FCI Jesup Mainline FY 2015 Weekly Menu - As Served, at BOP002284–88.

[33] *See* Ex. 6, Stiltner Tr. at 106:12–15; Ex. 17, Maqbul Decl. ¶ 16.

[34] *See* Ex. 5, Kugler Tr. at 36:11–21; Ex. 1, Carr Tr. at 53:13–17; *see also* Ex. 62 at EMAIL00003731–34.

[35] *See* Ex. 6, Stiltner Tr. at 105:16–21 (acknowledging that "during mainline when we're serving like pork items, issues [may arise] where maybe some of the juices from the meat would get into another pan"); Ex. 36, Email from Charles E. Samuels, Jr., Director, BOP (Dec. 13, 2013), at EMAIL00002323 (citing review of a BOP facility: "Internal controls for maintaining a safe, sanitary, and secure environment are not adequate. This presents the potential for food borne illness and cross-contamination of food."); Ex. 37, Email from Gregory S. Bondurant (May 29, 2013), at EMAIL00004088 (report on food service sanitation at another BOP facility noting that "possibility of cross-contamination of food is a continuing problem," and listing a variety of issues including "pans, trays, lids, etc.[] not properly air drying; food exposed in coolers and freezers . . . ; dish machine temperatures not in the proper range . . . ; cutting boards stored on top of each other; [and] soap and paper towels not present at hand washing sinks").

[36] Ex. 1, Carr Tr. at 60:23–61:20 (testifying that he witnessed pork juice drip onto vegetables); Ex. 2, Crenshaw Tr. at 39:16–40:5 (testifying that he previously "worked in the dining hall area," and witnessed personnel "handle . . . a pork item and still handle the fruits and vegetables in performing the job"); Ex. 4, Wilson Tr. at 66:10-67:18 (testifying that he observed trays being contaminated with pork grease); *id.* at 83:18-84:4 (testifying that he avoids the salad bar because he has observed that "a lot of those guys don't wash their hands properly" and cross-contaminate by using the utensils used for haram food).

mainline diet does not provide food that accords with Plaintiffs' religious beliefs.[37]

### B.  The No-Flesh Diet

27.  The no-flesh diet consists of a self-selection of vegetarian foods from the mainline diet.[38]

28.  None of the items available on the no-flesh diet is certified as halal.[39]

29.  Many items served on the no-flesh menu could contain haram ingredients.[40]

30.  The no-flesh menu is exposed to the same risk of cross-contamination as the mainline menu,[41] and therefore the BOP has acknowledged that the no-flesh diet does not meet the religious dietary needs of some Muslim inmates like Plaintiffs.[42]

31.  Furthermore, the no-flesh diet does not include meat,[43] which renders it incompatible with Plaintiffs' religious belief that they must consume meat.[44]

### C.  The Certified Religious Diet

32.  The certified religious diet consists of prepackaged meals—sealed, individual trays—that

---

[37] *See* Ex. 32 ¶ 8(b); Ex. 33 ¶ 8(b); Ex. 34 ¶ 8(c); Ex. 35 ¶ 8(c); *see also* Ex. 6, Stiltner Tr. at 109:14–18 ("Q. For food that is not served and sealed, prepackaged trays the way you do for certified foods, cross-contamination is a bigger issue than it is for the certified foods?  A. It can be an issue, yes."); Ex. 1, Carr Tr. at 47:24–25.

[38] *E.g.*, Ex. 15, Boz Tr. at 57:25–58:1; Ex. 6, Stiltner Tr. at 106:22–107:1.

[39] *See* Ex. 5, Kugler Tr. at 36:11–21; *see also* Ex. 1, Carr Tr. at 53:13–17; Ex. 17, Maqbul Decl. ¶ 38; *see also* Ex. 62 at EMAIL00003731–34.

[40] Ex. 17, Maqbul Decl. ¶ 40; *see also* Ex. 15, Boz Tr. at 124:9–10, 124:11–126:12 (BOP Imam acknowledging that "widely accepted minimum standards for halal production" indicate that "yogurt, cheese, or other products" may be rendered haram due to the presence of gelatin, "rennet or enzymes that com[e] from prohibited sources").

[41] *See* Ex. 6, Stiltner Tr. at 105:16–107:6 (BOP National Food Service Administrator testifying that pork juices could contaminate the meatless alternatives); *id.* at 110:5-7 (acknowledging that "cross contamination is a potential concern" for the no-flesh alternative); Ex. 1, Carr Tr. at 60:23–61:18 (testifying that he witnessed pork being served immediately adjacent to vegetables, with no barrier to prevent cross-contamination, and that vegetables are often cooked using the same utensils and pans as those used to cook pork items); Ex. 34 ¶ 8(e) (Kent stating that he has "particular concerns about cross contamination because while working in the prison kitchen in Terre Haute during Ramadan, [he] witnessed inmates use the same pots, pans, and utensils for the meals containing pork as those prepared for the 'no flesh' meal option."); Ex. 35 ¶ 8(f) (Wilson stating that he has "witnessed firsthand that the same pots, pans, and utensils are used for both the 'no flesh' option and the rest of the mainline food, including pork").

[42] Ex. 6, Stiltner Tr. at 110:8–12 ("Q. So if you have a devoutly religious person who feels that he must eat kosher or halal food, no flesh might not meet his needs?  A. In a cross-contact situation, no, it would not."); *see also* Ex. 32 ¶ 8(c); Ex. 33 ¶ 8(c); Ex. 34 ¶ 8(d); Ex. 35 ¶ 8(e).

[43] Ex. 62 at EMAIL00003739; Ex. 6, Stiltner Tr. at 106:22–107:1.

[44] *See* Ex. 32 ¶ 8(c); Ex. 33 ¶ 8(c); Ex. 34 ¶ 8(d); Ex. 35 ¶ 8(e).

have been certified Kosher by one of the certifying organizations approved by the BOP.[45]

33. BOP policy precludes BOP institutions from making changes or substitutions to the certified religious diet menu or product specifications.[46]

34. The BOP began using individual sealed trays in order to alleviate concerns about cross-contamination of Kosher food.[47]

35. The certified religious diet meals are not certified as halal.[48]

36. There are significant differences between the requirements for food to be certified Kosher and for food to be certified halal in accordance with Plaintiffs' beliefs.[49]  For example:

    a.    Kosher-certified foods could contain gelatin derived from haram sources, which Plaintiffs' religious beliefs would prohibit them from consuming.[50]

    b.    Kosher dietary laws do not prohibit the use of alcohol in food, which is strictly forbidden by Plaintiffs' religious beliefs.[51]

    c.    The slaughtering practices required for meat and animal products to be considered Kosher are different than the requirements demanded by Plaintiffs' religion.[52]

37. It is also impossible to determine whether any of the BOP's existing Kosher meals—even those that contain no meat—could comply with Plaintiffs' religious beliefs, because many of the

---

[45] *E.g.*, Ex. 62 at EMAIL00003737–39; Ex. 5, Kugler Tr. at 82:2–4; Ex. 6, Stiltner Tr. at 62:11–14.

[46] Ex. 62 at EMAIL00003737–38.

[47] Ex. 6, Stiltner Tr. at 109:19–110:4.

[48] Ex. 5, Kugler Tr. at 82:2–6; *see also* Ex. 62 at EMAIL00003737–39.

[49] *See, e.g.*, Ex. 32 ¶ 8(d); Ex. 33 ¶ 8(d); Ex. 34 ¶ 8(b); Ex. 35 ¶ 8(b); Ex. 17, Maqbul Decl. ¶¶ 23–35 (discussing the myriad ways that Kosher-certified food may contain haram ingredients); *see also* Ex. 15, Boz Tr. at 101:12–102:2; Ex. 1, Carr Tr. 73:7–14; Ex. 2, Crenshaw Tr. at 37:19–38:10, 50:11–21; Ex. 3, Kent Tr. at 25:10–26:6; Ex. 4, Wilson Tr. at 98:15–21.

[50] *See* Ex. 6, Stiltner Tr. at 276:19–277:18 ("Q. And are you aware that gelatin can be kosher but not necessarily halal?  A. Yes, I am now."); *see also* Ex. 15, Boz Tr. at 123:23–124:7 (acknowledging that some Muslims believe that "if the animal's gelatin comes from . . . an animal that's not slaughtered through Islamic slaughtering ritual process, then the gelatin is not permissible"); *see also* Ex. 17, Maqbul Decl. ¶¶ 23–35.

[51] Ex. 17, Maqbul Decl. ¶¶ 24–25; Ex. 15, Boz Tr. at 80:8–19.

[52] Ex. 17, Maqbul Decl. ¶ 24; Ex. 15, Boz Tr. at 81:3–18 (BOP Imam describing opinion he provided to the BOP in April 2016 memorandum that "according to some Muslim scholars, kosher does not reach the level of halal" due to concerns about alcohol and the differences in slaughtering methods).

ingredients used in these meals, including many unidentified spices and flavorings, could be haram.[53]

38.  Due to these differences, some Muslims—including Plaintiffs—do not consider a Kosher certification sufficient to establish that food is halal in accordance with their beliefs.[54]

### D.    The BOP's Additional Dietary Accommodations

39.  Outside of the three options provided on the national menu, the BOP offers other specialty diets on an inmate-by-inmate basis, including vegan diets,[55] diets that accommodate inmates' various food allergies,[56] high-calorie diets that provide inmate with more food than other inmates,[57] diets tailored to the needs of diabetics,[58] and other medically necessary diets.[59]

40.  The BOP has purchased food items that it would not otherwise purchase in order to provide inmates with these specialty diets.[60]

41.  The BOP has also accommodated Orthodox Jewish inmates in at least five BOP institutions who require that their food be certified to meet the Kosher standards of the Central Rabbinical Congress ("CRC")—a stricter standard than the one required for the Kosher meals the BOP otherwise provides as part of the certified religious diet program.[61]

---

[53] Ex. 17, Maqbul Decl. ¶¶ 25–31; *see also* Ex. 15, Boz Tr. at 132:9–21 ("Q. [T]here are potentially haram ingredients in kosher foods beyond alcohol and gelatin, correct?  A. Right.  Okay.  You discuss alcohol and gelatin here, but there are a lot of various ingredients that come from meat sources that may be slaughtered in accordance with the kosher tradition, but not in accordance with the halal tradition?  A. Yes.  Q. Okay.  And some of those ingredients may show up even in vegetarian foods such as cheese, correct?  A. Yes.").

[54] *See* Ex. 5, Kugler Tr. at 22:10–21 (agreeing that the BOP's "Kosher certification was not meeting the needs of" the "four plaintiffs in this case"); Ex. 32 ¶ 8(d); Ex. 33 ¶ 8(d); Ex. 34 ¶ 8(b); Ex. 35 ¶ 8(b); Ex. 17, Maqbul Decl. ¶ 35 (stating that, because the certified religious diet's meals are not certified halal, they "do[] not meet the Plaintiffs' stated religious need to eat Halal food").

[55] Ex. 6, Stiltner Tr. at 150:1–11.

[56] Ex. 6, Stiltner Tr. at 33:8–34:10.

[57] Ex. 16, Lawton Tr. at 133:1–4, 133:19–134:20.

[58] Ex. 16, Lawton Tr. at 133:5-18.

[59] Ex. 6, Stiltner Tr. at 31:10–32:1; Ex. 16, Lawton Tr. at 133:1–134:20.

[60] *E.g.*, Ex. 6, Stiltner Tr. at 33:19–34:3 ("Q. So you had to procure gluten-free food for those inmates?  A. We would.  Q. . . . [G]luten-free food was not available as part of your normal dietary offerings?  A. It was not.").

[61] *See* Ex. 10, Tr. of Dep. of Kathleen Churchill ("Churchill Tr.") at 18:19–19:2; Ex. 16, Lawton Tr. at 33:18–34:11; Ex. 11, Richter Tr. at 23:3–7.

42. The BOP's Chaplaincy Services Coordinator recognizes that Plaintiffs' request for halal-certified food "is a similar situation to our Orthodox Jewish inmates who required CRC certification that went further than the kosher standard the Bureau was offering at that time."[62]

43. The provision of special medically-indicated meals has not presented any security concerns for the BOP.[63]

44. Likewise, the BOP cannot identify a single security-related incident that resulted from the provision of a religious meal to an inmate.[64]

## V. The BOP's Ability to Purchase Food Meeting Plaintiffs' Beliefs

### A. Available Vendors Providing Prepackaged Halal Meals that Could Satisfy Plaintiffs' Religious Needs

45. The BOP contends that "serving certified prepackaged meals sealed by the vendor" is "the best way to protect the integrity of the religious food certifications and hav[e] a cost-effective program."[65]

46. On March 12, 2015, the BOP issued an initial Request for Information ("RFI") asking vendors of prepackaged halal meals to submit answers to questions on various topics, including

---

[62] Ex. 39, Email from Michael Castle, Chaplaincy Services Coordinator (Sept. 10, 2015), at EMAIL00061783 (also acknowledging that Plaintiffs "have a differing view [of what is halal] also supported within Islamic thought, and RFRA affords inmates to dramatically differ from a majority position held within a religious group").

[63] *See* Ex. 6, Stiltner Tr. at 41:11–17 (testifying that purchasing special meals for inmates with medically-indicated diets did not "create any security concerns" and required no consultation with security experts); *id.* at 74:5–16 ("Q. [A]ny security concerns that would be caused by that situation? A. The situation? Q: Where you have one person on the Religious Diet Program and you're purchasing locally religiously certified food for that person? A: I do not see security concerns with that."); Ex. 7, Tr. of Dep. of Thomas Hinkle ("Hinkle Tr.") at 136:10–20; Ex. 16, Lawton Tr. at 133:15–18 ("Q. . . . And the institutions are able and capable to handle the provision of those extra foods to those inmate[s] [on high-caloric or diabetic diets] without issue? A Yes.").

[64] Ex. 7, Hinkle Tr. at 150:20–151:4 ("Q. . . . [A]re you aware of any instance where a provision of a religious meal has produced a security incident? A. Provision of a religious meal[?] No."); *see also* Ex. 64, Def's 2d Suppl. Resp. to Pls.' 1st Set of Interrogs. (Mar. 2, 2016), at 5–6 (failing to identify a single security incident resulting from "the provision of religious food items at any BOP Facility"); Ex. 65, Def's 3d Suppl. Resp. to Pls.' 1st Set of Interrogs. (Aug. 22, 2016), at 5–6 (same); Ex. 66, Def's 4th Suppl. Resp. to Pls.' 1st Set of Interrogs. (Nov. 14, 2016), at 6–8 (same); Ex. 68, Def's 7th Suppl. Resp. to Pls.' 1st Set of Interrogs. (Feb. 22, 2017), at 4 (same).

[65] Ex. 64 at 10–11; *see also* Ex. 17, Maqbul Decl. ¶¶ 66–67 ("It is my understanding that the BOP provides inmates requesting a Kosher diet sealed trays with Kosher-certified food. . . . A similar approach can be used to provide Halal-certified food to inmates whose religious beliefs require them to maintain a Halal diet.").

the products they offer, their religious certifications, and their ability to provide a large quantity of shelf-stable or frozen prepackaged halal meals to inmates.[66]

47. Numerous vendors responded to the RFI or other inquiries from the BOP, indicating that they could potentially provide prepackaged halal meals that accord with Plaintiffs' beliefs, including the following vendors:

   a.   Midamar Corporation ("Midamar") is a vendor offering sealed, prepackaged halal meals that are certified halal by ISA and ISWA and comply with all of Plaintiffs' religious requirements.[67] Midamar responded to the BOP's RFI on May 22, 2015, and has responded to numerous BOP follow-up questions,[68] leading the BOP's Acting National Food Services Administrator to conclude that "Midamar can provide meals that meet both [the BOP's] needs and [P]laintiffs' beliefs."[69]

   b.   SOPAKCO is a vendor offering sealed, prepackaged halal meals that comply with Plaintiffs' religious requirements.[70] SOPAKCO responded to the BOP's RFI on May 11, 2015.[71] When it responded to the RFI, SOPAKCO informed the BOP that when the BOP issues a solicitation, SOPAKCO would "adjust the menu configuration to match what is needed provided the quantity allows."[72] Despite this offer, the BOP has never issued a

---

[66] See Ex. 41, Solicitation Number DJBP0700NASRFI150001, at BOP003102; see also Ex. 40, Solicitation Number DJBP0700NASRFI150002, at BOP003087 (reissuance of RFI on April 24, 2015).

[67] Ex. 42, at FBOP00176; Ex. 61, Email from Tracey Komata, Vice President, National Food Group (July 26, 2017), at BOP042526; Ex. 28 at 3–4 (stating that Midamar provides meals that satisfy all of his religious requirements); Ex. 29 at 3–4 (same); Ex. 30 at 3–4 (same); Ex. 31 at 3–4 (same).

[68] Ex. 43, Email from Kent Vogel, Operations Manager, Midamar (May 22, 2015), at FBOP000095–112; Ex. 60, Email from Kent Vogel, Director of U.S.A. Sales Division, Midamar (Oct.27, 2017), at BOP044083; Ex. 61 at BOP042526.

[69] Ex. 16, Lawton Tr. at 112:17–21.

[70] Ex. 24 at 11–12 (stating that SOPAKCO provides meals that satisfy all of his religious requirements with the potential exception of poultry); Ex. 25 at 11–12 (same); Ex. 26 at 11–12 (same); Ex. 27 at 11–12 (same); see also Ex. 5, Kugler Tr. at 304:15–22 (testifying that SOPAKCO's meals would comport with Plaintiffs' religious requirements); Ex. 45, SOPAKCO RFI Response, at FBOP000187–188; Ex. 17, Maqbul Decl. ¶ 69.

[71] See Ex. 44, Email from David DuBose, Vice President, SOPAKCO (May 11, 2015), at FBOP000183–84.

[72] Id.

solicitation for halal-certified food that comports with Plaintiffs' beliefs.[73]  SOPAKCO

also responded to several follow-up inquiries from the BOP.[74]  Although the BOP initially

discounted SOPAKCO as a viable vendor because the meals that it provides to the

Department of Defense include a self-heating mechanism unsuitable for the prison

environment,[75] SOPAKCO also produces microwavable meals which would not include a

self-heating mechanism.[76]  The BOP's Acting National Food Services Administrator

concluded that SOPAKCO "could provide food that meets [P]laintiffs' beliefs and . . .  the

BOP's needs," and is "willing to work with [the BOP] to modify to potentially meet the

spec in full."[77]  As of November 3, 2017, the BOP had not yet sent its specifications to

SOPAKCO.[78]

    c.    Labriute Meals ("Labriute") is a vendor that offers sealed, prepackaged halal

meals.[79]  A representative of Labriute initially contacted the BOP in June 2015, asserting

that it could provide microwavable halal meals to the BOP.[80]  Labriute further

communicated with the BOP on September 28, 2017, confirming that it "could comply

with . . . all" of the BOP's proposed halal specifications,[81] leading the BOP's Acting

National Food Services Administrator to agree that there is nothing "preventing [Labriute]

from providing meals that would meet plaintiffs' beliefs and satisfy the requirements of the

---

[73] Ex. 16, Lawton Tr. at 117:12–20.

[74] *See* Ex. 46, Email from David DuBose, Vice President, SOPAKCO (June 18, 2015), at FBOP000026–28; *see also* Ex. 47, Email from Sam Reichardt, SOPAKCO (June 24, 2015), at FBOP000035–37.

[75] Ex. 8, Tr. of Dep. of Kathleen Cannon ("Cannon Tr.") 114:17–115:15.

[76] *Id.* at 129:1–130:6 (agreeing that SOPAKCO's website indicates "that SOPACKO provides microwaveable meals"); Ex. 70, SOPAKCO Institutional Retort Pouches (Apr. 26, 2017).

[77] Ex. 16, Lawton Tr. at 113:11–22; *see also id.* at 161:9–15.

[78] Ex. 16, Lawton Tr. at 78:5–80:1.

[79] Ex. 48, Email from Abe Halberstam, Labriute (Sept. 28, 2017), at BOP043271; *see also* Ex. 16, Lawton Tr. at 96:17–97:1.

[80] Ex. 49, Email from Moises Vela, CEO, The Vela Group LLC (June 16, 2015), at EMAIL00076939.

[81] Ex. 48 at BOP043271.

Bureau of Prisons."[82]

       d.     Taaza Fresh Global Food, Inc. ("Taaza Fresh") is a vendor offering sealed, prepackaged halal meals that have been certified halal in accordance with Plaintiffs' beliefs by HA/HFSAA.[83]  Taaza Fresh most recently resubmitted its RFI response to the BOP on January 17, 2017.[84]  In March 2017, Taaza Fresh responded to additional questions posed by the BOP, and confirmed that it could provide meals that comply with "almost all of" the BOP's menu.[85]  In April 2017, the BOP's contracting officer concluded that it "look[ed] like" Taaza Fresh could satisfy all of the BOP's requirements.[86]  Subsequently, in November 2017, the BOP's Acting National Food Services Administrator testified that he did not know if the BOP has "enough information to say that [Taaza Fresh] definitely can" provide food that meets Plaintiffs' religious beliefs and the BOP's food service needs, and acknowledged that he had not emailed with Taaza Fresh in over a month, and has not attempted call them.[87]

       e.     Sisters One, Inc. ("Sisters One") is a national food distributor offering sealed, prepackaged halal meals that have been certified halal by, *inter alia*, IFANCA.[88]  Sisters One initially reached out to the BOP in August 2016,[89] and later responded to the BOP's RFI on October 9, 2017.[90]  Sisters One indicated in its RFI response that the meat and

---

    [82] Ex. 16, Lawton Tr. at 96:17–97:1.  Plaintiffs have not been able to independently verify that Labriute complies with all of their religious requirements and rely solely on the BOP's representation that Labriute is capable of producing halal meals that do so.

    [83] *See* Ex. 50, Taaza Fresh RFI Response (Jan. 17, 2017), at BOP035297, BOP035300; Ex. 17, Maqbul Decl. ¶ 68; Ex. 24 at 11–12 (confirming that Taaza Fresh's meals appear to satisfy all of his religious requirements); Ex. 25 at 11–12 (same); Ex. 26 at 11–12 (same); Ex. 27 at 11–12 (same).

    [84] Ex. 50 at BOP035303.

    [85] *See* Ex. 51, Email from Faizal Moosa, Taaza Fresh (Mar. 20, 2017), at BOP039374–76.

    [86] Ex. 8, Cannon Tr. at 153:9–154:1.

    [87] Ex. 16, Lawton Tr. at 114:21–117:11.

    [88] Ex. 69, Sisters One RFI Response (Oct. 9, 2017), at BOP043286.

    [89] Ex. 52, Email from BOP-HSD/Food Svcs (July 28, 2017), at BOP042153.

    [90] Ex. 69 at BOP043279.

poultry included in its meals is slaughtered in accordance with Plaintiffs' religious beliefs.[91] The BOP's Acting National Food Services Administrator concluded that the meals provided by Sisters One would satisfy Plaintiffs' religious needs, but the BOP has not yet determined whether the meals provided by Sisters One would satisfy the BOP's food service requirements.[92]

     f.    National Food Group is a national food distributor offering sealed, prepackaged halal meals from various manufacturers, including a line of frozen meals that are certified halal by AHF.[93] Accordingly, with the potential exception of their poultry items, these frozen meals conform to Plaintiffs' religious beliefs.[94] National Food Group has responded to the BOP's RFI and submitted additional information to the BOP when requested.[95] The BOP believes that the only potential barrier to providing these meals to Plaintiffs is that they are manufactured using inmate labor, an issue that the BOP is still "investigating" to determine "whether or not" it would prevent it from purchasing the meals.[96]

     B.    <u>Procurement Regulations Applicable to Purchases of Halal-Certified Food for Plaintiffs</u>

48. The BOP's procurement of food is governed by, *inter alia*, the Competition in Contracting Act of 1984 ("CICA"); the Federal Acquisition Regulation ("FAR"), 48 C.F.R. pt.

---

[91] Ex. 69 at BOP043295, BOP043297.

[92] *See* Ex. 16, Lawton Tr. at 95:21–96:4; *see also id.* at 86:5–87:4 (testifying that Saffron Road line of products sold by Sisters One, although smaller and non-compartmentalized, was "not problematic from a food service standpoint other than it's not comparable . . . to what we're offering the Jewish inmates").

[93] *See* Ex. 53, National Food Group RFI Response, at BOP035533–36.

[94] *See* Ex. 28 at 3–4 (stating that CI Industries, the manufacturer of National Food Group's meals, provides meals that satisfy all of his religious requirements with the potential exception of poultry); Ex. 29 at 3–4 (same); Ex. 30 at 3–4 (same); Ex. 31 at 3–4 (same).

[95] *See* Ex. 53; Ex. 54, Email from Liz Baun, Corrections - Sales Support, National Food Group (Mar. 24, 2017), at BOP035538.

[96] Ex. 16, Lawton Tr. at 65:21–69:10, 71:2–72:20; *see also* Ex. 6, Stiltner Tr. at 233:17–20.

31 (generally governing the acquisition process for federal executive agencies); the Department of Justice Acquisition Regulation ("JAR"), 48 C.F.R pt. 2801 (governing acquisitions by Justice Department agencies); and the Bureau of Prisons Acquisition Policy ("BPAP"), Program Statement Policy, No. P4100.05 (a BOP policy further setting out its procurement approach) (collectively, "applicable procurement regulations").[97]

49. The applicable procurement regulations provide several different methods by which the BOP could procure food that meets Plaintiffs' religious needs:

a. For large-scale procurements, the BOP can use "full and open competition," which typically involves a three-step process of (i) preliminary market research, (ii) soliciting market information through an RFI, and (iii) obtaining proposals from vendors through a Request for Proposals ("RFP") or Request for Quote ("RFQ").[98]

b. For acquisitions under $150,000, the BOP may use the Simplified Acquisition Procedures ("SAP"), *see* 48 C.F.R. § 13.003, which streamlines the standard procurement process by permitting the BOP to solicit bids informally, including via telephone.[99]

c. For acquisitions under $3,500, the BOP may use the micro-purchase process, *see* 48 C.F.R. § 13.201, which allows BOP institutions to make purchases using the BOP credit card and requires no competitive process.[100]

d. For acquisitions where only one vendor is available, the BOP may use the sole-source exception, *see* 48 C.F.R. § 6.302-1(a)(2), which again permits it to purchase items without a competitive process.[101]

---

[97] Ex. 18, Decl. of Nathanael Hartland ("Hartland Decl.") ¶ 9; Ex. 13, Tr. of Dep. of [Nathanael] Hartland ("Hartland Tr.") at 44:10–46:11.
[98] Ex. 18, Hartland Decl. ¶¶ 15–21 (explaining steps to acquisition process).
[99] Ex. 9, Langford Tr. at 71:10–20; Ex. 12, Tr. of Dep. of Michael Bodine ("Bodine Tr.") at 143:9–145:13; Ex. 18, Hartland Decl. ¶ 12.
[100] Ex. 9, Langford Tr. at 22:13–23, 60:15–16; Ex. 12, Bodine Tr. at 143:9–21; Ex. 18, Hartland Decl. ¶ 13.
[101] Ex. 12, Bodine Tr. at 97:19–98:2; Ex. 9, Langford Tr. at 98:20–99:5; Ex. 18, Hartland Decl. ¶ 11.

50.  The BOP already uses these procedures to purchase food for its inmates.[102]  For example:

    a.  The BOP currently uses the SAP and micro-purchase process to acquire the CRC-certified kosher meals offered to certain Orthodox Jewish inmates.[103]

    b.  Many BOP institutions use the micro-purchase exception to purchase food for the certified religious diet.[104]

    c.  The BOP previously used the micro-purchase process to procure individual prepackaged meals for Plaintiffs that were certified as halal, albeit not in accordance with Plaintiffs' religious beliefs.[105]

51.  The BOP could use one or more of these avenues to procure certified halal meals for Plaintiffs, and could use the micro-purchase process to purchase meals until a competitive acquisition could be completed.[106]

    C.    <u>The BOP's Prior Purchases of Sealed, Prepackaged Halal-Certified Meals for Plaintiffs</u>

52.  In November 2015, the BOP used the micro-purchase process to purchase halal-certified meals from J&M Food Products Company.[107]

53.  The BOP purchased those meals with the intent to provide them to the four Plaintiffs in

---

[102] *See* Ex. 12, Bodine Tr. at 42:13–43:8.

[103] Ex. 12, Bodine Tr. at 65:13–18; Ex. 10, Churchill Tr. at 51:13–52:3; Ex. 6, Stiltner Tr. at 238:20–239:11.

[104] Ex. 6, Stiltner Tr. at 66:21–67:2.

[105] *See* Ex. 9, Langford Tr. at 130:7–19, 131:5–18; Ex. 12, Bodine Tr. at 112:11–113:7; Ex. 15, Boz Tr. at 70:22–71:13; *id.* at 141:24–142:2.

[106] Ex. 12, Bodine Tr. at 94:5–21 ("Q. If someone in the food service program were to come to you this afternoon and say: I need to purchase halal food for inmates . . . . How would you accomplish that goal?  A. Credit card.  Q. What limitations would be placed on that credit card order?  A. . . . I would say: Find out how much they are.  Keep it under the micro-purchase threshold.  And then also come to me and we will solicit on the open market for the long-term."); Ex. 9, Langford Tr. at 120:14–123:10, 131:1–132:16 (testifying that the BOP could use either the SAP or the micro-purchase rules to purchase halal-certified meals prior to initiating a competitive bid process); Ex. 18, Hartland Decl. ¶ 10 ("The BOP can procure Halal-certified food without competition for a limited period of time necessary to conduct a competitive procurement . . . ."); Ex. 13, Hartland Tr. 102:1–103:2.

[107] Ex. 16, Lawton Tr. at 51:14–21; Ex. 14, Tr. of Dep. of Rochelle Cecil ("Cecil Tr."), at 60:1–5; Ex. 55, Food Service Receipt for USP Lee (Nov. 5, 2015), at BOP028376; Ex. 56, Invoice from National Food Group (Nov. 13, 2015), at BOP028377; Ex. 57, Food Service Receipt for FCI Cumberland (Nov. 6, 2015), at EMAIL00173364-69; *see also* Ex. 6, Stiltner Tr. at 238:20–239:9 (discussing proposed J&M menu); Ex. 9, Langford Tr. at 122:16–21 (confirming that meals were purchased using micro-purchase exception).

this lawsuit.[108]

54. However, these meals did not conform to Plaintiffs' religious beliefs because they were not certified as complying with the traditional hand-slaughtering requirements described above.[109]

55. In May 2017, the BOP completed nutritional analysis of another halal menu, based on prepackaged halal-certified meals distributed through National Food Group, again with the intention of providing these meals to Plaintiffs.[110] The BOP has not implemented this menu principally because it is still "investigating" whether or not the manufacturer's use of prison labor legally prevents it from purchasing these meals.[111]

56. Although the BOP never provided any of these alternative meals to Plaintiffs, it was not because doing so would have created insurmountable security risks, been prohibitively expensive, or required full and open competition under governing regulations.[112]

57. For example, the meals purchased from J&M Products Company in November 2015 ranged in cost from $2.67 to $5.60 per meal,[113] while the BOP's overall food service budget was $412.8 million in 2015.[114]

---

[108] Ex. 16, Lawton Tr. at 54:14–55:4.

[109] *See* Ex. 15, Boz Tr. at 70:22–71:13 (BOP Imam acknowledging that the "food produced by J&M . . . wasn't halal" in accordance with Plaintiffs' beliefs); *id.* at 141:24–142:2 ("Based on . . . the strictest opinion of some . . . Muslims, and the interpretation of what halal slaughter is . . . J&M may not meet that requirement.").

[110] Ex. 58, Memorandum from Mitchel Holliday, Chief Dietician (May 23, 2017), at BOP040475–83; Ex. 16, Lawton Tr. at 65:21–69:8.

[111] Ex. 16, Lawton Tr. at 65:21–69:8.

[112] *See* Ex. 5, Kugler Tr. at 159:2–6 ("Q. So whatever obstacles there are to providing an accommodation -- halal-certified meal accommodation at a local level, it was possible to overcome that through providing J&M meals? A. Yes."); Ex. 7, Hinkle Tr. at 117:18–118:16 (testifying that there are no "insurmountable" security concerns regarding the provision of halal-certified meals to Plaintiffs); Ex. 16, Lawton Tr. at 155:6–22 (testifying that the BOP has not eliminated any potential halal vendors "based on the cost of their meals"); Ex. 9, Langford Tr. at 131:1–132:16 (confirming that regulatory requirements are not a barrier to procuring meals for Plaintiffs).

[113] Ex. 55 at BOP028376; Ex. 56 at BOP028377; Ex. 57 at EMAIL00173364-69.

[114] Ex. 63, Def.'s Resp. to Pls.' 1st Set of Interrogs., at 37–38 (indicating BOP's 2015 Food Service Operating Budget was $412.8 million).

## VI. Plaintiffs' Administrative Remedy Requests

58.  Carr submitted an administrative remedy request to the BOP on February 8, 2010, seeking halal-certified meals including halal-certified meat in accordance with his beliefs.  That request was denied by the FCC Terre Haute Warden on March 15, 2010.  Carr appealed that denial to the Regional Office on March 31, 2010, which again denied his request on April 20, 2010.  Carr appealed that denial to the BOP Central Office, where, citing national BOP policies, the BOP denied his appeal on December 14, 2010.[115]

59.  Carr submitted another administrative remedy request at Jesup FCI on May 13, 2014, again seeking halal-certified meals, including halal-certified meat.[116]  That request was denied, and Carr appealed to the Regional Office on July 5, 2014, which again denied his request on September 11, 2014.[117]  Carr did not continue to resubmit the same grievance after that time because the instant case had already been filed.[118]

60.  Crenshaw went through the same process, submitting an administrative remedy request for halal-certified meals including halal-certified meat on May 7, 2012, appealing the denial to the Regional Office on June 23, 2012, and appealing that denial on August 7, 2012.  The BOP Central Office, citing national BOP policies, denied Crenshaw's request on August 26, 2013.[119]

61.  Kent filed his administrative remedy request for halal-certified meals including halal-certified meat on February 6, 2012, and was denied on April 17, 2012.  His appeal of that denial was subsequently denied on May 11, 2012 by the Regional Office.  The BOP Central Office, citing to national BOP policies, denied Kent's appeal on April 19, 2013.[120]

---

[115] *See* Ex. 20; *see also* Ex. 72.
[116] Ex. 72 at PLTF000069
[117] Ex. 72 at CARR000449.
[118] Ex. 1, Carr Tr. at 97:1–4.
[119] *See* Ex. 21.
[120] *See* Ex. 22.

62. Wilson filed his administrative remedy request on February 28, 2012, seeking halal-certified meals including halal-certified meat. That request was denied on March 22, 2012, and his appeal to the Regional Office was denied on April 6, 2012. The BOP Central Office, citing to national BOP policies, denied his appeal on February 28, 2013.[121]

## ARGUMENT

Summary judgment must issue if "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (quotation omitted); *see* Fed. R. Civ. P. 56(a). Neither the "mere existence of some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis deleted), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Instead, "to avoid summary judgment [the non-moving] party must supply evidence sufficient to allow a jury to render a verdict in his favor." *Thomas v. Ramos*, 130 F.3d 754, 759 (7th Cir. 1997). "A dispute over material facts is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Farrell v. Butler Univ.*, 421 F.3d 609, 612 (7th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

RFRA offers broad protections to the religious beliefs of federal inmates like Plaintiffs. Under RFRA, if Plaintiffs demonstrate that: (1) the activity in which they seek to engage constitutes an "exercise of religion," and (2) that the BOP's actions "substantially burden[s]" that religious exercise, then the burden shifts to the BOP to prove that its refusal to accommodate

---

[121] *See* Ex. 23.

Plaintiffs' religious beliefs (1) "is in furtherance of a compelling governmental interest"; and (2) is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb–1.[122]

Plaintiffs readily meet their burden here. The BOP has acknowledged that it has no reason to question that Plaintiffs' dietary restrictions are rooted in their sincerely-held religious beliefs, and it is beyond dispute that the current meals offered by the BOP do not accommodate those restrictions. The law makes clear that the BOP's failure to provide a religiously-acceptable diet to an inmate constitutes a substantial burden upon the inmate's exercise of religion. *Nelson v. Miller*, 570 F.3d 868, 880 (7th Cir. 2009); *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008). Plaintiffs have thus established their prima facie case. *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013).

The undisputed facts further establish that the BOP cannot meet its burden of rebutting Plaintiffs' claims. No reasonable factfinder could conclude that denying Plaintiffs religiously appropriate meals is the least restrictive means of furthering a compelling governmental interest. While the BOP has identified several purported compelling governmental interests supposedly furthered by denying Plaintiffs a religiously-acceptable diet, the supposed nutritional, administrative, security, and regulatory obstacles identified by the BOP cannot possibly justify its refusal to accommodate Plaintiffs' religious beliefs, as the BOP has previously demonstrated that it can overcome these obstacles. Indeed, the BOP has purchased halal-certified food with the intention of providing that food to the Plaintiffs, demonstrating that it is perfectly capable of accommodating Plaintiffs' religious needs by purchasing meals from a vendor that produces food that satisfies Plaintiffs' religious beliefs. And the undisputed record makes clear that at least

---

[122] Both RFRA and its "sister statute," RLUIPA, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781 (2014), are governed by "the same standard." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

one, and possibly several more, vendors are ready and able to provide halal-certified meals that would accommodate Plaintiffs and would comply with the BOP's food service requirements.

## I.    The BOP is Substantially Burdening Plaintiffs' Religious Exercise.

### A.    Plaintiffs' Religious Beliefs Are Sincerely Held.

Plaintiffs sincerely believe that they must consume a diet that is halal in accordance with their religious beliefs.  Statement of Material Facts Not in Dispute ("SMF") ¶¶ 5–15.  In order for food to be halal according to Plaintiffs' religious requirements, it must satisfy all of the criteria discussed above, including: (1) the absence of alcohol or other intoxicants; (2) the absence of any ritually impure substances, including wine or animal blood; and (3) all meat (or products of animal origin) must be of a halal species that was slaughtered individually, by hand, by a sane adult Muslim who invokes the name of Allah upon the animal and slaughters it without delay, that the slaughterer must believe in all the essential matters of faith as described by Imam Al-Tahawi, and that the slaughterer must cut horizontally, severing at least three of four main vessels below the Adam's apple, and use a knife sharp enough to ensure that the slaughter is swift and the animal suffers minimally.  SMF ¶ 9.  In addition, food must be free of doubt as to its halal status, meaning that it cannot be exposed to haram foods or ingredients through cross-contamination.  SMF ¶¶ 8, 10.  Finally, Plaintiffs believe that they must consume meat on a regular basis as their faith in order to emulate the practices of the Prophet Muhammad.  SMF ¶ 12.

These dietary restrictions are religious in nature.  The faith traditions of eating halal food, and specifically halal meat, flow directly from the texts of the Holy Quran and the Sunnah, the record of the life and teachings of the Prophet Muhammad, and the practices of the Prophet Muhammad.  SMF ¶¶ 11–12.  Because the Prophet consumed meat, Plaintiffs sincerely believe that their diets should emulate this practice on a regular basis.  SMF ¶ 12.  According to

Plaintiffs' religious beliefs, strict adherence to the traditional hand-slaughtering practices described above is necessary to ensure that the meat is spiritually fit for consumption, and to respect the animal and minimize its suffering. SMF ¶ 9.b. Plaintiffs believe that the consumption of haram food directly interferes with their ability to adhere to their religious beliefs. SMF ¶ 13. For Plaintiffs, adherence to these dietary restrictions is a form of religious exercise. *See, e.g.*, *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2012); *Nelson*, 570 F.3d at 879.

In assessing the sincerity of a RFRA plaintiff's professed beliefs, courts generally act with "a light touch, or judicial shyness." *Moussazadeh*, 703 F.3d at 792 (quotations omitted). They do not inquire "whether a particular belief or practice is 'central' to a prisoner's religion.'" *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). "[I]t is not for [the courts] to say that [a plaintiff's] religious beliefs are mistaken or insubstantial." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014). Instead, the Court should limit itself "to 'almost exclusively a credibility assessment' when determining sincerity." *Moussazadeh*, 703 F.3d at 792 (quoting *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)).

Here, there is no reason to question the sincerity of Plaintiffs' beliefs. Not only have Plaintiffs testified under oath that they hold these religious beliefs, they have doggedly pursued accommodations for their beliefs, first through the BOP's rigorous administrative remedy process, and then through this protracted litigation, all without wavering in their convictions.[123]

---

[123] Plaintiffs complied with all of the BOP's "deadlines and other critical procedural rules" in filing their administrative remedy requests, and appealed the denial of those requests to the BOP Central Office, thus properly exhausting their claims. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). Because applicable BOP regulations are silent on the level of detail required in these requests, *see* 28 C.F.R. § 542.14, Plaintiffs' requests merely needed to "alert[] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). There can be no dispute that Plaintiffs' requests met this threshold, as they each made clear that their religious beliefs required them to consume a halal-certified diet including halal-certified meat. *See* SMF ¶¶ 58–62.

SMF ¶¶ 5–14, 58–62.  This is more than enough to establish that Plaintiffs' beliefs represent "an honest conviction."  *Hobby Lobby*, 134 S. Ct. at 2779 (quotation omitted).

Nothing in the record creates a material dispute over the sincerity of Plaintiffs' beliefs, or the religious nature of those beliefs.  The BOP may attempt to cast doubt on the sincerity of Plaintiffs' religious convictions by noting that Plaintiffs have purchased or consumed food items that are not certified as halal in accordance with their religious beliefs.  But of course Plaintiffs have consumed haram food while in prison—*all* of the food the BOP currently makes available to Plaintiffs is haram according to their religious beliefs.  SMF ¶¶ 23, 28, 35.  That fact is the very point of this lawsuit, and does nothing to call the sincerity of Plaintiffs' religious beliefs into question.[124]

Nor can the BOP question the sincerity of Plaintiffs' beliefs by noting that their beliefs are shared only by some Muslims.  *Nelson*, 570 F.3d at 879; *see Koger*, 523 F.3d at 798 (holding that denial of vegetarian diet was a substantial burden of inmate's religious exercise regardless of fact that inmate's religion "has no general dietary restrictions").[125]  RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc–5(7)(A); *see also id.* § 2000bb-2(4).  And Congress has mandated that RFRA's definition of religious exercise be construed broadly, to the maximum extent permitted by law and the Constitution.  *Hobby Lobby*, 134 S. Ct. at 2762 (citing 42 U.S.C. § 2000cc–3).

---

[124] Furthermore, the law does not require perfect adherence from a RFRA plaintiff.  *See, e.g.*, *Moussazadeh*, 703 F.3d at 791 ("A finding of sincerity does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time."); *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance . . . ."); *Caruso v. Zenon*, No. 95-mk-1578, 2005 WL 5957978, at *11 (D. Colo. July 25, 2005) (purchasing haram foods in the prison "canteen" demonstrated "carelessness at best, and spiritual weakness at worst, but [it did] not suggest that [plaintiff's] intent to adhere to Islamic law or a *halal* diet is somehow insincere").

[125] The BOP's own chaplaincy services coordinator acknowledged that Plaintiffs "have a differing view [of what is halal] also supported within Islamic thought, and RFRA affords inmates to dramatically differ from a majority position held within a religious group."  SMF ¶ 42.  By the BOP's own admission, what other Muslims believe is irrelevant to the RFRA inquiry.

Accordingly, all that matters is that Plaintiffs personally view their dietary requirements as religious commandments—a fact that cannot be disputed on the record before the Court.

> ### B.     <u>Denying Inmates Food that Accords with Their Religious Beliefs Places a Substantial Burden on Their Religious Exercise.</u>

The law is clear that refusing to provide inmates with meals that conform to the dictates of their faith imposes a "substantial burden" on their religious exercise. In *Koger*, the Seventh Circuit held that the substantial burden on an inmate's religious beliefs was "manifest" when the prison failed to provide him with a non-meat diet in accordance with his professed beliefs. 523 F.3d at 798. In *Nelson*, the court held that "denial of a non-meat diet on Fridays and during Lent substantially burdened [the inmate's] practice of religion." 570 F.3d at 880. Indeed, the federal government itself has successfully argued that Florida's refusal to provide Jewish inmates with kosher meals imposes a substantial burden on their religious beliefs. Florida did not even contest the point. *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1346 (11th Cir. 2016) (affirming summary judgment and permanent injunction against Florida on RLUIPA claim); *see also United States v. Sec'y, Fla. Dep't of Corr.*, No. 12-22958-CIV, 2015 WL 1977795 (S.D. Fla. Apr. 30, 2015) (granting summary judgment on RLUIPA claim).

District courts around the country have specifically concluded that the refusal to provide halal meals that accord with an inmate's sincere religious beliefs imposes a substantial burden upon the inmate's exercise of religion. *See, e.g.*, *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411 (D. Mass. 2008) (holding that "refusal to provide a daily Halal menu to Muslim inmates substantially burdens plaintiffs' exercise of their religious beliefs by creating pressure on plaintiffs to consume meals that do not conform with their understanding of the requirements of Islamic law"), *aff'd sub nom. Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009); *Caruso*, 2005 WL 5957978, at *12 (holding plaintiff's "ability to engage in the religious exercise of consuming

*halal* red meat is substantially burdened by [the prison's] food service policies" which did not provide halal meals with meat on a regular basis).

C.     <u>The BOP Does Not Provide Plaintiffs with Food that Comports with Their Faith.</u>

It is indisputable that the BOP fails to accommodate Plaintiffs' religious dietary needs. Currently, the BOP offers three primary diets to its inmates: the mainline diet, the no-flesh diet, and the certified religious diet. The BOP has admitted that none of these options satisfies Plaintiffs' religious beliefs. SMF ¶ 26, 30, 31, 38.

*First*, the mainline diet does not comport with Plaintiffs' religion because it—like each of the available diet options—does not include any food that is certified halal in accordance with Plaintiffs' religious beliefs. SMF ¶ 23. Moreover, it is composed of items that are obviously haram, like pork, and the preparation and delivery process creates a risk of cross-contamination. SMF ¶¶ 22, 24, 25. Experts proffered by both the Plaintiffs and the BOP confirmed that it is impossible to determine whether a food item is Kosher or halal absent an independent religious certification. SMF ¶¶ 16–17. And the BOP's own staff has acknowledged that cross-contamination issues are a frequent problem with the mainline diet. SMF ¶¶ 24. Several of the Plaintiffs have personally witnessed these problems. SMF ¶¶ 25. Any assertion that cross-contamination is not a serious issue is undercut by the BOP's policy of requiring Kosher-certified meals to be sealed and prepared in a separate area to avoid cross-contamination with food on the mainline diet. SMF ¶ 34.

*Second*, the BOP's no-flesh diet does not meet the requirements of Plaintiffs' faith, for many of the same reasons. Because the no-flesh menu is merely a self-selection of foods from the mainline, it is also not certified as halal and shares the mainline's risk of cross-contamination. SMF ¶¶ 27–30. These problems notwithstanding, the no-flesh diet contains no

27

meat, and therefore would not satisfy Plaintiffs' sincerely-held religious belief that they must eat meat. SMF ¶ 31. Once again, the undisputed record establishes that this option cannot satisfy Plaintiffs' religious needs.

**Third**, the existing certified religious diet does not meet Plaintiffs' religious needs, as it only provides Kosher-certified meals; it does not include meals that are certified halal in accordance with Plaintiffs' beliefs. SMF ¶¶ 32, 35. As discussed in more detail above, there are many differences between the requirements for food to be certified Kosher and the requirements of Plaintiffs' religious beliefs, including the exclusion of alcohol, differences in slaughtering practices, and the use of animal-based additives like gelatin. SMF ¶¶ 36–37. For these reasons, it is unsurprising that the BOP's own witnesses conceded that the Kosher-certified meals offered by the BOP do not accommodate Plaintiffs' religious beliefs. SMF ¶ 38.

Accordingly, it is beyond dispute that the current meal options provided by the BOP place a substantial burden on Plaintiffs' ability to exercise their religion. Every day, Plaintiffs are forced to violate their religious beliefs in order to survive, which is precisely what RFRA prohibits unless the government can satisfy the demands of strict scrutiny. In a nearly identical case, the Tenth Circuit concluded that a prison's "failure to provide a halal diet either prevents [the plaintiff's] religious exercise, or, at the least, places substantial pressure on [the plaintiff] not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316–17 (10th Cir. 2010); *see also id.* at 1325 (Gorsuch, J., concurring) ("[H]e has been forced to choose between violating his religious beliefs and starving to death. Whatever else might be said about RLUIPA, redressing this sort of Hobson's choice surely lies at its heart.").

## II.     Burdening Plaintiffs' Religious Exercise Is Not the Least Restrictive Means of Furthering a Compelling Government Interest.

Because Plaintiffs have made their prima facie case, the burden shifts to the BOP to justify the burdens it imposes on Plaintiffs under strict scrutiny. *Korte*, 735 F.3d at 673. Strict scrutiny is the "most demanding constitutional test" that exists. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2238 (2015). Courts must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to [the] particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). "Saving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow the prison system's rules. The Act requires prisons to change their rules to accommodate religious practices . . . ." *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015). Merely showing that a compelling government interest stands to be affected will not suffice: If any "less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015).

The BOP cannot meet its burden of demonstrating that the hardship it imposes on Plaintiffs' exercise of religion is the least restrictive means of furthering a compelling government interest. The undisputed record establishes that the BOP has not identified a single compelling government interest advanced by denying Plaintiffs meals that accord with their faith. Even if the BOP's actions furthered some compelling interest, there are less restrictive alternatives available to the BOP that would not substantially burden Plaintiffs' exercise of religion.

A. The BOP Fails to Identify Any Compelling Interest that Would Be Affected by Providing Meals that Meet Plaintiffs' Religious Needs.

The BOP has not identified—and cannot identify—any compelling interest furthered by failing to accommodate Plaintiffs' religious dietary needs. The BOP asserts that its refusal to provide Plaintiffs with appropriately halal-certified meals is necessary to further governmental interests in administering a food service operation that (1) "is palatable and which comports with applicable dietary and nutrition standards"; (2) "is simple and cost effective, and which also meets the religious dietary needs of the broadest number of religious dietary laws, within its budgetary constraints"; (3) "comports with applicable federal procurement statutes, regulations and BOP policies"; and (4) "ensures the safe, orderly and secure operations of prison facilities and does not create security concerns or increased risks within the prison environment"[126]—but the evidence in the record does not support these assertions.

*First*, the BOP cannot plausibly claim that denying Plaintiffs meals that align with their religious beliefs is the only method of ensuring inmates obtain adequate nutrition. Of the six potential halal vendors that the BOP has identified that could potentially satisfy Plaintiffs' religious needs, none has been eliminated due to concerns about nutrition or palatability. SMF ¶ 47. The BOP has already conducted a full nutritional analysis of an entire menu based on meals distributed by National Food Group, and deemed the menu acceptable. SMF ¶ 55.

*Second*, no compelling interest in cost can justify the BOP's actions. As many courts have acknowledged, the added expense that may be incurred by accommodating Plaintiffs' religious beliefs, standing alone, is not a compelling government interest. *See Schlemm*, 784 F.3d at 365; *see also Willis v. Comm'r, Ind. Dep't. of Corr.*, 753 F. Supp. 2d 768, 778 (S.D. Ind.

---

[126] *See* Def.'s Statement of Defenses, Dkt. 206; Ex. 73, Def.'s 7th Supp. Resp. to Pls.' 1st Set of Interrogs. (Nov. 3, 2017), at 2–4.

2010) ("Because the statute expressly anticipates increased costs, the fact that such diets may be more costly than non-religious diets is not alone a compelling governmental interest under the statute."). RFRA "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 134 S. Ct. at 2781.

Here again, the record is devoid of any evidence that cost concerns would justify denying Plaintiffs' meals that satisfy the mandates of their religious beliefs. A BOP witness testified that cost has not been a consideration when evaluating Plaintiffs' requests. SMF ¶ 56. Furthermore, the BOP's annual food service budget in 2015 was $412 million and the BOP's previous purchases of halal-certified food indicate that the cost of purchasing such meals was only $2.67 to $5.60 per meal. SMF ¶ 57. It is difficult to imagine how providing four inmates with meals that conform to their religious beliefs would have any appreciable impact on the BOP's overall budget. *See, e.g.*, *Beerheide v. Suthers*, 286 F.3d 1179, 1191 (10th Cir. 2002) (avoiding an expenditure of $13,000 out of a budget of over $8 million did not constitute a compelling government interest); *Moussazadeh*, 703 F.3d at 795 (similar). Even if accommodating Plaintiffs' religious needs is ultimately more expensive, the BOP cannot demonstrate that it is unable to afford the additional expense.

***Third***, the BOP cannot show that procurement regulations prevent it from providing Plaintiffs with suitable meals. Several BOP witnesses testified that the BOP could immediately purchase meals for Plaintiffs using, for example, the micro-purchase process, and that there would be no need to engage in a competitive bidding procedure for such purchases. SMF ¶¶ 49.c, 51. The BOP already uses the micro-purchase process and the SAP to purchase religious food for other groups, like the special CRC-certified Kosher meals procured for Orthodox Jewish inmates. SMF ¶¶ 42, 50.a. Indeed, the BOP previously used the micro-

purchase process to purchase prepackaged meals specifically for Plaintiffs that were certified halal, albeit not in accordance with Plaintiffs' beliefs.  SMF ¶ 50.c.

*Fourth*, the BOP cannot explain how providing Plaintiffs with individual halal meals that accord with their beliefs could adversely impact prison security given that it provides individual Kosher meals and specific medically-necessary meals to inmates who require them.  The BOP has expressed fears that providing different food to a small set of inmates could cause jealousy or a power imbalance among inmates, giving rise to a security risk.[127]  But the record shows that this fear is purely hypothetical.  Despite frequently providing specialty meals to small subsets of inmates, the BOP cannot identify a single instance where the special meals caused a security concern.  SMF ¶ 44.

The law is clear that the BOP's "stated security concern[s] must be grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations."  *West v. Grams*, 607 F. App'x 561, 567 (7th Cir. 2015) (quoting S. Rep. No. 103-111, at 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900); *see also Holt*, 135 S. Ct. at 864 ("RLUIPA . . . does not permit . . . unquestioning deference" to prison officials); *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) ("[T]he deference this court must extend to the experience and expertise of prison administrators does not extend so far that prison officials may declare a compelling governmental interest by fiat.").

Moreover, the fact that the BOP provides different meals to small subsets of inmates for medical or religious reasons, SMF ¶¶ 39–41, demonstrates that the BOP can overcome any purported security or operational concerns here.  *See Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013) (holding that where prison already accommodates many other diets,

---

[127] *See* Ex. 7, Hinkle Tr. at 80:2–83:13.

adding another would not be likely to cause security problems). "The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (rejecting as a "trivial concern" the argument that it was administratively inconvenient to provide a pork-free diet to eleven Muslim inmates); *see also Gonzales*, 546 U.S. at 433 ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (quotations omitted).

Any doubt over the viability of the BOP's defense is eliminated by the fact that the BOP has already purchased halal-certified food for the four Plaintiffs in this case without identifying any insurmountable security concerns. SMF ¶¶ 52–56. Although those meals were not certified as meeting the halal standards that Plaintiffs' beliefs require, SMF ¶ 54, there is no reason why purchasing similar meals from a different halal vendor would implicate any greater security concern. The BOP's past practices—especially its past plans to provide the "specific exemption[]" sought by Plaintiffs in this case to Plaintiffs themselves—undermines any claim that security risks pose a barrier to accommodating Plaintiffs' beliefs. *Gonzales*, 546 U.S. at 431; *see also Hobby Lobby*, 134 S. Ct. at 2782 ("HHS itself has demonstrated that it has at its disposal an approach that is less restrictive . . . HHS has already established an accommodation for nonprofit organizations with religious objections.").

In short, not one of the barriers that the BOP has indicated may prevent it from accommodating Plaintiffs' beliefs—nutrition, cost, security, and governing regulations—is

supported by the record evidence.  Instead, the record demonstrates that the BOP is capable of purchasing halal-certified meals that comply with the demands of Plaintiffs' faith.

### B. Multiple Vendors Provide Meals that Meet Plaintiffs' Religious Dietary Requirements, and the BOP Is Able to Order from Them.

The BOP has previously claimed that no vendors produced meals that satisfied the Plaintiffs' beliefs and the BOP's food service requirements.[128]  But the record is clear that the BOP could accommodate Plaintiffs' religious exercise by purchasing prepackaged meals that are certified halal in accordance with Plaintiffs' religious beliefs.  SMF ¶¶ 45, 47.  Indeed, the BOP has previously described this type of accommodation as "the best" way to satisfy Plaintiffs' needs and its own requirements.  SMF ¶ 45.  As of the filing of this motion, the record evidence indicates that the BOP has identified at least one vendor, Midamar, that it has determined is able to provide meals that satisfy Plaintiffs' religious needs and conform to the BOP's food service requirements.  SMF ¶ 47.a.

The record further establishes that there are five other interested vendors that may be able to satisfy Plaintiffs' needs and the BOP's requirements, none of which the BOP has been able to rule out as potentially viable: SOPAKCO, Labriute, Taaza Fresh, Sisters One, and National Food Group.  SMF ¶ 47.b–47.f.  Moreover, each of these vendors has been in contact with the BOP and has expressed a willingness to accommodate the BOP's requirements.  SMF ¶ 47.

To be clear, Plaintiffs do not contend—and have never contended—that these are the only certifiers or halal vendors could satisfy their religious needs.  Rather, Plaintiffs have stated explicitly that any vendor that complies with their religious requirements and is certified as doing so by an independent bona fide halal certifier could accommodate their religious beliefs.  SMF ¶ 18.  And the BOP has conceded that nothing in the applicable procurement regulations prevents

---

[128] *See, e.g.*, Ex. 64 at 10–11.

it from using one or more of the vendors identified above to procure meals for Plaintiffs that accord with their religious beliefs. SMF ¶ 51. The BOP even concedes that it could do so immediately using the micro-purchase process while it continues to explore options for a larger, competitive acquisition. SMF ¶ 51, 52.

Any contention that there are insurmountable barriers to accommodating Plaintiffs' religious beliefs—due to a lack of available vendors, security concerns, or any other issue—is refuted by the record evidence.

## CONCLUSION

For the reasons set forth herein, this Court should enter summary judgment in favor of Plaintiffs and order the BOP to provide Plaintiffs with meals that accommodate their religious beliefs as required by RFRA.


Respectfully submitted this 9th day of November 2017.

By: */s/ David J. Leviss*
David J. Leviss
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: dleviss@omm.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, a true and correct copy of the foregoing

Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment was filed

electronically.  Service of this filing will be made on all ECF-registered counsel by operation of

the Court's electronic filing system.

I further certify that a copy of the foregoing Plaintiffs' Memorandum of Law in Support

of Their Motion for Summary Judgment was served by email on the below counsel:

Shelese Woods
United States Attorney's Office
Southern District of Indiana
10 W. Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
E-mail: shelese.woods@usdoj.gov

*/s/ David J. Leviss*
David J. Leviss
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: dleviss@omm.com