# EXHIBIT 16

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
2                 TERRE HAUTE DIVISION
3    ------------------------:
     BRIAN CARR, et al.,        :
4                               :
               Plaintiffs,      :
5                               :
          vs.                   : Cause No.
6                               : 2:14-cv-00001-WTL-MJD
     THOMAS R. KANE, ACTING     :
7    DIRECTOR, FEDERAL BUREAU   :
     OF PRISONS,                :
8                               :
               Defendant.       :
9    ------------------------:
10
11            DEPOSITION OF ERIC LAWTON
12
     DATE:            Friday, November 3, 2017
13
     TIME:            9:06 a.m.
14
     LOCATION:        O'Melveny & Myers LLP
15                    1625 Eye Street, Northwest
                      Washington, D.C. 20006
16
17
     REPORTED BY:     Erick M. Thacker, RPR
18                    Reporter, Notary
19
20
21            Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
22              Washington, D.C. 20005

1        A      I mean --

2        Q      -- but you-all have not --

3        A      -- you saying are they choosing to use

4    it because they're discouraged that they don't

5    think they'll be successful is -- is not an -- if

6    you -- if you have a sincere held belief that

7    this is what I need to do to exercise my

8    religion, you don't go, aw-shucks, I'm not going

9    to try, though, because it's not going to get

10   approved.  You have sincere held belief, and you

11   are going to pursue that avenue to see if it gets

12   approved.

13       Q      Even if --

14       A      And we've seen it.  We're here now

15   discussing it because it's been -- it's been

16   used.

17       Q      Of course.  Of course.  But our

18   plaintiffs -- we're now in court because the BOP

19   at every level denied our plaintiffs' requests,

20   stating that the current diet meets their needs.

21            So do you not think it's possible that

22   other inmates may not see that denial and think,

1    well, it's pointless for me to try?  You know,

2    we've -- we've seen them.  They're actually

3    litigating this case now because the BOP denied

4    it.  Is it not possible that other inmates may be

5    discouraged by that fact even if they sincerely

6    believe this?

7         A    It is possible.

8         Q    Okay.  Thank you.  Now, let's see here.

9    Do you have any experience -- kind of turning to

10   a different subject matter now, though -- with

11   the CRC-based alternative religious diet?

12        A    Define "experience."

13             MS. WOODS:  I'll -- I'll object to the

14   form of the question.  However, you may answer

15   the question, Mr. Lawton.

16   BY MR. MCDERMOTT:

17        Q    Well, let me -- let me rephrase.

18             What is your experience with the

19   CRC-based religious diet?

20        A    I am aware that there is a level of

21   kosher certification that is called CRC and that

22   we have inmates that have voiced an interest in

1  receiving only that level of certification and
2  said that the other levels don't meet their need.
3     Q    Okay.
4     A    And we have inmates and institutions
5  that offer that level of kosher certification.
6     Q    Do you know how many institutions
7  currently?
8     A    Not specifically.  I can say that I
9  know of at least four.  I know that there are
10 more than that, but I couldn't give you an exact
11 number.
12    Q    Okay.  Do you know if at any of those
13 institutions whether they serve both the normal
14 religious diet menu and CRC foods, or at each of
15 those institutions, have they transitioned to a
16 full CRC menu for all --
17    A    To the best of my knowledge, when they
18 solicit bids, they choose only one, and they
19 specify that they want CRC.
20    Q    Okay.  And do you have any idea how
21 many Jewish inmates were requesting CRC foods
22 before the decision was made to transition some

1    institutions to a CRC-based diet?

2         A    I do not.

3         Q    Do you have any idea whether or not it

4    was more than a dozen?

5         A    I -- I -- I do not have specifics.

6    That was done prior to me being here.

7         Q    Okay.  Other than what we've already

8    discussed, do you have any other substantive

9    knowledge regarding the religious diet program or

10   substantive responsibilities regarding that

11   program?

12        A    Can you be specific?  I don't know

13   what --

14        Q    Well, let's put it this way:  Can you

15   give me an overview of any other responsibilities

16   that you have regarding the religious diet

17   program other than what we've covered?

18        A    I respond to the rabbis when they voice

19   their concerns about the product, the product

20   line, certain vendors, specifications.  I guess

21   that would cover it.

22        Q    When it comes to creating the menu, do

1          A     To the best of my knowledge, our

2     pursuit has been in the main -- having the bread

3     certified doesn't change the -- the ultimate

4     problem.  You could say that the bread is and,

5     okay, so now we have the bread problem handled,

6     but we haven't solved the problem because we need

7     to address the center of the plate item, the

8     entree, the meal.

9               Beyond that, all those other things are

10    fringe items that we can address, but until you

11    conquer the first one --

12         Q     So you think those fringe items would

13    be pretty easy for you-all to conquer once -- if

14    you -- if you were able to get the center piece

15    handled?

16         A     I believe easier, yes.

17         Q     Okay.  Can you think of any reason why

18    you could not have a halal certifier come in and

19    determine whether or not the current items that

20    you have on the menu --

21         A     Well, I think it's an open question in

22    that we don't know which halal.  So until --

1    until we understand which halal certification is

2    acceptable to the plaintiffs, we don't -- we

3    can't pursue the possibility of who do we get to

4    come in to certify this and -- and are there

5    obstacles involved in that.  We don't know.

6         Q    Well, now, when you say until we

7    understand the halal certification acceptable to

8    plaintiffs, you -- you do -- you are aware of

9    plaintiffs' beliefs, correct?

10        A    Correct.

11        Q    And so what more would you need to know

12   what certification standard is acceptable to

13   them?

14        A    From my understanding, we -- we thought

15   we understood what they wanted, and we purchased

16   and provided meals that we felt met their needs.

17        Q    The J&M meals?

18        A    The J&M meals.  And then were told, no,

19   that does not, although it is halal certified.

20   So now what is acceptable halal certification?

21   Is it IFANCA?  Is it ISWA?  Is it --

22        Q    Well, so -- and throughout this

1    litigation, plaintiffs have -- and I believe in

2    their interrogatory responses and other

3    documents, they've laid out their beliefs, you

4    know, and we can review them quickly.  You know,

5    it's that the meat must be slaughtered by a sane

6    adult Muslim male.  The cut has to be horizontal

7    across the neck.

8            So have you made any attempts to

9    determine whether or not specific certifiers meet

10   those standards?

11       A    Have I made attempts to -- we have

12   received documentation from two of the halal

13   certifiers explaining their process.  Have we

14   sought out others?  No.

15       Q    And why not?

16       A    I guess that's not completely accurate.

17   We have sought out vendors.

18       Q    Right.

19       A    So if the vendors have acceptable

20   certifications and we write those requirements in

21   the statement of work for the product that we're

22   pursuing, so I'd say -- I would say, yeah, okay.

1          Q    Well, you say if the vendors have
2     acceptable certifications, but you just said that
3     you don't know what the acceptable certifications
4     are.  So have you done any research independently
5     to determine what acceptable certifications are
6     out there, what certifications meet the standards
7     that plaintiffs have laid out?
8          A    I have not done individual research.
9          Q    Is there any reason why you-all have
10    not done individual research like that?
11              MS. WOODS:  I'll object to the form of
12    the question.  The witness testified that he
13    personally has not conducted independent
14    research.
15    BY MR. MCDERMOTT
16         Q    Is there a reason that you personally
17    have not conducted independent research?
18         A    Is there a reason that I haven't
19    personally done it?  I'm not sure -- I'm not sure
20    how to answer the question, in that we are -- we
21    are researching what's available, but are we
22    researching halal certifications?  No.  Is there

1    a reason that I'm not researching halal

2    certifications?  The reason would be, if it's not

3    available for a vendor, it doesn't matter if it

4    exists.

5              You could say -- you could say Halal

6    World is what we accept, but if there isn't a

7    vendor that has that product, it's irrelevant to

8    me.  So instead of preselecting a vendor or

9    preselecting a certifier, we put the

10   specifications of what the plaintiffs require in

11   the statement of work, and if you meet that, then

12   okay.  Whatever the name of it is is not

13   relevant.

14        Q    Of course.  Right.  But when it comes

15   to like the Midamar -- I'm sorry -- not the

16   Midamar -- the J&M purchase that the BOP made --

17        A    Correct.

18        Q    -- in an attempt to satisfy plaintiffs'

19   beliefs --

20        A    Correct.

21        Q    -- as I understand it, the BOP actually

22   purchased the food, and they intended to serve it

1   to just our four plaintiffs at that time,

2   correct?

3        A    I -- that's the way I understand it as

4   well.

5        Q    Okay.  And so they intended to serve it

6   to our four plaintiffs, but then the plaintiffs

7   rejected that because the certification standards

8   did not meet their needs?

9        A    As I understand it, that is correct,

10  but I also understand that at the time that those

11  meals were purchased and offered that the

12  plaintiffs' needs were not defined to exclude

13  those meals or IFANCA.

14       Q    Perhaps even assuming that was true, do

15  you not think that if you had performed some

16  outside research to determine whether or not

17  IFANCA met the specific requirements that

18  plaintiffs have laid out that perhaps this could

19  have been avoided?

20       A    I would be speculating.  That I don't

21  know.

22       Q    Are you aware of anyone else in the BOP

1    that has investigated whether or not potential

2    certifiers meet plaintiffs' stated religious

3    beliefs?

4        A    Do I know for a fact?  No.

5        Q    But you are not aware of anyone else

6    having conducted that sort of research?

7        A    I don't definitively know that they

8    did.  That's correct.

9        Q    Right.  Yes.  You are not aware

10   currently?

11       A    Correct.

12       Q    Okay.  Now -- okay.  As it pertains --

13   coming back to --

14       A    Let me say, on that last question, I --

15   I am aware that the chaplain reached out to our

16   Bureau imams to get input on what is acceptable

17   halal meals, so what is the definition for halal

18   certification and to provide feedback on our

19   specifications.

20       Q    Okay.  But she did not inquire as to

21   whether or not they had any experience with

22   specific halal certifiers?

1   wrap at the institution?

2        A    What you're suggesting is feasible, but

3   contrary to policy.  That's --

4        Q    Contrary to the policy that states that

5   it just has to be doubled wrapped?

6        A    That it has to be double wrapped and --

7   and that they have to be protected from -- from

8   cross-contact.

9        Q    But --

10       A    There are -- there are -- there are

11  items that the policy allowed for changing the

12  package.  For example, V8 Juice on the menu, the

13  aluminum can be a security issue, so those

14  institutions, that product has to be removed from

15  the aluminum can, put into a single-serve

16  disposable cup, sealed and delivered.

17            And so, worst-case scenario, if you had

18  to figure out how to do something, you know, you

19  could put the single-wrapped item inside a

20  clamshell container and microwave it that way so

21  that the contents is in there, but that would be,

22  you know, one, a situation that I don't think has

1    ever happened and, B, contrary to what we do.

2         Q    Okay.  And you've just -- you've never

3    had to look for a solution to this problem, it

4    sounds like, correct?

5         A    Correct.

6         Q    So -- okay.  And so you're not aware

7    of -- there may be an easier manner of protecting

8    against this that you're not aware of and that

9    I'm not aware of right now because neither of

10   us -- neither of us have ever had to look into

11   this issue, correct?

12        A    Correct.  We haven't had to look into

13   it, but we've solved the problem by putting it in

14   the spec that it's double wrapped.

15        Q    Okay.

16        A    So we've -- we've -- we've had the

17   problem, and we addressed -- addressed the

18   problem by saying, hey, double wrap the entrees.

19        Q    Okay.

20        A    That was the solution.

21        Q    Now, let's see here.  Now, what has

22   your level of contact been with the Washington

1    Department of Corrections, CI industry --

2    Correctional Industries out in Washington State

3    that produce --

4         A    No contact with them, but with their

5    vendor that distributes their thing from National

6    Food Group, Tracey Komata.

7         Q    Okay.  And what has your communication

8    with Tracey been regarding their products?

9         A    Just e-mails, and it's been to find out

10   whether there's been a resolution to their water

11   problem and their distribution problem.

12        Q    Okay.  And what are -- what is your

13   understanding of their distribution problem?

14        A    The distribution problem is that the

15   Federal Bureau of Prisons has some legal concern

16   with purchasing stuff that's made with inmate

17   labor.

18        Q    Are you aware of whether or not a

19   resolution has been reached?

20        A    To the best of my knowledge, no, but

21   purchasing isn't my -- you know, isn't my -- my

22   forte.

1          Q     When was your last contact with them

2     regarding that issue?

3          A     I would say about a month ago.

4          Q     A month ago.  Okay.  Let's see here.

5          A     The water problem was -- was resolved,

6     but I hadn't heard from legal or the business

7     office if the distribution problem had been

8     resolved or addressed or a work-around or if it's

9     been just absolutely, nope, can't do it.  As far

10    as I know, that's still up in the air.

11         Q     Okay.  But your last time you reached

12    out regarding that issue was about a month ago?

13         A     Correct.

14         Q     Okay.  And so you're not aware of --

15    you're not currently aware whether anything has

16    since changed?

17         A     That's correct.

18         Q     Besides the distribution issue, are you

19    aware of anything that would prevent the BOP from

20    ordering this food and serving it to plaintiffs?

21         A     It's not double wrapped currently, so

22    we would have to address that problem.  We've

1    asked them what the possibility is of having it

2    double wrapped, but the product itself is -- is

3    high quality, and I don't see -- same as -- same

4    as the other vendors.  No, I don't see a problem

5    from -- from a food service standpoint.

6         Q    Now, before the water issue arose back

7    this past spring --

8         A    Correct.

9         Q    -- if I'm not mistaken, the BOP had

10   intended to offer these meals and actually did

11   offer them to plaintiffs.

12             Do you know -- were any meals ever

13   actually purchased?

14        A    I do not believe any were.

15        Q    Okay.

16        A    They sent us samples and we -- we

17   photographed, tasted, looked at the samples, but

18   as far as at the institutional level being

19   purchased for inmates, none that I'm aware of.

20        Q    Okay.  So how did you-all plan to

21   address the single wrapped issue when you --

22        A    We --

1     Q     -- offered them to plaintiffs?

2     A     We had e-mailed Tracey to find out if

3     we can get them double wrapped.  The issue beyond

4     that, I'm not aware of.

5     Q     Okay.  But you intended to handle that

6     issue when it came about since you were actually

7     making an offer to plaintiffs?

8     A     Correct.

9     Q     Okay.  And have you had any phone

10    conversations with Tracey regarding these?

11    A     Not personally, no.

12    Q     Okay.  Just e-mails?

13    A     Correct.

14    Q     And I know Ms. Stiltner had actually

15    been out to Washington to see their facilities.

16          Have you done anything like that?

17    A     No, sir.

18    Q     Okay.  Can you talk to me a bit about

19    your contact with J&M or with NFG regarding J&M?

20    A     J&M -- I believe the meals that were

21    purchased and the -- I was not involved in that

22    at all.  And we received e-mails from them, and

1    we received some guidelines on halal foods.  They

2    have more than one product line, but the -- the

3    issue from -- kind of from -- for us is that that

4    product is, one, shelf stable, two, a different

5    weight, so -- so as -- that as a long-term

6    alternative is -- is not ideal.

7         Q    Okay.  I'm just going to pull out a

8    document here.  This is Tab 98.

9              MS. RICHARDS:  This is Debra Richards.

10   So if you'll just e-mail that to Shelese, and

11   I'll let you know when I've received it and been

12   able to review it.

13             MS. OBEN:  Do you want to take a break

14   now?

15             MR. MCDERMOTT:  We can actually --

16   yeah.  We can take a break now before we get into

17   this, and we'll -- we can start up after the

18   break with this document.

19             (Brief recess.)

20   BY MR. MCDERMOTT

21        Q    All right.  So back to halal meals and

22   food services.  So, before we left, we were

1    talking a bit about CI industries.

2             One thing I just wanted to follow up

3    on:  You noted that there were concerns related

4    to the distribution and purchasing of meals from

5    CI industries through NFG?

6        A    Correct.

7        Q    Do you know what those concerns were

8    more specifically?

9        A    To the best of my knowledge, there is

10   some rule regarding the Federal Bureau of Prisons

11   purchasing items that were produced by inmate

12   labor.

13       Q    Okay.  And do you know whether the BOP

14   is undertaking any steps to try to resolve that

15   issue?

16       A    From what I understand, they are

17   investigating or researching whether the fact

18   that we are buying it through National Food

19   Group, not straight from Washington, has an

20   impact in it --

21       Q    Okay.

22       A    -- and whether or not it can be done.

1     Q    Okay.  So it's your understanding that
2    it's up in the air right now?
3     A    That is my understanding.
4     Q    Okay.  Okay.  And so we were also just
5    about to move on to J&M Foods.  And you had
6    stated that they were not an ideal candidate for
7    a couple of reasons.  Their meals were off weight
8    and they were shelf stable, not frozen.
9          And now, recently, though, have you
10   been participating in any communications with
11   them or regarding them?
12    A    I want to say I recollect them saying
13   they have a new product line, and I have seen
14   photos and products that are frozen meals --
15    Q    Okay.
16    A    -- but it's under -- it's under -- it's
17   under a different label.
18    Q    My Own Meals, perhaps?
19    A    Correct.
20          MR. MCDERMOTT:  Okay.  Now, I wanted to
21   just show you an e-mail here, if we can mark this
22   as Exhibit 2.  And this is Tab 98 that we were

1    looking at before we left briefly.  Just on the
2    very front --
3                  (Plaintiffs' Exhibit Number 2
4                  was marked for identification.)
5            MS. RICHARDS:  Oh, I'm sorry.  I was
6    just going to say, I did get a look at that.
7            Is -- is there two different strings
8    in -- contained in -- in the exhibit?
9            MR. MCDERMOTT:  This is the document as
10   it has been produced to us by the BOP.  I am
11   unaware as to whether or not there are two
12   strings, but we are only going to be focusing on
13   this very first page, BOP043461.
14           MS. RICHARDS:  Okay.  Well, then I
15   would just object to that as to -- any questions
16   about the exhibit as to where the witness didn't
17   draft or receive these e-mails.
18   BY MR. MCDERMOTT
19      Q    Okay.  So, Mr. Lawton, the one thing I
20   just wanted to ask you about this is, you'll see
21   here on Wednesday, June 14th, 2017, about two
22   thirds of the way down the first page, where

1          Q    Do you know why that is?

2          A    Yes, I do.  The inmates use the inmate

3    -- use the aluminum in electrical outlets to brew

4    things in their -- in their cells.

5          Q    Okay.  Have you reached out to SOPAKCO

6    regarding whether or not they can provide meals

7    that do not contain aluminum?

8          A    Personally, no.

9          Q    Are you aware of whether or not they

10   can provide meals that do not contain aluminum?

11         A    My understanding is that they can, but

12   we haven't received or seen any samples.  I

13   believe their last thing was that they would work

14   with us to meet our spec.

15         Q    And how long ago was that?

16         A    I couldn't give you a date

17   specifically.

18         Q    Just an approximation.  A month ago,

19   two months ago, three?

20         A    A month ago, maybe.

21         Q    Okay.

22         A    I would say about the time that

1    Chaplain Kugler got the return phone call --

2         Q    Okay.

3         A    -- then -- yeah, I would say it's about

4    that time.

5         Q    Okay.  And what has the BOP done since

6    then to continue to work with SOPAKCO or to

7    determine whether or not they can indeed meet

8    those specifications?

9         A    What the Bureau has done in the interim

10   is develop a set of specifications to distribute

11   to potential vendors to see if they can meet

12   those specs and provide meals.

13        Q    So, as it currently stands, every

14   indication that you have received is that SOPAKCO

15   would be willing to meet the specifications

16   provided by the BOP?

17        A    Not every specification, but willing to

18   modify what's currently available to come closer

19   or provide something that doesn't have the

20   heating element.

21        Q    So what specifications are they not

22   willing to meet?

1    A    I don't know.  They haven't

2  responded -- we haven't issued them anything.  We

3  haven't gotten a response back.  So we don't have

4  a, yes, we can meet every part of this.

5    Q    But they -- they've indicated that they

6  are willing to work with you to --

7    A    To modify what they currently have,

8  yes.

9    Q    Okay.  To meet the specifications that

10  you-all put out?

11    A    They've -- they have indicated that

12  they're willing to modify what they have.  They

13  can't say they're willing to meet the

14  specifications that we're going to put out

15  because they haven't seen them yet.

16    Q    Okay.  But they're willing to work with

17  you?

18    A    Correct.

19    Q    Okay.  So, as it stands, there is -- as

20  it stands, you do not have a definitive view that

21  they are not a potential vendor that could supply

22  meals?

1      A    That is a correct statement.

2      Q    Okay.  All right.  Let's look at

3  Sisters One.  It's another vendor that I believe

4  you've had contact with.

5      A    Correct.

6      Q    Can you just again describe the extent

7  and kind of communications that you've had?

8      A    E-mail.  And the e-mail indicated that

9  they are a contractor, not a producer, and they

10  actually provide meals that are produced by some

11  of the other people that are on the list.  They

12  carry meals from -- from the other vendors.

13      Q    Okay.

14      A    They're not a producer.  They basically

15  subcontract out the meals through the other

16  vendors.

17      Q    And have they indicated to you that

18  they could contract for meals that would meet the

19  specifications as well as plaintiffs' beliefs?

20      A    I don't recall specifically them saying

21  it, other than that they said they are a

22  contractor.  And, of course, they've mentioned

1    the other vendors, so if the other vendors are

2    going to produce the meals, then I guess it

3    stands to reason.

4              MR. MCDERMOTT:  Let's see here.  One

5    moment.  We're going to look at Tab 18.  This is

6    going to be marked as Plaintiffs' 3.

7              (Plaintiffs' Exhibit Number 3

8               was marked for identification.)

9              MS. OBEN:  Thank you.

10             MS. RICHARDS:  I'll let you know as

11   soon as I get that.  I'm watching Shelese's

12   e-mail.

13             MR. MCDERMOTT:  Okay.  And, Mr. Lawton,

14   we're going to be specifically focusing on the

15   end pages of this document, which I think, again,

16   contains multiple threads.  Let's see.  This is

17   going to be starting on page BOP043279.

18             MS. RICHARDS:  I still haven't gotten

19   the e-mail yet.

20             MR. MCDERMOTT:  Sorry.  It's 43279.

21             MR. HAMMACK:  There's multiple

22   documents in here, but it's the one on Bates

1    A    Usually revert to policy.  What does

2    the -- what does policy say we do?  How does it

3    handle -- and -- and, yeah.

4    Q    And sometimes policy is tolerant of a

5    disparity?

6    A    It's -- that's -- that's a pretty broad

7    statement.  If there's a liturgical need, it's in

8    policy and we follow policy.

9    Q    So there have been times when an inmate

10   has complained alleging a disparity based on an

11   action that was consistent with policy?

12   A    Correct.

13   Q    And in that instance, nothing is

14   changed?

15   A    I can't say nothing's changed.  It's a

16   case-by-case thing.  I don't know how every one

17   of them is resolved.  I wouldn't say nothing is

18   ever changed or --

19   Q    There are at least instances in which

20   the policies continued -- has continued --

21   A    The policy didn't change?

22   Q    Right.

1    A    Correct.

2    Q    Okay.  Now, going back to Saffron Road,

3    what efforts has the BOP undertaken to determine

4    whether or not they would be willing to alter

5    their tray size or their meal size to bring it up

6    to weight?

7    A    I don't recall seeing anything from

8    Saffron Road saying that they would modify that,

9    and their response to the RFI or communication

10   would be through contracting.  I saw the response

11   regarding the J&M meals, not Saffron Road, that I

12   remember.

13   Q    Okay.  Now, you were just saying that

14   you spoke with SOPAKCO about altering their

15   packaging and working with you.

16        So you're not aware, though, of the BOP

17   reaching out to Saffron Road on the BOP's own

18   initiative to see whether or not they would be

19   willing to work with you to alter their --

20   A    I don't recall that, no.

21   Q    Okay.  So, again, as it stands with

22   Sisters One, you are not currently aware of

1    whether or not they could provide food that would

2    meet plaintiffs' beliefs and that would satisfy

3    the BOP's requirements?

4         A    Correct.

5         Q    Let's turn to Labriute or --

6         A    Labriute, yeah.

7         Q    Labriute?

8         A    I can't pronounce it either.  Yeah.

9         Q    Can you just go over any communications

10   that you've had with them?

11        A    So my communication with Abe at

12   Labriute consisted of a phone call with a

13   follow-up e-mail and a response to that e-mail.

14        Q    And when were these communications

15   roughly taking place?

16        A    A month ago, maybe.

17        Q    Okay.  As it -- or is it your

18   understanding that Labriute -- Labriute -- that

19   there is anything preventing them from providing

20   meals that would meet plaintiffs' beliefs and

21   satisfy the requirements of the Bureau of

22   Prisons?

1      A    There is not.

2      Q    Are you continuing to communicate with

3   them regarding whether or not they would be

4   interested in providing such meals?

5      A    Yes.  We are waiting for their response

6   at this time.

7      Q    Their response to what?

8      A    If you see the e-mail that's in that

9   package, Abe writes back, yes, we can comply with

10   this.  What is our next step?

11          We sent them a copy of our proposed

12   specs for the RFI and asked about cost and

13   availability and timeline, and we are awaiting

14   his response.

15      Q    And when did you send that?

16      A    A month ago, maybe, if that, maybe not

17   quite that long.  It's --

18      Q    And --

19      A    It's in this packet.  I saw it.  Oh,

20   here we go.  September 28th.

21      Q    Let's see.  What -- what page are you

22   looking at there?

1      A    43271.  So that communication, it was

2   probably a week or two after that before we sent

3   the follow-up specs and request for information.

4      Q    Sorry.  I'm not sure I'm following

5   completely.  So the September 28th e-mail on page

6   43271 is an e-mail from Abe to you saying that,

7   yes, they can comply with all the requirements?

8      A    Correct.

9      Q    And asking what their next steps would

10  be?

11     A    Correct.

12     Q    And so have you communicated with them

13  since this?

14     A    We had follow-up questions, and we're

15  waiting for their response.

16     Q    So the -- the last e-mail, though, is

17  this top one from Abe.  The ones further below

18  are from you at an earlier time.  Abe responds to

19  you, saying, yes, we can meet --

20     A    No, there's been an e-mail since then.

21  It's not in this packet, but --

22     Q    Okay.  There has been an e-mail since

1          was marked for identification.)

2               MS. OBEN:  Thank you.

3               MS. WOODS:  I am waiting on it.  I

4     didn't want you to think I was asleep at the

5     switch here.

6               MR. MCDERMOTT:  Sounds good.

7               MS. WOODS:  This morning our network

8     was down, so luckily we got that resolved.

9               Okay.  I have Exhibit 7.  Thank you.

10    BY MR. MCDERMOTT

11         Q    Okay.  So, Mr. Lawton, looking at this

12    e-mail, would you say that it appears to

13    establish -- well, sorry.

14              Let's start this off with:  This is an

15    e-mail from Kent Vogel of Midamar --

16         A    To me.

17         Q    -- to you --

18         A    Correct.

19         Q    -- dated 10/27/2017?

20         A    Correct.

21         Q    Now, would you agree that this appears

22    to establish that Midamar can provide meals that

1    meet plaintiffs' beliefs?

2         A    It appears, yes.  But it also --

3         Q    Okay.

4         A    -- points out that we need to know what

5    the exact specification is.  He indicates that

6    there's some -- some question there.  But at the

7    bottom of the last sentence, he says, hey, the

8    specifications that we received, we can meet

9    those specifications, which we've itemized those

10   steps in it.  So, yes, it appears that they can

11   meet that specification.

12        Q    Right.  And so they would just be

13   waiting on whatever final specs that you-all

14   issue as part of your request?

15        A    When we change it from a request for

16   information to a request for purchase.

17        Q    Correct.  Right.  So, based on this,

18   would you say that there is -- it is your

19   understanding that Midamar can provide meals that

20   meet both your needs and plaintiffs' beliefs --

21        A    Yes.

22        Q    -- at this time?  Okay.

1           And then -- so we were just recapping

2     the other vendors.  After that, we spoke about CI

3     industries, and it was your understanding that

4     they could also provide meals that meet

5     plaintiffs' beliefs and that there is an issue

6     with regards to whether or not the BOP can

7     currently purchase those meals, but the BOP is

8     conducting research into whether or not it can do

9     so?

10         A    That is my understanding, correct.

11         Q    Okay.  And when it comes to SOPAKCO,

12    again, it was your understanding that they could

13    provide food that meets plaintiffs' beliefs and

14    that BOP -- and that meet the BOP's needs to an

15    extent, correct?

16         A    Correct.  To an extent.

17         Q    And --

18         A    And they're willing to work with us to

19    modify to potentially meet the spec in full.

20         Q    And pending that, they may be able to

21    provide meals that meet everybody's needs?

22         A    That is correct.

1        Q    And, again, when it comes to Sisters

2    One, you are not currently aware of whether or

3    not they can provide meals that meet both

4    plaintiffs' needs and the BOP's, but it is

5    possible?

6        A    That is correct.

7        Q    And with Labriute, it is your

8    understanding that they can provide meals that

9    meet both your specs and plaintiffs' beliefs

10   based on their representations?

11       A    That is correct.

12       Q    Okay.  Oh, and one more.  Taaza Fresh,

13   can you describe your communications with them?

14       A    E-mail requesting follow-up information

15   to the RFI.

16       Q    Okay.  And what dates has your -- have

17   your communications to them ranged over?

18       A    I would say from July forward.

19       Q    Of this year?

20       A    Correct.

21       Q    Is it your understanding that they too

22   can provide meals that meet plaintiffs' beliefs

1    and the BOP's requirements?

2         A     I don't believe we have enough

3    information to determine whether they can or

4    can't at this point.

5         Q     What information are you in need of?

6         A     I'm doing this from memory, but from

7    what I understand, we sent several communications

8    to Taaza Fresh and got no response from the

9    e-mail that we had, and I believe the one reply

10   that we got indicated that they were a -- not

11   necessarily a vendor, but a producer, a

12   repackager, and so I don't think it clarified

13   whether they could provide something that met our

14   needs or not.

15              I wouldn't say that they're excluded,

16   that they -- that it can't be done, but I don't

17   know if we have enough information to say that

18   they definitely can.

19        Q     Okay.  And when was your last

20   communication with them?

21        A     Over a month ago.

22        Q     And have you made any other attempts to

1    contact them?  Have you tried calling them or

2    anything --

3        A    I --

4        Q    -- like that?

5        A    I have not.

6        Q    Are you aware of anyone else having

7    done so?

8        A    I do not know whether the business

9    office or anybody else has tried to solicit more

10   information.

11       Q    You said that you didn't receive a

12   response from them?

13       A    Not to the initial e-mails.  And I want

14   to say, at one point, we got an undeliverable

15   thing saying that the e-mail address was

16   incorrect or no longer valid.  It was like Faisal

17   (phonetic) at -- there was -- there was some

18   problem with that e-mail at some point during --

19       Q    Okay.  And have you confirmed whether

20   or not he could have sent anything to that other

21   address that you were having issues with?

22       A    I do not know whether he did or not.

1          Q     Okay.  So it's possible that he has

2     been trying to communicate?

3          A     It's possible.

4          Q     And you are unaware of any attempts by

5     the BOP to establish communications with him

6     beyond e-mail?

7          A     Correct.  I do not know.

8          Q     So, as it stands, he may be able to

9     provide meals, but you're unaware of whether or

10    not that is the case at this time?

11         A     Correct.

12         Q     Now, a minute ago, you mentioned -- you

13    were talking about one of the vendors, and you

14    said, you know, there's a difference between a

15    request for information and a request for

16    purchase, right?

17         A     Correct.

18         Q     Do you have an understanding as to why

19    a request for purchase has never been issued?

20         A     I would be speculating.

21         Q     So you don't have any personal

22    knowledge as to that process?

1      A     I have a limited understanding of how

2    that works.  As I understand it, you have to do a

3    request for information to determine if what

4    you're seeking is available anywhere on the open

5    market, and if there's competition, you can do a

6    request for purchase and provide your

7    specifications to the market to see if you get a

8    response or solicitation.

9      Q     Now, isn't it true, though, that some

10   vendors would be more motivated to come out and

11   participate in a request for purchase because

12   they see that as an actual viable contract is at

13   stake, whereas, opposed to an RFI that's just

14   kind of putting information out into the void?

15           Have you encountered that mentality?

16     A     I have heard of that, but I can't speak

17   to it.  You know, I don't do contracting.  But I

18   have heard people say that.

19     Q     So it's all to say that it's possible

20   that there are other vendors out there that have

21   not contacted you, but which may be willing and

22   able to provide meals that meet both your

1   not handling food well, are those handled in a

2   similar manner?

3          A    It depends again on the institution.

4   If you're -- if you are at an institution that

5   has an open compound and you're serving mainline,

6   then intolerances are addressed by

7   self-selection.  Hey, if you know that doesn't

8   agree with you and you go to mainline, pick the

9   other entree, not the one that doesn't agree with

10  you.

11         Q    Okay.

12         A    If you are at a high-rise in

13  segregation somewhere where they're doing

14  single-plated satellite service --

15         Q    Right.

16         A    -- then it's handle differently.

17         Q    And how is it handled in that

18  situation?

19         A    Then it would be back to the -- here,

20  the person has a diet prescription or has a

21  thing, and we make him a tray specifically to

22  meet his need.

1      Q    Okay.  Now, are there ever instances

2    where inmates receive more food than other

3    inmates, for instance, somebody who's underweight

4    needing a high caloric diet?

5      A    Have they been prescribed?  Yes.

6      Q    Okay.  And I assume, with diabetics,

7    they also receive snacks that other inmates don't

8    generally receive?

9      A    If they are an insulin diabetic, they

10   receive a diabetic snack, so not all diabetics.

11   Just being diabetic doesn't automatically qualify

12   you for a snack.

13     Q    Okay.

14     A    Insulin diabetics, yes.

15     Q    Okay.  And the institutions are able

16   and capable to handle the provision of those

17   extra foods to those inmate without issue?

18     A    Yes.

19     Q    Okay.  And on a high caloric diet,

20   what -- what does that mean, you know, when

21   somebody might need more calories than the

22   average inmate?  What does that relate to?  I

1   mean, are they allowed to take an extra portion?

2   Are they --

3       A    I've seen it --

4       Q    How is that handled?

5       A    I've seen it done differently based on

6   the -- either the dietician's recommendation, the

7   doctor's recommendation, the clinical directors.

8   Some have -- say, you know, double the starch.

9   Some have said increase the entree, you know,

10  double entrees.  They're pretty rare, actually --

11      Q    Okay.

12      A    -- because the calories provided in our

13  normal diet is over the recommended daily

14  calories.

15      Q    Right.  But it's not unheard of?

16      A    It's not unheard of, but the fact of

17  the matter is, the majority of our inmate

18  population is overweight, not underweight.  When

19  we do see increased calories, it's usually based

20  on another medical condition.

21      Q    Okay.  And -- well, we can cover

22  nutrition in a bit, but I guess I do have just

1    one question that kind of relates to that.

2          When you're looking at the caloric

3    intake -- intake of an inmate or how their meals

4    are -- are doled out, I guess it's all very

5    standardized, so you're not taking into account

6    the variation in body mass or how much an inmate

7    may work out or require more or less nutrients.

8    I mean, it's all standardized across the

9    population for the most part unless it's a

10   prescribed medical diet?

11       A    Correct.  It's standardized based on

12   the -- and I'm not the chief dietician, so, you

13   know, I couldn't give you exact numbers, but it's

14   standardized across that -- you know, the

15   majority of our inmate population is males

16   between the ages of -- you know, they're adult

17   males, so that's the -- the RDIs that we base

18   our -- our nutrition goals on.

19       Q    Well, now, but -- so, I mean, for

20   instance, you are training for this Murphy

21   marathon, right?

22       A    Right.

1    after the deposition.

2              MR. MCDERMOTT:  Okay.

3    BY MR. MCDERMOTT

4       Q    Now, what about when it comes to

5    medical diets and some of the other special diets

6    that we were just speaking about?  Do you have

7    any way to break down the costs associated with

8    those?

9       A    No.

10      Q    Okay.  But it's fair to say that some

11   of them would likely be more expensive than --

12      A    Yes.

13      Q    -- other options?

14      A    Yes, that's correct.  Some of them are

15   less expensive, also.  If somebody goes on a

16   liquid diet --

17      Q    Right.

18      A    -- that costs next to nothing to put

19   out.

20      Q    Right.  Okay.  So I think we've -- we

21   can agree, though, that there is some variance

22   between institutions and between the per capita

1    meal costs an inmate will receive generally, be

2    it because he's on mainline or certified

3    religious diet or because of the geographic

4    location of the institutions?

5         A    That is a true statement.

6         Q    Okay.  Now, when it comes to the

7    outreach that you've been doing to vendors

8    related to this case and your attempts to

9    accommodate the plaintiffs in this case, their

10   beliefs, have you ever declined to work with or

11   consider or stopped analyzing a vendor based on

12   the cost of their meals?

13        A    No.

14        Q    Is that -- is the cost of the meals

15   factored into your analysis at all?

16        A    That's more complicated than -- so

17   we're talking about two different things.  A is

18   accommodating four inmates right now --

19        Q    Right.

20        A    -- and the answer to that is no.  Cost

21   has not been a factor in the food service portion

22   of the evaluation.

1      Q    Okay.

2      A    Side B is like you mentioned at the

3    beginning of our conversation, that there is

4    potentially more inmates out there that would

5    want halal certified meals, and so from a

6    perspective of providing a halal meal Bureau-wide

7    as part of our certified foods component, then it

8    would come under our purchasing, which is based

9    on lowest bidder.  So, yes, price would be a

10   factor.

11     Q    Okay.

12     A    Not -- not in determining whether it

13   was offered, but which vendor was awarded the

14   bid, whether it's on a quarterly basis, weekly

15   basis, five-year contract.

16     Q    So of the vendors that met the specs

17   that you put out --

18     A    Correct.  Whoever --

19     Q    -- you would then --

20     A    -- had the lowest price is --

21     Q    -- consider -- okay.

22     A    -- is going to get awarded the -- the

1      A     Correct.

2      Q     -- cognizant of the costs?  Okay.

3            Now, one other topic that I wanted to

4      touch base on, nutrition.  Now, I know you've

5      said you're not the chief dietician, but can you

6      just enlighten me as to how your day-to-day

7      responsibilities touch on nutrition, the

8      nutritional guidelines, the Department of

9      Agriculture's guidelines for daily intake?

10     A     My personal responsibility is very

11     little other than, if I'm asked, I know who to

12     refer them to --

13     Q     Okay.

14     A     -- you know.  And if -- and if somebody

15     inquires how we came up with our numbers or where

16     they can find the nutritional data, I can direct

17     them in the right location.  Some of it we make

18     available on our internal website.  Some of

19     it's -- you know, we can direct them to where

20     it's posted for the USDA or so forth.

21     Q     So is it fair to say that you don't

22     have any personal knowledge regarding the

1  development of the nutritional standards that the

2  BOP uses or the implementation of those

3  standards?

4      A    That would be an accurate statement.

5      Q    Okay.  Now, I had a few points -- we're

6  going to have to circle back here to some of the

7  conversations we had earlier, but a few points I

8  just wanted to follow up on.

9          I believe when we were speaking about

10 SOPAKCO, a few hours ago now, you mentioned that

11 they were just waiting on you-all now to send

12 specs and that they were potentially going to

13 work with you to accommodate whatever specs you

14 issued?

15     A    Correct.

16     Q    When it comes to the specs that the BOP

17 is developing, can you speak to that at all, what

18 kind of specs are currently being developed and

19 what that process --

20     A    Sure.

21     Q    -- looks like?

22     A    So the current version of the specs --

1    and, again, this is to go, you know, with plan B

2    to offer this to -- agency-wide upon approval by

3    the executive staff -- is based on what we

4    currently offer the Jewish inmates.  What can

5    you -- can you provide something as similar as

6    possible to this, only that's certified halal and

7    meets these halal specifications --

8          Q    And when you say --

9          A    -- versus --

10         Q    -- "these halal specifications," you

11   mean the ones that plaintiffs have laid out?

12         A    Right.

13         Q    Okay.

14         A    Itemized ones.  And we -- we took those

15   specs that were already done and we routed them

16   through religious services, because, again, food

17   service is not the subject matter expert on

18   religious accommodation.

19         Q    Right.

20         A    So we develop a spec based on this is

21   what we have, this is how many ounces of chicken,

22   this is how many ounces of beans, this is how

1    many green beans, this is the corn, and we

2    presented those to Chaplain Kugler.  She routed

3    those through her Bureau imams, and they provided

4    input on the specs, saying, hey, instead of

5    saying alcohol, say mind altering, instead of

6    saying this, say that, and that's the current

7    version of the specs that -- that we're working

8    on.

9         Q    Okay.  And when does BOP anticipate

10   having that -- those specs completed and ready to

11   be issued?

12        A    The specs are completed, but if we're

13   talking -- like I said, this is Bureau-wide

14   implementation -- it has to be approved by the

15   executive staff, and the next executive staff

16   meeting is in January.

17        Q    And so how do -- how do these specs

18   relate to your attempts to accommodate the four

19   plaintiffs specifically at issue in this case?

20        A    Because what the plaintiffs have

21   requested, as far as I understand, is reflected

22   in those specs, so if we can find a vendor that

1    can produce that, it can be rolled out to those

2    four inmates now and easy transition to

3    Bureau-wide if the executive staff approves it

4    versus we come up with something, we offer it to

5    four inmates, then come up with something

6    different to offer the rest of the agency and

7    then have to go back to the first four inmates

8    and go, hey, we want to change your thing or

9    continue to serve you something totally different

10   than we're serving the rest of the inmate

11   population, which again creates problems.

12       Q    Right.  Okay.  So -- but as it stands

13   now, the vendors that are maybe willing to work

14   with you to change their product lines, such as

15   SOPAKCO or possibly --

16       A    Midamar --

17       Q    -- Sisters One --

18       A    -- or -- right.

19       Q    Yeah.  They -- well, scratch that.

20            Is there a means by which those kinds

21   of vendors could provide or could know what type

22   of accommodations you need in the meantime?  That

1    is, if you wanted to start serving something to

2    these plaintiffs --

3        A    As -- as I understand it, the business

4    office is the next as far as approving those

5    specs and submitting them, because, ultimately,

6    whether it's for those four inmates or for the

7    entire agency, the actual purchasing is done at a

8    local level.  It doesn't come out of my budget.

9    I don't have a budget for food.

10       Q    Right.

11       A    It's going to be purchased locally, and

12   so they would submit it out for bid at the local

13   level.  So our -- our goal is, hey, let's develop

14   a specification so that it can be put out for bid

15   at the local level.

16       Q    Okay.  So let me understand this.  So,

17   right now, you've developed specs?

18       A    Correct.

19       Q    And those specs need executive

20   approval?

21       A    To -- to implement Bureau-wide, yes.

22       Q    And then after they get executive

1    approval, they will be sent to the business

2    office, or is that beforehand?

3         A    Two different -- two different

4    scenarios.  Business office is for approval to

5    accommodate four inmates.

6         Q    Okay.

7         A    Executive staff is to accommodate and

8    institute halal meal accommodation Bureau-wide.

9         Q    Okay.  Okay.  So have these specs been

10   sent to the business office for approval to

11   accommodate the four inmates, the four plaintiffs

12   at issue?

13        A    No.

14        Q    Why not?

15        A    I received them yesterday.  I have a

16   meeting with Chaplain Kugler tomorrow, and we'll

17   proceed from there.

18        Q    Okay.  That's good to know.

19        A    We received the feedback from the imams

20   and edited the specs with those -- with that

21   input, and that's where it sits right now.

22        Q    Okay.  So what is your next step after

1          A     Normally a day or so.

2          Q     Okay.  It also says on the witness list

3     that you may testify regarding the purchase of

4     food for inmates.

5               Does your knowledge there encompass

6     anything other than what we've already discussed

7     today?

8          A     No.

9          Q     Okay.  It says here that you may

10    testify regarding attempts to accommodate the

11    plaintiffs' religious beliefs and the beliefs of

12    other BOP inmates.

13              Does your knowledge here encompass

14    anything other than what we've discussed already

15    here today?

16         A     I don't believe so, no.

17         Q     Okay.  And it says you may testify

18    regarding food services policy.

19              Is there anything relevant to food

20    service policy that is also relevant to this case

21    which we have not discussed here today?

22         A     Not that occurs to me.

1          MS. WOODS:  I'm going to object to the

2     form of the question on the basis that it calls

3     for a legal conclusion about what is relevant for

4     trial.  However, you may answer the question,

5     Mr. Lawton.

6     BY MR. MCDERMOTT

7          Q    Okay.  And one final point that I just

8     wanted to recap on.  We were talking about the

9     vendors earlier and specifically the double

10    wrapping issue of certified meals.

11         A    Okay.

12         Q    You noted that it's really important to

13    have the meals double wrapped because you

14    indicated that it's important to represent to the

15    inmates that it's not just me, you know, a BOP

16    guy saying this meal didn't touch anything, but

17    we've got an outside agency that's come in and,

18    you know, they've certified this as being kosher

19    or halal or whatever it is?

20         A    Correct.

21         Q    I just want to get your take on why is

22    it important to have that third party involved as

1  opposed to saying, take our word for it, take the

2  BOP's word for it that this is --

3       A    As I've said, being a food service

4  employee does not make you an expert in religious

5  diet accommodation, so the fact that somebody who

6  is is certifying that this meets somebody's

7  religious dietary needs is -- is important.

8       Q    Okay.  Okay.  So it's your

9  understanding that the BOP just doesn't have the

10  capabilities necessary to do this on their own?

11       A    I don't --

12       Q    The expertise --

13       A    I don't think we want to be the

14  certifying agency.  I don't think we want that

15  responsibility.  I don't think we want to give

16  that impression that, hey, you know, we're the

17  only restaurant in town, you have to come eat

18  with us, and take our word for it, this is

19  kosher.  You know what I mean?

20       Q    Right.  And even if the BOP had wanted

21  to do that, it's your understanding that they

22  just don't have the expertise as it currently

1    stands to be --

2         A    I don't think you have it at every

3    single institution.  Obviously, we have imams

4    that work for the Bureau that are in the agency

5    that are at institutions that can give us

6    information, feedback on a Bureau-wide thing, but

7    they're not at every institution.

8              So, you know, Chaplain Jamiu cannot

9    leave Philadelphia and go to Fairton, Fort Dix,

10   you know, everywhere else and go, yeah, this is

11   good, yeah.  No.  We just do not have the

12   personnel to -- to go certify meals at every

13   institution in our -- in our agency.

14        Q    And it's also equally plausible that

15   Jamiu is not an expert in halal certification

16   even if he is a Muslim, right --

17        A    That is --

18        Q    -- just as every --

19        A    -- possible.  Correct.

20        Q    Yes.  Okay.

21        A    He's certainly -- he's certainly more

22   qualified to speak on halal accommodation than I

1           CERTIFICATE OF NOTARY PUBLIC

2      I, ERICK M. THACKER, the officer before whom

3  the foregoing deposition was taken, do hereby

4  certify that the witness whose testimony appears

5  in the foregoing deposition was duly sworn by me;

6  that the testimony of said witness was taken by

7  me in stenotype and thereafter reduced to

8  typewriting under my direction; that said

9  deposition is a true record of the testimony

10  given by said witness; that I am neither counsel

11  for, related to, nor employed by any of the

12  parties to the action in which this deposition

13  was taken; and, further, that I am not a relative

14  or employee of any counsel or attorney employed

15  by the parties hereto, nor financially or

16  otherwise interested in the outcome of this

17  action.

18               ERICK M. THACKER

19          Notary Public in and for the

20            District of Columbia

21

My commission expires:

22

June 14, 2019