UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRIAN CARR, et al.,            )
                        )
          Plaintiffs,      )
                        )
        v.              )       CAUSE NO. 2:14-cv-00001-WTL-MJD
                        )
FEDERAL BUREAU OF PRISONS, *et al*., )
                        )
         Defendant.      )

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Bureau of Prisons has a national food services program, which ensures that inmates are provided nutritious meals on a consistent basis, and that all inmates are provided reasonable opportunities to pursue their religious beliefs, including religious dietary practices. In this case, four Plaintiffs are not satisfied with the BOP's religious diet program, nor even the vendor that the BOP found to provide halal-certified meals specifically for these Plaintiffs. Plaintiffs have instead demanded that the BOP purchase halal-certified meals from the specific vendors that Plaintiffs prefer. This request frustrates the intent of the Religious Freedom Restoration Act (RFRA), not to mention the BOP's compelling interests in providing healthy, nutritious meals equitably to all inmates, within the constraints of its budgetary limitations, and consistent with the security and orderly running of prisons. Based on the foregoing, the Court should grant Defendant's Motion for Summary Judgment.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

**1. The BOP's Religious Diet Program**

The Bureau of Prisons affords all inmates reasonable and equitable opportunities to pursue their religious beliefs, including religious dietary practices, within the constraints of budgetary limitations and consistent with the security and orderly running of its prisons. (Ex. 1, Kugler Decl. ¶ 5; 28 C.F.R. § 548.10; 28 C.F.R. § 548.20.)

The BOP has instituted a National Menu, whereby 150,000+ inmates are served essentially the same menu in every BOP institution around the country. (Ex. 2, Holliday Decl. ¶ 1, 7-8; Ex. 3, Holliday Dep. 36.) Before approving meals to be served to inmates, the BOP's Chief Dietician reviews and analyzes the proposed menu and meals for nutritional content and sufficiency. (Ex. 2, Holliday Decl. ¶ 6.) In doing so, the Chief Dietician reviews the average daily nutrient intake levels needed to meet the requirements of healthy individuals, as required by standards set forth by the American Correctional Association (ACA). (Ex. 2, Holliday Decl. ¶¶ 6, 11; Ex. 3, Holliday Dep. 106.) The National Menu is also used to create clinical guidelines for inmate medical care. (Ex. 2, Holliday Decl. ¶ 11.) To conduct this analysis, the Dietician reviews very detailed information about the specific ingredients in the food items to be offered. (Ex. 3, Holliday Dep. 103, 109.) Once the menu is created, local institutions purchase the food by soliciting bids using applicable regulations and BOP policies. (Ex. 4, Langford Dep. 22, 43.)

The National Menu has important benefits over an earlier policy in which every BOP institution was responsible for setting its own menu. (Ex. 2, Holliday Decl. ¶ 8.) The National Menu has led to greater consistency in terms of the quality and nutritional content of the food provided. (*Id.*; Ex. 3, Holliday Dep. 125-26, 136-37.) It has also reduced the number of inmate

complaints about food. (Ex. 2, Holliday Decl. ¶ 10.) And it has reduced cost overall. (*Id.*) Finally, having a consistent menu has assuaged compelling security concerns that arise when one inmate or a group of inmates receives items that other inmates are not offered. (Ex. 5, Hinkle Dep. 78-83, 86-89 (testifying that security issues have decreased under the National Menu and Certified Religious Diet).)

In addition to the National Menu, the BOP has a religious dietary program, called the Alternative Religious Diet Program, which consists of two separate components: 1) self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar (Ex. 1, Kugler Decl. ¶ 7; Ex. 6, Stiltner Decl. ¶ 7); and 2) religiously-certified pre-packaged meals. (Ex. 6, Stiltner Decl. ¶ 7.) As with the National Menu or "mainline," the meals served on the certified component of the Alternative Religious Diet are the same for every inmate on the diet in each BOP institution across the country. (Ex. 2, Holliday Decl. ¶ 1, 7-8; Ex. 3, Holliday Dep. 36.)

On the Alternative Religious Diet, the BOP provides meals certified as containing no pork, alcohol, emulsifiers, mind altering substances, enzymes and/or chemicals. (Ex. 2, Holliday Decl. ¶ 14, Ex. 7, BOP042146, BOP Certified Food Specifications.) Inmates who participate in the Alternative Religious Diet Program are provided with sealed individual, pre-packaged, double wrapped meals, which are delivered frozen so as to prevent any contact with prohibited items. (*Id.*) Certified food items are removed from the original manufacturer's packaging in a separate area used only for certified food preparation. (*Id.*)

In creating the Alternative Religious Diet Menu, the BOP took steps to ensure that its food services program accommodates the beliefs of Muslim inmates. (Ex. 8, Kugler Dep. 42-44; Ex. 9, Boz Dep. 61-63, 74-76, 90-93.) The BOP consulted and continues to consult with Muslim

Imams with experience and expertise in Islamic doctrine in making decisions about religious dietary accommodations. (Ex. 8, Kugler Dep. 42-44; Ex. 9, Boz Dep. 61-63, 74-76, 90-93.) These Imams advised that, in their opinion, the Alternative Religious Diet comports with Islamic doctrine, and many Muslim inmates have found the diet a sufficient accommodation for their religious beliefs. (Ex. 8, Kugler Dep. 36-37, 42-44; Ex. 9, Boz Dep. 100-101; Jamiu Dep. 30.)

### 2. Plaintiffs' Claims and Dietary Requests

a. *Brian Carr* - Brian Carr arrived in BOP custody on March 20, 1990, and is currently housed at the USP - Atlanta. (Ex. 1, Kugler Decl. ¶ 18.) In his Administrative Remedy before filing suit, Carr claimed that he should be provided with "Halal meat and meals from vendors products which are recognized as 100% Halal Certified by IFANCA at www.IFANCA.org and also the Connecticut Council of Masajid." (Ex. 10, Carr Dep. Exhibit, PLTF0000027.) In this lawsuit, Carr now argues that all food provided to him should be certified as halal by the American Halal Foundation or Halal Advocates. (Carr Dep. 89-90.) He also asserts that his religion requires him to eat meat certified by those organizations twice daily and that he believes all food not certified by those organizations to be "doubtful." (Ex. 11, Carr Dep. 89-90.)

In his deposition, Carr made several admissions regarding his dietary practices and beliefs. He acknowledged that many foods such as fruit, vegetables, fish and grains are halal and permissible to eat without certification. (Ex. 11, Carr Dep. 53-54, 107.) He also testified that he voluntarily purchases and eats clams and oysters from the commissary without concern, and also mackerel, instant noodle soups, Ramen noodles and snacks. (*Id.* 45, 129.) Carr has not attempted to purchase halal-certified meals through the BOP's Special Purpose Order (SPO) process or the commissary (Ex. 11, Carr Dep. 127-29), nor has he requested halal meat as part of the Eid

ceremonial meal at the end of Ramadan (Ex. 11, Carr Dep. 127).

Carr also acknowledges that his purported views have changed over time. The BOP offered Carr halal-certified meals distributed by J&M Meals and certified by IFANCA (as he initially requested) in 2015, (Stiltner Dep. at 238-39) but Carr rejected those meals (Carr Dep. 71, 133). Carr asserts that, since beginning this lawsuit, he no longer views IFANCA as an acceptable certifying organization. (Carr. Dep. 71). Carr admits, however, that he has no actual, personal knowledge about either the American Halal Foundation or Halal Advocates. (Carr Dep. 76, 85.)

b. *Mark Crenshaw* - Mark Crenshaw arrived in BOP on October 24, 1990, and is currently housed at USP – Florence. (Ex. 1, Kugler Decl. ¶ 20.) When he filed his administrative remedy, Crenshaw requested to "eat halal meat and food (halal-certified food)," but did not request any specific certifier or vendor. (Ex. 13, Crenshaw Dep. 81.) Crenshaw now claims that he must eat halal-certified meat twice a day and that all food is "doubtful" unless it is certified as halal by American Halal Foundation or Halal Advocates. (Ex. 13, Crenshaw Dep. 101-102.) Crenshaw admits that he has no personal knowledge about these specific certifiers or vendors, relying solely on information provided to him by his attorneys. (Ex. 13, Crenshaw Dep. 55-59.)

In his deposition, Crenshaw acknowledged that many foods such as fruit, vegetables, fish and grains are halal and permissible to eat. (Ex. 13, Crenshaw Dep. at 38.) Crenshaw also testified that he eats cereal, oatmeal, rice, apples, noodles, refried beans, bagels without concern about religious permissibility. (Ex. 13, Crenshaw Dep. 100, 117, 125-26.) Crenshaw is also comfortable eating numerous non-halal snack items from the commissary even though he is not sure whether they are certified or whether they contain haram ingredients. (Ex. 13, Crenshaw Dep. 117-18, 125-28.) Crenshaw has not attempted to purchase halal meals through the SPO

process or the commissary. (Ex. 13, Crenshaw Dep. 93-94.) And although Crenshaw claims he must eat halal-certified meat twice a day, he makes this demand based on "nutritional purposes." (Ex. 13, Crenshaw Dep. 64-65.)

In 2015, the BOP also offered Crenshaw halal-certified meals distributed by J&M Meals and certified by IFANCA. (Ex. 12, Stiltner Dep. at 238-39.) He rejected the meals claiming that IFANCA was not a satisfactory certifying organization. (Ex. 13, Crenshaw Dep. 98.) But Crenshaw testified in his deposition that he has no personal knowledge or sincerely-held religious beliefs about J&M Meals or IFANCA. (Ex. 13, Crenshaw Dep. 99-100.)[1]

c.   *John Wilson*- John Wilson arrived in BOP custody on March 8, 2000, and is currently housed in FCI - Cumberland. (Ex. 1, Kugler Decl. ¶ 24.) In his administrative remedy, Wilson stated that "Muslims are commanded to eat only meats that are Halal," but did not specify any certifier or organization. (Ex. 1, Kugler Decl. ¶ 26.) Wilson now claims in this lawsuit that all food is "doubtful" unless it is certified as halal by American Halal Foundation or Halal Advocates. (Ex. 14, Wilson Dep. 45-47, 46-48.)

Wilson has frequently chosen to eat non-halal certified food rather than pursue halal options. Wilson eats tuna, peanut butter sandwiches, refried beans, mackerel, smoked oysters, salmon, mayonnaise, hot sauce and sweet sauce, ramen noodles, swiss cheese and beef summer sausage without concern about permissibility. (Wilson Dep. 86-87, 132, 134, 136, 139, 141, 154.) Wilson admitted that he "can't honestly particularly say" whether the snack items he purchases and eats

---

[1] Q, Are you familiar with a company called J&M Meals?
 A. No
 Q. Would J&M Meals be an acceptable food vendor of halal-certified meals to you?
 A. I don't know even know what J&M Meals is. So –
(Ex. 13, Crenshaw Dep. at 99.)

from the commissary are halal. (Wilson Dep. 139.) Wilson also purchased and ate non-halal beef sausage from the commissary in January 2015 even though halal beef sausage was also available for purchase. (Wilson Dep. at 138-39.) And Wilson has not attempted to purchase halal-certified meals through the SPO process or the commissary, (Wilson Dep. 113) nor has he requested that halal meat made available as part of the Eid ceremonial meal at the close of Ramadan (Wilson Dep. 114). Moreover, Wilson was removed from the religious diet program in May 2015 for taking a food tray from mainline with fried chicken on it, then claiming he intended to sell the chicken. (Ex. 14, Wilson Dep. 79-80.)

Wilson testified that he has no personal knowledge about the specific certifiers or vendors he has claimed are required, and that he is relying solely on information provided to him by his attorneys. (Ex. 14, Wilson Dep. 47.)[2] As to eating meat, although he has claimed he must eat halal-certified meat twice a day, (Ex. 14, Wilson Dep. 50-51) Wilson concedes that this demand is based not on religious belief but nutrition concerns (Ex. 14, Wilson Dep. 51 (stating meat is needed twice a day based on "nutritious experts")).

In 2015, the BOP offered Wilson halal-certified meals distributed by J&M Meals and certified by IFANCA. (Ex. 12, Stiltner Dep. at 238-39.) He rejected the meals, although he testified that he "didn't have the information one-way or the []other" as to whether the meat was properly slaughtered and did not know who the proposed vendor was. (Ex. 14, Wilson Dep. 117-

---

[2] Q. So other than information from conversations with your lawyers, do you have any personal knowledge about Halal Advocates of America?
 A. No.
 Q. Is it your sincerely held religious belief that Halal Advocates of America is the only viable certifier of halal food?
 A. I can't say one way or another. I don't really know. . . .
(Ex. 14, Wilson Dep. at 47.)

18.) Wilson also testified that he has no personal knowledge or sincerely-held religious beliefs about J&M Meals or IFANCA. (Ex. 14, Wilson Dep. 50.)[3]

d. *Tron Kent*- Tron Kent arrived in custody BOP on August 27, 2007, and is currently housed in FCI – Memphis. (Ex. 1, Kugler Decl. ¶ 22; Pls.' S.J. Br. at 8, ¶ 3.) In his administrative remedy, Kent stated that "I am commanded to and believe that I am required to eat only Halal meat and food", but did not specify an organization or vendor that was acceptable to him. (Ex. 1, Kugler Decl. ¶ 23 (citing Kent Administrative Remedy No. 677597).)

Kent was removed from the religious diet program in June 2015 for eating items that were not certified, but later enrolled again and remains enrolled in the BOP's Alternative Religious Diet Program. (Ex. 15, Kugler Decl. ¶ 5; Ex. 16, Kent Dep. 32-33.) Kent admits that he has voluntarily purchased and eaten beef sausage and turkey from the commissary even though these snack, meat items were not certified halal. (Ex. 16, Kent Dep. 33-34.) He also eats ramen noodles, beef, turkey and cheese and other items from the commissary without concern about their religious permissibility. (Ex. 16, Kent Dep. 28, 35, 60-61.)

Kent has not attempted to purchase halal-certified meals through the SPO process or the commissary, (Ex. 16, Kent Dep. 73-74) nor has he requested halal meat as part of the Eid ceremonial meal at the close of Ramadan. (Ex. 16, Kent Dep. 74.)

Kent has no personal knowledge about the specific certifiers or vendors he has claimed are required, but is relying solely on information provided by his attorneys. (Ex. 16, Kent Dep. 48-49.) As to eating meat, Kent conceded that this demand "has nothing to do with religion" and is

---

[3] Q. And so why do you find that IFANCA's certified food is not acceptable to you?
A. I really don't know anything about it, honestly. I don't know anything about IFANCA. (Ex. 14, Wilson Dep. 50.)

based on "social norms." (Ex. 16, Kent Dep. 69-72.)

In 2015, the BOP offered Kent halal-certified meals distributed by J&M Meals and certified by IFANCA. (Ex. 12, Stiltner Dep. 238-39.) He rejected the meals, although he testified that he cannot remember why and has no personal knowledge or sincerely-held religious beliefs about J&M Meals or IFANCA. (Ex. 16, Kent Dep. 76-77.)[4]

### 3. BOP's Efforts to Identify a Suitable Halal Vendor

Over the last several years, the BOP has taken steps to determine whether there exists a food vendor that provides shelf-stable, halal-certified meals, in the quantity sufficient to provide meals to the BOP's Muslim population, and consistent with BOP specifications. (Ex. 6, Stiltner Dep. 194, 256.) Vendors of food to the BOP must meet certain requirements, and the BOP is compelled by procurement regulations to choose the vendor most advantageous to the Government, taking into account past performance and price. (Ex. 4, Langford Dep. 45, 52, 68.)

In 2015, the BOP issued three Requests for Information (RFIs) for vendors of halal-certified meals. (Ex, 12, Stiltner Dep. 194, 256.) No vendor responded to the first RFI, but several vendors responded to the second and third. (Ex. 8, Kugler Dep. 153; Ex. 12, Stiltner Dep. 261.) At the time, none of the respondents offered pre-packaged halal-certified meals that comported with both the BOP's requirements and Plaintiffs' stated requirements for halal-certification, with the possible exception of National Food Group (NFG). (Ex. 8, Kugler Dep. 36-37, 304-05, 128;

---

[4] Q. Are you familiar with a company called J&M Meals?
 A. No.
 Q. You never heard of J&M?
 A. No.
 Q. Would J&M be an acceptable vendor of halal food for you?
 A. I don't know them.
(Ex. 16, Kent Dep. at 76-77.)

Ex. 17, Lawton Dep. 78-79; Ex. 15, Kugler Decl. ¶ 12.)

The BOP has continued to communicate with those vendors to determine whether they can provide meals that meet specifications for a halal menu to be implemented on a Bureau-wide basis to all inmates. (*See, e.g.,* Ex. 8, Kugler Dep. 306-07, Ex. 17, Lawton Dep. 76-79, 162-68.)

In June 2017, the BOP offered NFG halal-certified meals to the Plaintiffs in this case, which were manufactured by CI Industries of the Washington State Department of Corrections and certified by American Halal Foundation. (Ex. 17, Lawton Dep. 66-68.) Shortly after the offer was extended, CI Industries encountered a water contamination issue and NFG terminated its contract with that company. (Ex. 21, BOP043450-51; Ex. 17, Lawton Dep. 66-69.) To date, NFG is not offering meals manufactured by CI. (Ex. 17, Lawton Dep. 66-69; Ex. 21, BOP043449-50.)

In late 2017, the BOP prepared another halal menu that mirrors its current certified religious diet, for the purchase of halal-certified meals at the local institutions. (Ex. 8, Kugler Decl. ¶ 33.) The specifications include the most stringent halal certification standards known to the BOP through research and consultation with BOP Imams, including the Plaintiffs' purported certification requirements. (*Id.*; Ex. 24, BOP044114-044115.) The menu has been nutritionally analyzed in accordance with ACA Standards and meets the DRI nutritional standards. (Ex. 24, BOP044119- 044121; Ex. 25, BOP044125-044131.)

On November 30, December 6, and December 7, 2017, the FCI –Memphis, USP – Atlanta, FCI – Cumberland, and FCC – Florence posted solicitations for pre-packaged, halal-certified meals that comport with the most stringent halal certification requirements. (Ex. 15, Kugler Decl. ¶¶ 31-34.) The specifications for meat require that the meat be hand-slaughtered with a horizontal cut to the throat of the animal so that three of the four vessels are severed in one cut,

by a practicing, adult Muslim, with the slaughterer reciting "In the Name of Allah" before the slaughter of each animal, in a manner prescribed by Islamic law. (*Id.*; Ex. 24, BOP044114.)

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

The Defendant disputes the following Plaintiffs' Statements of Material Fact:

8.   Defendant disputes Plaintiffs' statement that "[i]f it is unclear or doubtful whether an items is halal, Plaintiffs' religious beliefs deem the items to be haram or forbidden." As set forth in Defendant's Statement of Materials Facts Not In Dispute, *supra* at 4-10, Plaintiffs acknowledged in their depositions that certain non-certified foods are halal and they regularly consume non-certified food without concern about religious permissibility. Plaintiffs also testified that they have engaged in other behavior that does not comport with the purported dietary beliefs set forth in their factual statement No. 8.

12.   Defendant disputes Plaintiffs' statement that "Plaintiffs believe that they should consume halal meat on a regular basis in order to follow [the Prophet Muhammad's] example" to the extent this factual statement suggests that that Plaintiffs hold a sincerely-held religious belief that they must eat meat twice daily, or with any other specific regularity. As set forth in Defendant's Statement of Materials Facts Not In Dispute, *supra* at 4-10, Plaintiffs acknowledged in their depositions that their assertion they must eat halal meat twice daily is not a religious belief but a preference based on nutritional or other secular concerns.

14.   Defendant disputes Plaintiffs' statement that all of the dietary restrictions set forth in the preceding paragraphs are sincerely held. As set forth in Defendant's Statement of Materials Facts Not In Dispute, *supra* at 4-10, Plaintiffs acknowledged in their depositions that certain non-certified foods are halal and they regularly consume non-certified food without concern about

11

religious permissibility. Plaintiffs also testified that they have engaged in other behavior that does not comport with the purported dietary beliefs set forth in their factual statement No. 14. Plaintiffs also acknowledged in their depositions that their assertion they must eat halal meat twice daily is not a religious belief but based on nutritional or other secular concerns.

15. Defendant disputes Plaintiffs' statement that the BOP "has no 'reason to doubt' the sincerity of Plaintiffs' religious beliefs regarding dietary restrictions." In support of this statement, Plaintiffs cite the testimony of Heidi Kugler, who is a Chaplain and the head of National Chaplaincy for the BOP. Ms. Kugler testified that the Plaintiffs asserted beliefs appeared to be "shifting," but as a clergy person, it is "not my role to assess when someone changes their religious preference or shifts a religious tenet." (Ex. 8, Kugler Dep. at 264-65.) As set forth in Argument, Section 1, the BOP is challenging certain aspects of Plaintiffs' claims as being sincerely-held religious beliefs. Ms. Kugler was testifying in her role as a Chaplain and lacked specific personal knowledge to testify as to the sincerity of Plaintiffs' religious beliefs.

19. Defendant partially disputes Plaintiffs' factual statement No. 19 on the basis that it is inconsistent with Plaintiffs' discovery responses and deposition testimony. Throughout this lawsuit, Plaintiffs have taken the position that they may only eat food certified by Halal Advocates or the American Halal Foundation. (*See, e.g*., Ex. 11, Carr Dep. at 89-90; Dkt. No. 210-25 at 6; Ex. 14, Wilson Dep. at 45-47, 46-48 (discussing Interrogatory responses asserting that only Halal Advocates of America was acceptable to him); Ex. 16, Kent Dep. at 68-69; Ex. 26, Kent Resp. to Interrog. No. 3; Ex. 13, Crenshaw Dep. at 55, 57-58, 101-02 (testifying regarding response to Interrogatory that Halal Advocates is "[t]he only viable certifier of which plaintiff is presently aware that certifies halal food in accordance with plaintiff's religious beliefs

is Halal Advocates of America" and American Halal Foundation with the exception of poultry");
*see also* Dkt. No. 210-18, ¶ 10(G), ¶ 69 (Plaintiffs' expert testifying that in order to meet the
Plaintiff's religious needs, the BOP must procure meals certified by Halal Advocates).)

In Plaintiffs' supplemental responses to Interrogatories served on or about November 3, 2017
(the day discovery closed), Plaintiffs state that the various certifiers identified in factual
statement No. 19 "are potentially able to certify that food is prepared in accordance with the
halal slaughtering and preparation requirements identified in Plaintiff's [original Interrogatory
responses], however, not all of the food products certified as 'halal' by these organizations are
prepared in accordance with Plaintiff's religious beliefs." (Dkt. No. 210-29 at 3-4; *see also* Dkt.
No. 210-30 at 3-4; Dkt. No. 210-31 at 3-4; Dkt. No. 210-32 at 3-4.)

Thus, the evidence does not support Plaintiffs' factual statement No. 19.

36.    Defendant disputes any suggestion in factual statement 36(a)-(c) that the certified
religious meals served by the BOP contain alcohol, gelatin derived from haram sources, or other
haram ingredients. The deposition testimony cited by Plaintiffs does not support these
allegations. In support of factual statement 36(a), Plaintiffs cite the deposition testimony Karen
Stiltner, the former National Food Services Administrator for the BOP, regarding an article
printed from the internet, which posited that gelatin used in Pop-Tarts or Kellogg's cereal
containing marshmallow additives could be derived from pork. (Ex. 12, Stiltner Dep. 276-77.)
Ms. Stiltner testified, however, that this issue was not implicated with the BOP's certified menu
because these items were not served on the BOP's menu. (Ex. 12, Stiltner Dep. 277.) Stiltner
also testified that the BOP's specifications for certified religious meals do not permit gelatin as
an ingredient. (Ex. 12, Stiltner Dep. 272-73.)

Plaintiffs also cite the deposition testimony of BOP Imam Mustafa Boz as acknowledging that some Muslims believe that if gelatin comes from an animal that was not slaughtered in accordance with Islamic practices, it may not be permissible. (Pls.' S.J. Br. at 10 fn.50.) This testimony, however, does not support any assertion that the BOP's certified meals actually contain gelatin derived from an impermissible source. In fact, Imam Boz testified that he was not aware of any alcohol, enzymes or gelatin derived from impermissible sources in the BOP's certified diet. (Ex. 9, Boz Dep. 100.)

Defendant also disputes factual statements 36(a) – (c) to the extent they rely on the report and deposition testimony of Hamzah Maqbul. Defendant has moved to strike Mr. Maqbul's report and testimony, and incorporate that motion and supporting brief herein.

In sum, Plaintiffs have designated no evidence that the certified food served by the BOP contains ingredients which Plaintiffs believe to be forbidden. (Ex. 13, Crenshaw Dep. 51-53; Ex. 11, Carr Dep. 104.)[5] Even their own purported expert testified that he has no evidence that the food offered by the BOP to inmates on the certified religious diet contains haram ingredients. (Ex. 27, Maqbul Dep. 158-59, 161.)

47. Defendant disputes Plaintiffs' factual statement No. 47, which states that "[n]umerous vendors" responding to the RFIs indicated they could provide prepackaged meals "that accord with Plaintiffs' beliefs, . . ." on the basis that it is inconsistent with Plaintiffs' discovery responses and deposition testimony, and other evidence in the record.

---

[5] Q. Have you ever -- are you aware of a time when you were served fish within the Bureau of Prison system that had Haram sauces or additives in it?
   A.  Not that I'm aware of right now that I can point to.
(Ex. 11, Carr Dep. 104.)

As discussed above, throughout this lawsuit, Plaintiffs have taken the position that they may only eat food certified by Halal Advocates or the American Halal Foundation. (*See, e.g.*, Ex. 11, Carr Dep. 89-90; Dkt. No. 210-25 at 6; Ex. 14, Wilson Dep. 45-47, 46-48; Ex. 16, Kent Dep. 68-69; Ex. 26, Kent Resp. to Interrog. No. 3; Ex. 13, Crenshaw Dep. 55, 57-58, 101-02; Dkt. No. 210-18, ¶ 10(G), ¶ 69.) Thus, at the time the RFI responses were received in 2015 and early 2016, Plaintiffs maintained that they would only accept meals certified by Halal Advocates or the American Halal Foundation. (*Id.*)

In support of factual statement No. 47, Plaintiffs cite the deposition of Eric Lawton, one of the BOP's Acting National Food Services Administrators, for the proposition that various vendors would "meet Plaintiffs' beliefs." Mr. Lawton testified, however, that he did not know what halal certifications Plaintiffs were willing to accept. (Ex. 17, Lawton Dep. 109-111.)

Defendant specifically disputes factual statements 47(a) – (f) as set forth below:

47(a)   Midamar Corporation responded to the RFI, but indicated that its meals were certified by the Islamic Services of America (ISA) and Islamic Society of Columbus, which Plaintiffs did not deem acceptable, and that it allowed machine slaughter of poultry, which Plaintiffs did not deem acceptable. (Ex. 19, FBOP000176-78.) Midamar also stated that it did not double wrap its meals, which is a BOP requirement for certified meals to avoid any issues with cross-contact. (Ex. 19, FBOP000176, Ex. 12, Stiltner Dep. 108-09.)

47(b)   Sopakco, Inc. responded to the RFI and represented at that time that its meals were certified by ISA, which Plaintiffs did not deem acceptable. (Ex. 28, FBOP000185-000190.) Moreover, Sopakco distributes its halal meals in MREs, which contain a heating element and foil packaging that cannot be used in BOP institutions for security reasons. (Ex. 17, Lawton Dep. 76-

79; Ex. 12, Stiltner Dep. 244, 258, Ex. 8, Kugler Dep. 130, 304.) To date, Sopakco has not confirmed that it will change its meals to meet the BOP's packaging requirement. (Ex. 17, Lawton Dep. 78-79; Ex. 15, Kugler Decl. ¶ 12.) Moreover, to date, Sopakco has not confirmed which organization now certifies its line of halal meals, so there is no assurance that Plaintiffs would deem the meals acceptable. (Ex. 18, BOP043314-15; Ex. 15 Kugler Decl. ¶ 13.)

47(c)   Labriute Meals did not respond to the RFIs. (Ex. 29, BOP044037; Ex. 17, Lawton Dep 96-97.)

47(d)   Defendant does not dispute that Taaza Fresh Global Food, Inc. did not respond to the RFIs until January 2017, which was nearly one year after the third RFI was posted. Taaza's initial response to the RFI indicated that it only provided bulk meat; not pre-packaged meals, which did not meet the BOP's requirements. (Ex. 12, Stiltner Dep. 257.) The BOP has attempted to follow up with Taaza Fresh, but Taaza has never responded to the BOP's requests for detailed menu and meal information (including meal sizes and nutritional content), which is required for the BOP to analyze whether Taaza can indeed meet the BOP's nutritional requirements. (Ex. 17, Lawton Dep. 114-115; Ex. 22, BOP041271; Ex. 23, BOP044012.)

47(e)   Sisters One, Inc. stated in their RFI response that they distributed meals certified by several certifiers, none of which Plaintiffs deemed acceptable at that time. (Ex. 20, BOP043286.) Moreover, Sisters One has not confirmed that it can provide pre-packaged halal meals that are double-wrapped. (Ex. 17, Lawton Dep. 84-88, 95-96.)

47(f)   National Food Group also responded to the RFI. (Ex. 12, Stiltner Dep. 258.) As discussed above, in June 2017, the BOP offered halal-certified meals to the Plaintiffs in this case, which were manufactured by CI Industries of the Washington State Department of Corrections,

distributed by NFG, and certified by American Halal Foundation, but later had to withdraw the offer after the meals were recalled. (Ex. 21, BOP043450-51; Ex. 17, Lawton Dep. 66-69.) To date, NFG is not offering meals manufactured by CI Industries. (Ex. 17, Lawton Dep. 66-69; Ex. 21, BOP043449-50.)

48 – 51   Defendant disputes factual statements 48 – 51 to the extent they rely on the report and deposition testimony of Nathaneal Hartland. Defendant has moved to strike Mr. Hartland's report and testimony, and incorporate that motion and supporting brief herein. Moreover, the statutes, regulations and BOP policies speak for themselves.

55.    Defendant disputes Plaintiffs' statement that the BOP did not offer halal-certified meals distributed by NFG in May 2017 solely because "it is still 'investigating' whether or not the manufacturer's use of prison labor legally prevents it from purchasing the meals." Shortly after the BOP created another halal menu for the four Plaintiffs in this case and took steps to purchase halal-certified meals for them (again), the BOP was notified by NFG that the manufacturer of the meals (CI Industries of the Washington State Department of Corrections) experienced water contamination issues, and the meals had been recalled. (Ex. 21, BOP043450-51; Ex. 17, Lawton Dep. 66-69.) NFG then terminated its contract with CI Industries and, to date, has not renewed the contract. (Ex. 17, Lawton Dep. 66-69; Ex. 21, BOP043449-50.)

## LEGAL BACKGROUND

### 1.  The Religious Freedom Restoration Act[6]

Congress enacted RFRA "'in order to provide very broad protection for religious liberty.'"

---

[6] On November 2, 2017, Plaintiffs filed a stipulation to dismiss Count II of their Amended Complaint, which was a claim brought under the Equal Protection Cause. (Dkt. No. 204.) Thus, their only remaining claim in this case is under RFRA. (Dkt. No. 18.)

*Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)); 42 U.S.C. § 2000bb - 2000bb-4. RFRA applies to the federal government and its agencies. *Hobby Lobby*, 134 S. Ct. at 2761. It provides that the "'[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,' unless the government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Holt*, 135 S. Ct. at 860. Determining the compelling-interest and least-restrictive means are questions of law. *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008).

When seeking an accommodation from a prison policy under RFRA, the plaintiff bears the initial burden of proving that the defendant's challenged policy implicates the plaintiff's religious exercise. *Holt*, 135 S. Ct. at 862. The plaintiff's request for an accommodation "must be sincerely based on a religious belief and not some other motivation." *Id.* at 862; *see also Hobby Lobby*, 134 S. Ct. 2751 ("[t]o qualify for RFRA's protection, an asserted belief must be 'sincere'"). Additionally, the plaintiff bears the burden of proving that the challenged policy "substantially burden[s] that exercise of religion." *Holt*, 135 S. Ct. at 862. He can do so by showing that the challenged policy requires him to "engage in conduct that seriously violates [his] religious beliefs." *Id.* (citing *Hobby Lobby*, 134 S. Ct. at 2775).

If the plaintiff meets his burden of showing that the challenged policy substantially burdens his exercise of religion, the burden then shifts to the defendant to show that its refusal to allow him an accommodation was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest. *Holt*, 135 S. Ct. at 863 (citing 42 U.S.C. §

2000cc-1(a)). "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Id.* (quoting *Hobby Lobby*, 134 S. Ct. at 2780). "'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'" *Holt*, 135 S. Ct. at 853 (quoting *Hobby Lobby*, 134 S. Ct. at 2780).

## 2. RFRA As Applied In the Prison Diet Context

There are myriad federal cases discussing RFRA and its sister statute, RLUIPA (the Religious Land Use and Institutionalized Persons Act),[7] in the prison diet context. In general, and consistent with RFRA, prisons cannot force inmates to choose between their religious practice and adequate nutrition. *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990).

Where the religious belief asserted involves a preference for, but not a religious requirement to eat, halal-certified meat, federal courts have held that vegetarian meals are sufficient to ensure that an inmate is not forced to eat haram food. *Pratt v. Corrections Corp. of America*, 267 F. App'x. 482, 483 (8th Cir. 2008) (RFRA claim fails "because he did not show that defendants placed a 'substantial burden' on his ability to practice his religion by failing to provide him with Halal meat" instead of a vegetarian diet); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810–12 and n.8 (8th Cir. 2008) (prison's meal plan regulations did not substantially burden Muslim inmate's free exercise rights where inmate had access to only vegetarian entrees); *Abdullah v.*

---

[7] RFRA and RLUIPA "are substantively identical with respect to prisoners' entitlements." *Whitfield v. Illinois Dep't of Corr.*, 237 F. Appx. 93, 94 (7th Cir. 2007).

*Fard*, 173 F.3d 854, at *1 (6th Cir. 1999) (holding that prison's failure to provide halal meat did not violate the Equal Protection Clause because inmate was provided vegetarian meals); *Cloyd v. Dulin*, No. 3:12–CV–1088, 2012 WL 5995234, at *4 (M.D. Tenn. Nov. 30, 2012) ("Muslim prisoners do not have a right under the First Amendment or the RLUIPA to be provided [H]alal meat entrees; rather, a correctional facility need only provide Muslim prisoners with food that is not 'haram' (impermissible)."); *Hudson v. Caruso*, 748 F. Supp. 2d 721, 729–30 (W.D. Mich. 2010) (holding that providing a Muslim inmate vegetarian entrees without providing Halal meat entrees did not substantially burden free exercise); *Samak v. Satcher*, 2007 WL 2708284, 4 (E.D. Tex. 2007) (BOP's failure to provide halal meats did not substantially burden the inmate's belief); *Watts v. Byars*, 2013 WL 4736693, 3 (D.S.C)(finding vegetarian meal in substitution of halal meals did not constitute a substantial burden on Plaintiff's sincerely held belief in a halal diet); *Abdul–Malik v. Goord*, 1997 WL 83402, at *5–7 (S.D.N.Y. 1997) (holding that the failure to provide Muslim inmates with Halal meat several times per week did not substantially burden their exercise of religion under RFRA).

In sum, the federal courts have generally found that inmates have a right to avoid eating foods that are forbidden by their religious beliefs. *Hunafa*, 907 F.2d at 47; *Moorish Science Temple v. Smith*, 693 F.2d 987 (2d Cir. 1982). But prisoners seeking highly individualized diets are rarely successful. *See Jenkins v. Angelone*, 948 F. Supp. 543 (E.D. Va. Oct. 4, 1996).

## ARGUMENT

### 1. Plaintiffs' Alleged Dietary Needs Are Not Sincerely-Held Religious Beliefs

To be protected under RFRA, Plaintiffs' professed beliefs must be "sincerely held." *Hobby Lobby*, 134 S.Ct. at 2774. RFRA protects requests for accommodations "sincerely based on a

religious belief and not on other motivation," *Zubik v. Burwell*, 135 S. Ct --, 862 (2015), and courts must separate real from fictitious religious beliefs. *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 713-16 (1981). "[W]hile the "truth" of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" *Thacker v. Dixon*, 784 F.Supp. 286 (E.D.N.C. 1991) (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)). "Checking for sincerity and religiosity is important to weed out sham claims." *Korte*, 735 F.3d at 683.

      a.   *Plaintiffs' claim that all food they consume must be certified halal is not a sincerely-held religious belief.*

    Plaintiffs have taken inconsistent positions about their "religious beliefs" throughout this case. They have maintained in their briefing not simply that they must avoid certain forbidden foods, but that all food is "doubtful" unless it is certified as halal by American Halal Foundation or Halal Advocates. (*See, e.g.*, Pls.' Br. In Supp. of Mot. For Preliminary Injunction at 25; Ex. 11, Carr Dep. 89-90; Ex. 13, Crenshaw Dep. 101-102.) Yet Plaintiffs acknowledged in their depositions that they view many foods such as fruit, vegetables, fish and grains as permissible without certification. (Ex. 11, Carr Dep. 53-54, 107; Ex. 13, Crenshaw Dep. 38.) Plaintiffs also routinely eat food and snacks from the commissary that are not halal-certified without concern about permissibility. (Ex. 13, Crenshaw Dep. 100, 117, 125-26; Ex. 16, Kent Dep. 28, 35, 60-61; Ex. 14, Wilson Dep. 86-87, 132, 134, 136, 139, 141, 154; Ex. 11, Carr Dep. 45, 129.)

    Plaintiffs have engaged in other behavior that does not comport with their purported dietary beliefs. Although behavior inconsistent with a purported religious belief does not necessarily establish lack of sincerity, it is highly relevant to that inquiry. Here, such behavior indicates just such a lack of sincerity. Kent, for example, was removed from the religious diet program in June

2015 for eating items that were not certified without any suggestion that such consumption was necessary for his health or adequate nutrition. (Ex. 16, Kent Dep. 32-33.) Kent also admits that he purchased and ate beef sausage and turkey from the commissary even though these snack items were not certified halal. (Ex. 16, Kent Dep. 33-34.) Similarly, Wilson was removed from the religious diet program in May 2015 after for taking a food tray from mainline with fried chicken, which he says he intended to sell. (Ex. 14, Wilson Dep. 79-80.) Wilson also purchased and ate non-halal beef sausage from the commissary in January 2015 even though halal beef sausage was also available for purchase. (Ex. 14, Wilson Dep. 138-39.) And Wilson admitted he "can't honestly particularly say" whether the snack item he purchased and ate from the commissary was halal. (Ex. 14, Wilson Dep. 139.) Crenshaw testified that he is comfortable eating numerous non-halal snack items from the commissary even though he is not sure whether they are certified or contain haram ingredients. (Ex. 13, Crenshaw Dep. 117-18, 125-28.)

Plaintiffs further have not taken available administrative steps to comply with their purported beliefs. For example, Plaintiffs have not attempted to purchase halal meals through the BOP's special order process or the commissary. (Ex. 13, Crenshaw Dep. 93-94; Ex. 11, Carr Dep. 127-29; Ex. 16, Kent Dep. 73-74; Ex. 14, Wilson Dep. 113.) Plaintiffs also have not requested halal meat as part of the Eid ceremonial meal at the close of Ramadan. (Ex. 11, Carr Dep.127; Ex. 16, Kent Dep. at 74; Ex. 14, Wilson Dep. at 114; Ex. 30, Jamiu Dep. 64-65; 86-87 (testifying that halal lamb is made available to Muslim inmates upon request to celebrate the end of Ramadan).) Thus, despite claiming that they must eat halal-certified meat while avoiding any meat that is "doubtful," Plaintiffs have not taken steps to follow these purported religious beliefs.

Plaintiffs claim that they lack sufficient funds to purchase halal meats or meals through the commissary, but that is simply not the case. All of the Plaintiffs have had sufficient funds in their trust accounts to purchase numerous other snacks and items over the last several years, but have simply chosen not to use their funds to buy halal meat even when it was available. (Ex. 13, Crenshaw Dep. 119; 128-29; Ex. 11, Carr Dep. 129-30; Ex. 14, Wilson Dep. 131-32.) Based on the foregoing, the record establishes that Plaintiff do not sincerely believe they may only consume certified food, and in particular may only eat halal-certified meats.

> b. *Plaintiffs' claims that they must eat meat twice daily certified by specific certifying organizations are not sincerely-held religious beliefs.*

Even if the Court determines that Plaintiffs have a sincerely-held belief that they must eat halal-certified food, additional record evidence undermines any claim that they have a sincerely-held belief that such food must be certified by specific organizations, or that they must consume halal-certified meat twice a day. The record makes clear that these demands are based on preferences and information obtained and advanced by third-parties, including Plaintiffs' attorneys and their purported expert, not religious belief.

To begin, Plaintiffs' purported beliefs about specific certifiers and meat requirements have developed and shifted throughout this litigation. When each of the Plaintiffs filed their administrative remedies with the BOP, they demanded only "halal-certified meals." (Ex. 11, Carr Dep. 69-71; Ex. 16, Kent Dep. 48-49.) It was only after this lawsuit was filed that Plaintiffs took the position that they may only eat food certified by Halal Advocates or the American Halal Foundation. (*See, e.g.*, Ex. 11, Carr Dep. 89-90; Dkt. No. 210-25 at 6; Ex. 14, Wilson Dep. 45-47, 46-48 (discussing Interrogatory responses asserting that only Halal Advocates of America was acceptable to him); Ex. 16, Kent Dep. 68-69; Ex. 26, Kent Resp. to Interrog. No. 3; Ex. 13,

Crenshaw Dep. 55, 57-58, 101-02 (testifying regarding response to Interrogatory that "[t]he only viable certifier of which plaintiff is presently aware that certifies halal food in accordance with plaintiff's religious beliefs is Halal Advocates of America" and American Halal Foundation with the exception of poultry"); *see also* Dkt. No. 210-18, ¶ 10(G), ¶ 69 (Plaintiffs' expert testifying that BOP must procure meals certified by Halal Advocates).)

Further, each of the Plaintiffs testified during their depositions that they had no actual, personal knowledge about the specific certifiers or vendors they claimed were required, and that they were relying solely on information provided to them by their attorneys. (Ex. 16, Kent Dep. 48-49; 66-68; Ex. 14, Wilson Dep. 47; Ex. 13, Crenshaw Dep. 55-59; Ex. 11, Carr Dep. 76, 85.)

Plaintiffs' shifting attitudes toward IFANCA-certified meals further undermine their claims. In 2015, the Bureau of Prisons created a "Certified Religious Diet Halal Menu" specifically for these four Plaintiffs. These institutions purchased prepared halal-certified meals for the Plaintiffs, which would have provided halal meals distributed by J&M Meals and certified by IFANCA. These meals included meat on a regular basis. (Stiltner Dep. 271, Certified Religious Diet (Halal) Menu (including fish fillet, beef stew, tuna, and halal bologna).) Plaintiffs rejected the meals and refused to eat them. Carr and Crenshaw rejected the meals claiming that IFANCA was not a satisfactory certifying organization, (Carr Dep. 133; Crenshaw Dep. 98) while Wilson and Kent could not explain why exactly they rejected the meals (Wilson Dep. 50, 117-18; Kent Dep. 76-77). Carr, who had specifically asked for IFANCA-certified meals when he filed his administrative request, (Carr Dep. 71) recently changed his position again, suggesting that IFANCA (among other certifiers) is "potentially able" to certify in accordance with his beliefs. (Dkt. No. 210-29 at 3-4). The other three Plaintiffs have followed suit. (Dkt. No. 210-30 at 3-4;

Dkt. No. 210-31 at 3-4; Dkt. No. 210-32 at 3-4.)

But again, Plaintiffs repeatedly claimed that IFANCA was not an acceptable certifier. (Wilson Dep. 48 (testifying that IFANCA is not an acceptable certifier); Crenshaw Dep. 59-60 (same); Kent Dep. 68, 84 (testifying that even if the BOP had provided him with halal-certified meals in response to his grievance, it would not have been acceptable if the meals were IFANCA-certified).) The transitory nature of Plaintiffs' purported beliefs is suspect.

Plaintiffs' claims about a requirement to eat meat have similarly shifted forms and appear to be based on non-religious preferences. Plaintiffs claim in their summary judgment brief that they must eat meat on a "regular" basis, but do not specify what this means. (Pls.' S.J. Br. at 23.) During discovery, Plaintiffs claimed this meant they must eat halal-certified meat twice a day, (Ex. 13, Crenshaw Dep. 64; Ex. 14, Wilson Dep. 50-51) but three of the Plaintiffs explicitly conceded this "belief" was not religious in nature. (Ex. 13, Crenshaw Dep. 64; Ex. 14, Wilson Dep. 51-52; Ex. 16, Kent Dep. 70-71 (agreeing that twice-a-day demand "has nothing to do with religion").) And all of the Plaintiffs generally asserted their demand was based on "fairness" because they believe other inmates eating food from mainline can obtain meat twice daily, or based on "nutrition" or "social norms." (Ex. 11, Carr Dep. 117-118; Ex. 13, Crenshaw Dep. 64-65 (saying that meat is required twice daily "for nutritional purposes"); Ex. 14, Wilson Dep. 51 (stating meat is needed twice a day based on "nutritious experts"); Ex. 16, Kent Dep. 69-72 (eating meat is part of "social norms").) But it is bedrock law that preferences not based on religious doctrine or belief and are not protected by RFRA. *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008)(Koger's desire for a non-meat diet rooted solely in health concerns is not protected); *see also United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996) (religious belief must

25

be more than just a philosophy or way of life); *Thiry v. Carlson*, 78 F.3d 1491 (10th Cir. 1996) (same). Accordingly, any assertion by Plaintiffs that they must be provided halal-certified meat twice daily cannot be sustained under RFRA.

Based on the foregoing, the Court should grant Defendant's motion on the basis that Plaintiffs' alleged dietary requirements are not based on a sincerely-held religious belief.[8]

**2. Any Substantial Burden Is Justified By Compelling Governmental Interests and the BOP's Diet Program is the Least Restrictive Method of Furthering Those Interests.**

In the alternative, any burden placed on Plaintiffs by not providing them with meat twice daily, certified by a halal certification company that they find suitable, is justified by several compelling Governmental interests, which are being furthered by the least restrictive means. RFRA provides that the Government may substantially burden a person's exercise of religion if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000bb-1. As the Supreme Court explained under RLIUPA, "'[c]ontext matters' in the application of that standard." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)). Courts should apply the standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.*

The compelling Governmental interests implicated in this case are several: inmate health and safety; the safe and orderly running of prisons; and the integrity of the Government procurement

---

[8] To the extent the Court finds that the Plaintiffs have a sincerely-held religious belief that they must eat halal-certified meat, certified by one of their preferred organizations, twice daily, the BOP is not currently providing this dietary accommodation to the Plaintiffs.

process. *See Andreola v. Wisconsin*, 211 Fed.Appx. 495, 498–99 (7th Cir. 2006) (finding under RLUIPA compelling Governmental interests of maintaining prison security and "abating the costs of a prisoner's keep"); *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007) (prison policy is "related to maintaining good order and controlling costs and, as such, involves compelling governmental interests."); *Cf. Cutter*, 544 U.S. at 726, 125 S.Ct. 2113 ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."). *But see Schlemm v. Wall*, 784 F.3d 362, (7th Cir. 2015) (finding cost was not a compelling Governmental interest in accommodating one Native American inmate's request that he be provided venison once a year for feast).

The BOP is engaging in the least restrictive means in furthering those interests through its Alternative Religious Diet Program. When determining whether a particular regulatory scheme is the "least restrictive," the appropriate inquiry is whether the individual or organization with religious objections, and those similarly situated, can be exempted from the scheme—or whether the scheme can otherwise be modified—without undermining the government's compelling interests. *United States v. Schmucker*, 815 F.2d 413, 417 (6th Cir. 1987) (describing the least restrictive means test as "the extent to which accommodation of defendant would impede the state's objectives"); *United States v. Wilgus*, 638 F.3d 1274, 1289-95 (10th Cir. 2011). The Government is not required "to do the impossible—refute each and every conceivable alternative regulation scheme." *Wilgus*, 638 F.3d at 1289. Instead, the Government need only "refute the alternative schemes offered by the challenger." *Id*.

Here, the BOP has instituted a National Menu, which includes the Alternative Religious Diet,

whereby 150,000+ inmates are served essentially the same menu in every BOP institution around the country. (Ex. 2, Holliday Decl. ¶ 1, 7-8; Ex. 3, Holliday Dep. 36.) Before approving meals to be served inmates, the BOP's Chief Dietician reviews and analyzes the proposed meals for nutritional content and sufficiency. (Ex. 2, Holliday Decl. ¶ 6.) In doing so, the Chief Dietician reviews the average daily nutrient intake levels needed to meet the requirements of health individuals, as required by ACA standards. (Ex. 2, Holliday Decl. ¶¶ 6, 11; Ex. 3, Holliday Dep. 106.) The Dietician also uses the National Menu to create clinical guidelines for inmate medical care. (Ex. 2, Holliday Decl. ¶ 11.) *See Jenkins v. Angelone*, 948 F. Supp. 543 (E.D. Va. 1996) (finding that nutritional value of prison food was compelling Governmental interest under RFRA). The Menu has improved food consistency in terms of both quality of food and nutritional content. (Ex. 3, Holliday Dep. 125-26, 136-37.)

The BOP's Alternative Religious Diet Menu is the least restrictive means by which the BOP can pursue its nationalized menu while accommodating religious exercise. Through the Alternative Religious Menu, the BOP provides meals certified as containing no haram ingredients such as pork, alcohol, emulsifiers, mind altering substances, enzymes, and/or chemicals. (Ex. 2, Holliday Decl. ¶ 14, Ex. 7, BOP042146, BOP Certified Food Specifications.) It is able to ensure that these meals meet the necessary nutrition and medical standards for its inmates. And, based on consultations with Imams and experience in the prisons themselves, this Alternative Religious Diet Menu is able to accommodate the overwhelming number of Muslim inmates. (Ex. 8, Kugler Dep. 36-37, 42-44; Ex. 9, Boz Dep. 100-101; Ex. 30, Jamiu Dep. 30.)

The BOP has attempted to go further to accommodate sincerely-held religious beliefs—by seeking halal-certified meals that it could include as an option in the Alternative Religious Diet

Program. Over the past three years, the BOP has issued three Requests for Information (RFIs) for vendors of halal-certified meals. (Ex. 12, Stiltner Dep. 194, 256.) No vendor responded to the first RFI, but several vendors responded to the second and third. (Ex. 8, Kugler Dep. 153; Ex. 12, Stiltner Dep. 261.) At the time, none of the respondents offered pre-packaged halal-certified meals that comported with both the BOP's requirements and Plaintiffs' stated requirements for halal certification. (Ex. 8, Kugler Dep. 36-37, 304-05, 128.) The BOP has continued to communicate with those vendors to determine whether they can provide meals that meet specifications for a halal menu to be implemented on a Bureau-wide basis to all inmates. (*See, e.g.,* Ex. 8, Kugler Dep. 306-07, Ex. 17, Lawton Dep. 76-79, 162-68.)

The BOP also sought to accommodate the particular religious views of the Plaintiffs without success. In 2015, the BOP also offered halal-certified meals to Plaintiffs, purchased the meals, and had them available at Plaintiffs' institutions for consumption. (Ex. 4, Langford Dep. 127; Ex. 8, Kugler Dep. 163-64, 194-95.) Plaintiffs refused to accept the meals, stating that they were not properly certified. (Ex. 8, Kugler Dep. 194-95.)

Although Plaintiffs argue in their brief that meals certified by that certifier is now acceptable to them, their supplemental responses to Interrogatories served on or about November 3, 2017 (the day discovery closed) state that various certifiers (including IFANCA) are only "*potentially able to certify that food is prepared in accordance with the halal slaughtering and preparation requirements identified in Plaintiff's [original Interrogatory responses], however*, not all of the food products certified as 'halal' by these organizations are prepared in accordance with Plaintiff's religious beliefs." (Dkt. No. 210-29 at 3-4; *see also* Dkt. No. 210-30 at 3-4; Dkt. No. 210-31 at 3-4; Dkt. No. 210-32 at 3-4 (identical responses from all Plaintiffs) (emphasis added.)

Thus, even today, the BOP could not purchase halal meals certified by these organizations with any confidence that Plaintiffs would deem them acceptable.

Several BOP institutions have recently posed solicitations for halal-certified meals for their inmate populations, and those solicitations are pending. In particular, the FCI – Memphis, USP – Atlanta, FCI – Cumberland, and FCC – Florence posted Requests for Quote to the FedBizOpps website for the purchase of halal-certified meals. (*See, e.g.,* Ex. 24, BOP044109-44124.) The specifications for meat require that the meat be hand-slaughtered with a horizontal cut to the throat of the animal so that three of the four vessels are severed in one cut, by a practicing, adult Muslim, with the slaughterer reciting "In the Name of Allah" before the slaughter of each animal, in a manner prescribed by Islamic law. (Ex. 24, BOP044114.)

The BOP's unsuccessful attempt to identify a vendor to date that can accommodate Plaintiffs on either a specific or preferably national level demonstrates that the BOP is pursuing the least restrictive means to achieve its compelling interests. *See Schlemm*, 784 F.3d at 365 (least restrictive means test would be met if state demonstrated that it could not locate a viable alternative); *Warsoldier v. Woodford*, 418 F.3d 989, (9th Cir. 2005) (least restrictive means test met where party "demonstrates that it has actually considered and rejected the efficacy of less restrictive measures"). The BOP continues to try to identify a vendor who meets Plaintiffs' stated certification requirements and the BOP's dietary and packaging requirements by recently issuing solicitations for halal-certified meals. These facts satisfy the least restrictive means test.

Despite the clear record evidence of BOP's efforts, Plaintiffs now assert that the BOP has simply ignored several vendors who could currently provide halal meals that meet their requirements and the BOP's packaging and nutritional requirements. This is not the case.

Sopakco, Inc., for example, distributes its halal meals in MREs, which contain a heating element and foil packaging that cannot be used in BOP institutions for security reasons, (Lawton Dep. 76-79; Stiltner Dep. 244, 258, Kugler Dep. 130, 304), and it has not confirmed that it will change its meals to meet the BOP's packaging requirement. (Lawton Dep. 78-79.) Moreover, to date, Sopakco has not confirmed which organization certifies its halal meals, so there is no assurance that Plaintiffs would deem them acceptable. (BOP043314-15; Ex. 15 Kugler Decl. ¶ 13.)

Midamar's response to the RFI indicated that they do not double wrap its meals, which is required by the BOP for certified meals to avoid any issues with cross-contact, (FBOP000172-000181; Stiltner Dep. 108-09), and in any event, their meals would not satisfy the Plaintiffs because the meals were certified by the Islamic Society of America (ISA), and include poultry slaughtered by machines. Sisters One has similarly not confirmed that it can provide pre-packaged halal meals consistent with the BOP's requirements for certified religious food, (Lawton Dep. 84-88, 95-96) and again, distributes meals certified by several certifiers the Plaintiffs have not deemed acceptable.

Labriute did not respond to the RFI (BOP044037; Lawton Dep 96-97) and, despite BOP's efforts to inquire into Labriute's capacity to provide the meals, Labriute has, to date, not provided the detailed menu and meal information required for the BOP to determine whether such meals meet the BOP's nutritional requirements. (Lawton Dep. 96-97, 99-100.)

National Food Group was a potential, viable vendor, and the BOP sought to procure meals through them, but NFG's manufacturer encountered a water contamination issue and NFG terminated its contract with them. (BOP043450-51; Lawton Dep. 66-69.) As for Taaza Fresh, Taaza's response to the RFI indicated that it only provided bulk meat, not pre-packaged meals,

(Stiltner Dep. 257) and Taaza has never responded to the BOP's requests for detailed menu and meal information to analyze whether Taaza can indeed meet the BOP's nutritional requirements. (Lawton Dep. 114-115; BOP041271; BOP044012.)

Moreover, although Plaintiffs suggest in their brief that there are numerous other potential halal food vendors available, the reality is that up until filing their brief, Plaintiffs maintained that only vendors certified by Halal Advocates and American Halal Foundation were acceptable. *See supra* Argument, section 1.

Unable to dispute the record evidence of the BOP's efforts, Plaintiffs argue that the BOP should simply pick up a credit card and begin purchasing meals from a vendor Plaintiffs approve. This approach would up-end valid BOP policy. The BOP cannot simply depart from its nutritional requirements, packaging requirements, and normal procurement process to purchase meals that four inmates request. (Ex. 12, Stiltner Dep. 207, 216-17 (testifying BOP cannot create menu and specifications based on one vendor's offerings based on procurement policies); Ex. 3, Holliday Dep. 124-25, 134.) *See LABAT–Anderson, Inc. v. United States*, 65 Fed.Cl. 570, 581 (2005) ("It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."); *Eco Tour Adventures, LLC v. United States*, 114 Fed.Cl. 6 (2013); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed.Cir. 2009) (procurement decisions must have rational basis and cannot involve a violation of regulation or procedure).

Vendors of food to the BOP must meet certain requirements, and the BOP is compelled by procurement regulations to choose the vendor most advantageous to the Government, considering past performance and price. (Ex. 24, BOP044109; Ex. 4, Langford Dep. 45, 52, 68.)

Ordering Plaintiffs meals outside the normal BOP process would undermine BOP's compelling interest in providing safe and nutritious food to inmates across the country on a consistent basis. (Ex. 2, Holliday Decl. ¶ 13.)

Plaintiffs' assertions also ignore the difficulty of finding food that actually complies with their purported religious beliefs. Halal-certified food is not easily found at any local grocery store and, even if it were, there is no way of knowing whether the meat provided would meet both the BOP's safety and nutrition standards (which in turn must meet the Dietary Reference standards of the Food and Nutrition Board of the National Academy of the Sciences and approved by a registered dietitian) - and Plaintiffs' strict standards for halal certification. (Ex. 3, Holliday Dep. 124-25 (testifying that a menu specifying only "a starch" or "a protein" would not allow for an appropriate nutritional determination and would lead to inconsistency in the quality of meals served at different institutions).) Plaintiffs concede this point by insisting that their food must be inspected and certified by specified vendors. (Pls.' S.J. Br. 27.) For this reason, Plaintiffs cannot and do not plausibly argue that the BOP should purchase halal meat in bulk and prepare it in a separate, halal kitchen.

Plaintiffs' requested remedy also raises security concerns. ACA standards provide that "[s]pecial diets should be kept as simple as possible and should conform as closely as possible to the foods served other inmates." (Ex. 2, Holliday Decl. ¶ 13; Ex. 3, Holliday Dep. 148 (citing ACA standard, 4-4319).) For good reason: the BOP has determined that compelling security concerns are raised wherever one inmate or group of inmates receives items that other inmates are not offered. (Ex. 5, Hinkle Dep. 78-83, 86-89 (testifying that security issues have decreased under the National Menu and Certified Religious Diet).) Thus, medical dietary accommodations

must be based on a documented, physician-determined clinical need (Holliday Dep. at 34-36), and, in nearly every case, are satisfied with foods already found on the National Menu (*Id*.) So too with religious diets. The meals purchased pursuant to the Alternative Religious Diet Program—including those certified by the Central Rabbinical Congress for Orthodox Jews— follow a specific, nationwide policy that ensures adequate nutrition and minimizes friction amongst inmates. (Churchill Dep. at 26.) Plaintiffs' request that this Court order the BOP deviate from its National Menu programs, create an entirely new menu, and order meals from specified vendors would raise significant security concerns.

In sum, the BOP through its Food Services, Procurement and Chaplaincy staff has considered viable alternatives in providing food to Plaintiffs and have been unable to find a vendor that conclusively satisfies the BOP's requirements and Plaintiffs' purported certification requirements. The National Menu and Alternative Religious Diet is the least restrictive means by which the BOP can achieve its compelling governmental interests in inmate health and safety; the safe and orderly running of prisons; and the integrity of the Government procurement process. Based on these facts, the Court should grant summary judgment in Defendant's favor.

**3.   Any Injunctive Relief Ordered Must Be Narrowly Drawn.**

If despite all of the evidence of the BOP's efforts toward accommodation, this Court determines that RFRA requires further action with respect to these Plaintiffs, such injunctive relief should be narrowly drawn. Under the Prison Litigation Reform Act, remedial injunctive relief entered against the BOP must be "narrowly drawn, extend[ ] no further than necessary to correct the violation of the Federal right, and [use] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A); *see also Lindell v. Frank*, 377

F.3d 655, 660 (7th Cir. 2004) (reversing part of an injunction as overbroad in violation of the PLRA). The PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: "[P]rison officials have broad administrative and discretionary authority over the institutions they manage." *Hewitt v. Helms*, 459 U.S. 460, 467 (1983). And as the Seventh Circuit has held, any relief granted cannot eliminate operational discretion and flexibility of prison administrators. *Westefer v. Neal*, 682 F.3d 679, 682 (7th Cir. 2012).

Accordingly, if the Court were to determine that the BOP must begin providing specific halal-certified meals to the Plaintiffs, any such order should provide general guidelines and sufficient time for the BOP to continue its established, statutory and regulatory procurement process for the purchase of halal meals. *Westefer*, 682 at 686 (reversing district court's order of injunctive relief as "highly specific" and beyond constitutional requirements).

## CONCLUSION

WHEREFORE, the Defendant requests that the Court grant summary judgment in his favor and dismiss all of the Plaintiffs' claims against him.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By      *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which sent notification of such filing to the

following:

    David J. Leviss
    Scott Hammack
    Jessica L. Thorn
    Bradley N. Garcia
    Darcy M. Meals
    Meredith Garagiola
    Lindsey R. Love
    Sergei Zaslavsky
    Matthew Gill
    John McDermott
    Carolyn Appel

    O'MELVENY & MYERS LLP
    1625 Eye Street, NW
    Washington, D.C. 20006

and I hereby certify that I have mailed by United States Postal Service the document to

the following non CM/ECF participants:

    NONE.


                                          *s/ Shelese Woods*
                                          Shelese Woods
                                          Assistant United States Attorney


Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN   46204
Telephone: (317) 226-6333
Fax: (317) 226-5027