**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| **BRIAN CARR,** *et al.*, | |
| **Plaintiffs,** | **No. 2:14-cv-00001-JMS-MJD** |
| **v.** | |
| **MICHAEL CARVAJAL, DIRECTOR, FEDERAL BUREAU OF PRISONS,** | |
| **Defendant.** | |

## PLAINTIFFS' MOTION FOR ATTORNEY'S FEES AND COSTS

Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, Local Rule 54-1 of the

U.S. District Court for the Southern District of Indiana Local Rules, 28 U.S.C. § 2412, and 42

U.S.C. § 1988, Plaintiffs Brian Carr, John Wilson, Tron Kent, and Mark Crenshaw respectfully

submit this motion for an award of attorney's fees and costs against Defendant Michael Carvajal,

in his official capacity as the Director of the Federal Bureau of Prisons ("BOP"). This motion is

supported by the accompanying Declaration of David J. Leviss ("Leviss Decl.") and related

exhibits, and the Declaration of Scott Hammack ("Hammack Decl.").

Plaintiffs filed this suit in 2014 because the BOP refused to provide them with a diet that

conformed to their religious beliefs as practicing Muslims. After six-plus years of hard-fought

litigation and lengthy settlement negotiations, on May 29, 2020, the Parties entered into a

Settlement Agreement in which the BOP agreed to fully accommodate Plaintiffs' religious

beliefs by providing Plaintiffs with a diet that complies with their religious beliefs for as long as

Plaintiffs remain in BOP custody. *See* Leviss Decl. Ex. A, Settlement Agreement and Release

("Settlement Agreement") ¶ 3. Specifically, the Settlement Agreement requires the BOP to

provide a Halal Diet that includes halal meat and that requires meals to meet exacting religious criteria. *Id.* (describing required elements of Halal Diet). This Settlement Agreement resolved the merits of this litigation by providing Plaintiffs with essentially all of the relief they sought in this case.

In an effort to expedite the resolution of Plaintiffs' substantive claims, the parties agreed to exclude the issue of Plaintiffs' entitlement to attorney's fees and costs from the Settlement Agreement. *See id.* ¶ 16. Following execution of the Settlement Agreement, the Parties have continued to negotiate on the issue of attorney's fees and costs, but have been unable to reach agreement. Both the Settlement Agreement and the Court's Order on Stipulation of Dismissal ("Dismissal Order") (Dkt. 333), provide for the Court's ongoing jurisdiction to enforce terms of the Settlement Agreement and to adjudicate any motion for an award of fees or costs. Settlement Agreement ¶ 9; Dismissal Order at 1. For the reasons set forth herein, Plaintiffs, as prevailing parties in this action, are entitled by statute to an award of attorney's fees and costs. Plaintiffs seek an award of $2,462,703.77 in fees and $53,710.48 in costs.

## I.    **BACKGROUND**

Plaintiffs are four Muslim federal inmates whose sincere religious beliefs require them to consume halal food including meat that has been certified as complying with their religious beliefs. For years, the BOP refused to provide Plaintiffs with meals that accommodated their religious beliefs. Instead, it long maintained that its existing Kosher-certified menu satisfied the religious needs of all Muslim inmates, even though those meals are not certified as halal and do not comply with Plaintiffs' religious beliefs. After exhausting administrative appeals (a process which took more than a year for most Plaintiffs), Plaintiffs filed this action in January 2014 under the Religious Freedom Restoration Act ("RFRA"), arguing that the BOP's refusal to provide them with a religiously-acceptable diet "substantially burden[ed] religious exercise

without compelling justification." 42 U.S.C. § 2000bb(a)(3).[1]  Plaintiffs sought a permanent injunction from this Court that would require the BOP to provide Plaintiffs with a diet that conformed to their religious beliefs.  After more than six years of litigation, the Parties entered into a Settlement Agreement that guarantees Plaintiffs access to halal meals including certified meat for the remainder of their incarcerations, effectively granting Plaintiffs the original relief sought.

A.  **The BOP's Dilatory Litigation Tactics**

Instead of working to diligently accommodate the four Plaintiffs in this case, the BOP chose to aggressively defend this action for more than six years.  For most of that time, the BOP continued to maintain that its existing offerings accommodated Plaintiffs' religious needs.  *See* Def.'s Answer to Pls' Am. Compl. & Affirmative Defenses (Dkt. 19) ¶ 21; Br. in Supp. of Def.'s Mot. for Summ. J. & in Opp. to Pls' Mot. for Summ. J. ("Def's MSJ Mot.") (Dkt. 220) at 3-4 (filed Dec. 8, 2017).  It also contended that its decision to repeatedly transfer Plaintiffs to new BOP institutions required them to re-exhaust their administrative remedies at each institution and mooted their claims, *see* Def.'s Partial Mot. to Dismiss (Dkt. 14); Def.'s Mot. to Dismiss for Lack of Jurisdiction (Dkt. 97), a proposition this Court rejected, *see* Order (Dkt. 194).  At the same time, the BOP insisted that it had various compelling government interests that prevented it from accommodating Plaintiffs' religious rights.  These included inmate health and safety, prison security, and integrity of the government procurement process—all of which, the BOP maintained, necessitated a standardized, nationwide menu.  Def's MSJ Mot. at 26-28.  This

---

[1] It is settled law that failure to provide inmates with meals that conform to their sincere religious beliefs substantially burdens religious exercise.  *Jones v. Carter*, 915 F.3d 1147, 1150 (7th Cir. 2019); *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008).  As discussed further below, Plaintiffs' complaint included a second count under the Equal Protection Clause of the Fifth Amendment seeking identical relief.  Am. Compl. (Dkt. 18) ¶¶ 82-86.  That count was later dismissed pursuant to stipulation.  Stipulation of Partial Dismissal (Dkt. 204).

position required Plaintiffs to engage in extensive discovery regarding the BOP's national policies as well as the implementation of those policies at specific BOP institutions, including the ones that housed Plaintiffs at various points throughout the litigation. Plaintiffs ultimately had to depose twelve BOP officials and experts and review over 90,000 documents produced by the BOP. Plaintiffs also needed to retain experts to rebut the BOP's claims regarding the procurement process and the certification of religious food.

Discovery deadlines in this case were repeatedly extended or stayed due to the BOP's lethargic approach to this case. Upon receiving Plaintiffs' initial discovery requests in November 2014, the BOP requested a stay to allow the parties to explore settlement. Plaintiffs agreed, and the Court stayed discovery until January 16, 2015 "to allow [the parties] to continue certain settlement negotiations." Order (Dkt. 39) (staying discovery deadlines). However, it was not until March 2015 that the BOP issued a Request for Information ("RFI") to identify potential vendors, *see* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' MSJ") (Dkt. 210) at 13, and the BOP did not even make a settlement offer until the morning of the Settlement Conference, which had been pushed back until September 28, 2015. *See, e.g.*, Order (Dkt. 41) (staying deadlines until May 7, 2015); Order (Dkt. 43) (staying deadlines until July 24, 2015); Order, Dkt. 47 (staying deadlines until September 28, 2015). Plaintiffs' rejected the proposed settlement, which would have provided food that did not comply with Plaintiffs' religious beliefs. Following the settlement conference, the Court set a new discovery deadline of March 4, 2016. Minute Entry (Dkt. 59). However, the BOP was unable to meet the deadlines for document productions, and discovery was again extended to September 2, 2016. *See* Joint Mot. for Extension of Time (Dkt. 61); Order (Dkt. 63). At the March 1, 2016 status conference, the BOP informed the Court that a snowstorm caused the BOP's email servers to crash, which would

further delay discovery as the BOP had yet to complete its production of emails.  The Court then suspended all discovery deadlines.  Minute Entry (Dkt. 66).

By January 19, 2017, more than three years into this litigation, the BOP had still not complied with its discovery obligations, having engaged in what Magistrate Judge Dinsmore characterized as a year-long "leisurely process of . . . restor[ing] of its server to functionality." Minute Entry (Dkt. 128) at 1.  Even after the server was restored, the BOP's efforts to comply with its discovery obligations were "patently unreasonable."  *Id.* at 2; *see also* Order on Mot. to Compel (Dkt. 171) at 1-2 (noting that, following the server outage and restoration, "subsequent efforts to produce documents have likewise proven glacial").  Magistrate Judge Dinsmore ordered the BOP to produce the outstanding documents by February 21, 2017, or else face sanctions, noting that "[i]t is difficult to imagine a situation where any other litigant would have been allowed to delay a production for as long as the Bureau of Prisons has delayed its production in this case."  Minute Entry (Dkt. 128) at 1.  Three days after that court-imposed deadline, on February 24, 2017, the BOP produced 90,000 emails to Plaintiffs.  Def.'s Notice to Court (Dkt. 137).

During this lengthy delay, the BOP continued to violate Plaintiffs' rights on a daily basis by refusing to provide them with food that satisfied their religious beliefs.  Unwilling to sit idly by while the BOP dragged its feet, Plaintiffs actively worked to secure relief during this period. Throughout 2015 and 2016, Plaintiffs' counsel worked to locate vendors and certifiers that the BOP could use to obtain food that met Plaintiffs' beliefs.  Having identified a number of vendors who were capable of providing halal food that met Plaintiffs' beliefs, in October 2016, Plaintiffs sought a preliminary injunction that would have required the BOP to provide certified halal meals to Plaintiffs.  Mot. for Prelim. Injunction (Dkt. 84).  Plaintiffs' counsel briefed the motion

and diligently prepared for the hearing, which was scheduled for August 8, 2017. Order (Dkt. 170). The Court cancelled the hearing five days before it was set to occur and deferred consideration of the merits until after summary judgment. Order (Dkt. 176).

### B.       The BOP's Languid Efforts to Accommodate Plaintiffs

The BOP's efforts to find an accommodation for Plaintiffs were similarly dilatory and transparently driven by pending litigation deadlines. After Plaintiffs filed their complaint in January 2014, the BOP created a working group to evaluate potential accommodation of halal requests. Ex. 15 to Def.'s Cross-Mot for Summ. J. (Dkt. 219-15), Kugler Decl. ¶ 6. More than a year later, in March 2015, the BOP finally issued its first Request for Information ("RFI") to potential vendors of halal meals. The RFI generated encouraging responses from multiple vendors, including from Midamar, which is the vendor the BOP selected four years late to provide Plaintiffs with the halal-certified meals that are currently being provided under the terms of the Settlement Agreement. *See* Pls.' MSJ at 13.[2] But back in 2015, the BOP failed to follow up with Midamar and other interested vendors; instead, once discovery was stayed, the BOP's working group stopped meeting, ceased all ongoing communications with potential halal vendors, and did not convene again until discovery resumed in early 2017. Ex. 8 to Def.'s Cross-Mot for Summ. J. (Dkt. 219-8), Kugler Dep. Tr. 306:8-307:9. During this hiatus, the BOP issued no new RFIs, nor did it seek a Request for Quote ("RFQ"), the next step in the procurement process. At the same time, the BOP continued to deny Plaintiffs access to its earlier communications with vendors, which identified Midamar and other potentially viable vendors, implausibly asserting deliberative process privilege and other privileges over its communications

---

[2] In December 2015, the BOP actually purchased meals from another company, J&M Foods, and offered them to Plaintiffs, but the meals did not comply with many of Plaintiffs' religious requirements, such as the requirement that meat be hand-slaughtered. Pls.' MSJ at 18-19.

with an outside commercial vendor. Plaintiffs were required to research these issues, file a successful motion to compel, and argue the issues in multiple status conferences.[3] *See* Order on Mot. to Compel (Dkt. 125) at 7 (concluding there was "no support for the BOP's position" and ordering the communications produced).

Meanwhile, Plaintiffs' counsel spent hundreds of hours researching, identifying, and communicating with potential vendors of halal meals that would be acceptable to the BOP, as well as halal certifiers who could attest that vendors' products complied with Islamic dietary laws. Plaintiffs' efforts were necessitated by the BOP's insistence that it could not locate a vendor that could provide meals that met Plaintiffs' beliefs and BOP requirements. However, this was driven largely by the BOP's unreasonable and unsupported insistence that any halal menu be identical—down to the weight of the peas and carrots provided—to the existing Kosher religious menu. Pls.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' MSJ Reply") (Dkt. 223) at 32-33. While Plaintiffs repeatedly identified vendors who were willing to provide food that was certified as meeting Plaintiffs' beliefs, the BOP summarily ignored vendors who did not have a pre-existing line of Halal meals that were identical to the Kosher ones the BOP was serving.[4]

It was not until discovery resumed in early 2017 that BOP continued its contacts with potential vendors. It again contacted Midamar, who responded to all of the BOP's questions within 24 hours. Pls.' MSJ at 13. In its communications, Midamar repeatedly represented to the BOP that it could create meals that satisfied Plaintiffs' religious needs. *Id.* Likewise, another vendor, Sopakco, had offered to modify its halal-certified offerings as needed to meet the BOP's

---

[3] The parties have participated in 24 status conferences over six years of litigation in this case.
[4] Throughout this litigation, Plaintiffs have never insisted on a particular vendor or halal certifier, but have consistently maintained that any vendor and certifier that complies with their religious beliefs would be acceptable. *See* Pls.' MSJ Reply at 25-26.

7

specifications, but it does not appear that the BOP followed up in response. *Id.* at 13-14. By October 2017, Plaintiffs had informed the BOP of at least six viable vendors of halal food that could potentially satisfy their religious beliefs, including Midamar. *See id.* at 13-16.

In the week leading up to filing its motion for summary judgment, the BOP at long last finally issued RFQs for prepackaged halal-certified meals at the four institutions housing Plaintiffs. Ex. 24 to Def.'s Cross-Mot for Summ. J. (Dkt. 219-24), FCI Memphis RFQ (Nov. 30, 2017); Ex. 82 to Pls.' MSJ Reply (Dkt. 223-10), USP Atlanta RFQ (Dec. 6, 2017); Ex. 83 to Pls.' MSJ Reply (Dkt. 223-11), FCI Cumberland RFQ (Dec. 6, 2017); Ex. 84 to Pls.' MSJ Reply (Dkt. 223-12), FCC Florence RFQ (Dec. 7, 2017). These RFQs were transparently driven by the BOP's need for a better record in this litigation. The BOP's summary judgment motion filed on December 8, 2017, prominently touted these RFQs as evidence that the BOP was attempting to accommodate Plaintiffs' religious beliefs, even though no vendors had yet had the chance to respond and the RFQs included unnecessarily burdensome specifications that the BOP knew no vendor could currently satisfy. Indeed, the BOP failed even to notify most vendors of the RFQs, including four of the six vendors Plaintiffs had already identified as viable. Pls.' MSJ Reply at 23-24.

The Court ultimately denied the BOP's motion for summary judgment, as well as Plaintiffs' cross-motion, and granted Plaintiffs' motion to strike two of the BOP's experts. Order on Mot. to Strike Experts (Dkt. 198); Entry on Mots. for Summ. J. (Dkt. 277). One month before the Final Pretrial Conference, and just two weeks before the parties were due to file their final stipulations, exhibit and witness lists, and deposition designations, the Court vacated the July 2018 trial date. Order Granting Pls.' Unopposed Mot. for Continuance of Trial (Dkt. 265). It later reset the bench trial for September 16, 2019. Minute Entry (Dkt. 283). Again, Plaintiffs'

counsel ramped up their trial preparation efforts and prepared to exchange pre-trial materials with the BOP until the Court granted the BOP's motion to continue the trial date on July 19, 2019—less than three weeks before the Final Pre-Trial Conference was due to occur, and just days before the parties were due to submit their pretrial filings. Order (Dkt. 309).

Following the BOP's issuance of the RFQs, Midamar again reached out to the BOP offering to create a line of halal-certified meals that would meet Plaintiffs' religious beliefs and the BOP's requirements. At long last, the BOP took Midamar up on its offer, and worked with Midamar to develop a line of halal-certified meals that satisfied the BOP's demand that the meals be identical to its existing Kosher menu. Br. in Supp. of Mot. to Dismiss or in the Alternative Mot. for Summ. J. (Dkt. 300) at 7. After working with Midamar for over a year, in April 2019, the BOP began offering these meals as part of a trial halal diet to inmates at a handful of BOP institutions, including the four institutions housing Plaintiffs. *Id.* at 8. The trial, by the BOP's own admission, was designed to be temporary and was not made an official part of the BOP's national menu, nor was it implemented at all BOP institutions. Pls.' Opp. to Def.'s Mot. to Dismiss & Mot. for Summ. J. (Dkt. 301) at 7-8. Nothing legally bound the BOP to continue the menu after completion of the trial period, and the BOP's own witness testified that they had not yet "determine[d]" whether to continue the trial on a "permanent basis." *Id.* at 8 (quotation omitted). Moreover, the BOP retained the ability to transfer Plaintiffs to another facility where the meals were not available or to change the religious criteria the menu was required to meet. *Id.* at 9.

### C. The Parties' Settlement Agreement

After lengthy negotiations, including two settlement conferences, the parties ultimately reached a settlement that legally requires the BOP to provide Plaintiffs with a Halal Diet for the duration of Plaintiffs' incarcerations. Settlement Agreement ¶ 3(a). The Settlement Agreement

mandates that any meats or food containing meat on the Halal Diet be independently certified by a halal certifier as complying with Plaintiffs' religious requirements. *Id.* ¶ 3(d)-(e). It requires the BOP to provide Plaintiffs with halal-certified meat at least seven times per week. *Id.* ¶ 3(f). It requires the BOP to provide the Halal Diet to Plaintiffs even if they are moved to different BOP institutions. *Id.* ¶ 3(a). In addition, the Settlement Agreement obligates the BOP to maintain records related to the Halal Diet for two years and to provide those records to Plaintiffs upon request. *Id.* ¶ 3(h). The requirements set forth in the Settlement Agreement are virtually identical to the relief sought by Plaintiffs in their complaint in 2014. *Compare* Am. Compl. (Dkt. 18) ¶¶ 14-20, 50-67, Prayer for Relief ¶¶ (c), (d).

The Settlement Agreement also creates a detailed procedure in the event that any party breaches the Agreement. Settlement Agreement ¶¶ 14-15. If the parties are unable to resolve a dispute, the Agreement provides for this Court's ongoing jurisdiction to enforce the terms of the Settlement Agreement, just as it would under a permanent injunction or consent decree. *Id.* ¶¶ 9, 13, 15. The Settlement Agreement is enforceable by motion; neither party must file a new action to enforce the Agreement's terms. *Id.* ¶ 15. This Court's dismissal order incorporates the same retention-of-jurisdiction requirement. Dismissal Order at 1. Importantly, the parties agreed that the Settlement Agreement would not become effective unless and until the Court signed and entered the Dismissal Order containing the retention-of-jurisdiction language. Settlement Agreement ¶ 21.

The parties were unable to reach agreement on an award of attorney's fees to Plaintiffs. To allow Plaintiffs to expeditiously obtain the benefits of the Settlement Agreement—and the Court to close the case—the parties agreed to carve out the fee award issue from the Settlement Agreement. *Id.* ¶ 16. In hopes of avoiding burdening the Court with "a second major litigation,"

*Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), the parties faithfully attempted to resolve the fee issue following execution of the Settlement Agreement. *See* Hammack Decl. ¶¶ 4-10. Although counsel for the parties met and conferred multiple times, the parties were unable to settle on a fee amount and agreed that mediation would not be fruitful. *Id.* ¶ 10.

## II.   ARGUMENT

### A.   Plaintiffs Are Statutorily Entitled to an Attorney's Fee Award

"Generally, the prevailing party in a civil rights lawsuit is entitled to an award of attorney's fees." *Capps v. Drake*, 894 F.3d 802, 804 (7th Cir. 2018). That includes prisoners who are prevailing parties in "an action to enforce . . . RFRA against the United States or its officials." *N. Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1085 (8th Cir. 2006). Specifically, Section 1988, the ordinary statute governing civil rights fee awards, expressly applies to RFRA suits, and the Equal Access to Justice Act makes the United States liable to a fee award under Section 1988 to the same extent as any other party. 42 U.S.C. § 1988(b); 28 U.S.C. § 2412(b). Because Plaintiffs qualify as prevailing parties under the terms of the Settlement Agreement and satisfy the other statutory requirements, they are entitled to an award of attorney's fees and costs.[5]

### 1.   Plaintiffs Are Prevailing Parties Under the Settlement Agreement

Plaintiffs are prevailing parties because the Settlement Agreement works a judicially sanctioned "material alteration of the legal relationship of the parties" just like an enforceable judgment on the merits or a consent decree. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (quotation omitted). Critically, the

---

[5] Although Section 1988 states that the Court "in its discretion" may allow a fee, the Supreme Court has clarified that a prevailing party in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989) (quotation omitted).

Settlement Agreement requires the BOP to provide Plaintiffs with the Halal Diet they sought from the beginning, imposes detailed recordkeeping requirements, and provides for ongoing judicial enforcement in the event the BOP breaches its obligations. The Court's continuing jurisdiction and role in oversight of the Settlement Agreement establish that Plaintiffs are prevailing parties.

A private settlement, even if not labeled a consent decree, may confer prevailing-party status if it "functionally" operates as one. *T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 478 (7th Cir. 2003). This may be done by including within the dismissal order a "separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement)." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *see Petersen v. Gibson*, 372 F.3d 862, 866-67 (7th Cir. 2004) ("[A] settlement short of a consent decree may qualify if, for instance, the terms of the settlement were incorporated into the dismissal order and the order was signed by the court rather than the parties, *or the order provided that the court would retain jurisdiction to enforce the terms of the settlement*." (emphasis added)).[6] Here, both the Settlement Agreement and the Dismissal Order include clauses explicitly retaining this Court's ancillary jurisdiction to oversee and enforce the Settlement Agreement. Settlement Agreement ¶¶ 9, 13, 15; Dismissal Order at 1.

The settlement also contains "mandatory language" imposing affirmative obligations on the BOP that mirrors the language of an injunction or consent decree, thereby materially altering

---

[6] At least five other circuits have joined the Seventh Circuit and concluded that a court order expressly retaining jurisdiction to enforce the settlement agreement satisfies the prevailing-party standard established in *Buckhannon*. *See Raab v. City of Ocean City*, 833 F.3d 286, 294 (3d Cir. 2016); *Hendrickson v. United States*, 791 F.3d 354, 359 (2d Cir. 2015); *Roberson v. Giuliani*, 346 F.3d 75, 82–83 (2d Cir. 2003); *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320 (11th Cir. 2002); *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 283 (4th Cir. 2002); *Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 n.5 (9th Cir. 2002). *But see Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003) (taking contrary view); *id.* at 999 (Melloy, J., dissenting) (noting that majority opinion diverged from that of other circuits).

the legal relationship between the parties. *T.D.*, 349 F.3d at 478 (quoting *John T. ex rel. Paul T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 558 (3d Cir. 2003)). As noted above, the Settlement Agreement requires the BOP to provide Plaintiffs with the relief they sought from the start: halal meals containing meat independently certified as conforming to their religious beliefs for the duration of their incarcerations. While the BOP began offering these meals prior to the Settlement Agreement, without the Settlement Agreement, the BOP remained free to stop providing the meals to Plaintiffs at any point, or to modify the religious criteria in a way that would cause the meals not to comply with Plaintiffs' religious beliefs. The Settlement Agreement forecloses that possibility by detailing the certification requirements that the Halal Diet must meet. Settlement Agreement ¶ 3(d).

Aside from ensuring that the BOP will provide meals that accommodate Plaintiffs' beliefs, to ensure compliance, the Settlement Agreement also obligates the BOP to maintain records and provide them at Plaintiffs' request. If the BOP fails to satisfy any of its obligations, the Settlement Agreement outlines a dispute resolution process, overseen and enforceable by the Court. Unlike an ordinary private settlement, Plaintiffs do not need to file a new action for breach of contract; they can rely on the Court's ancillary jurisdiction over the Agreement to seek immediate relief via a motion to enforce. *Kokkonen*, 511 U.S. at 381; *see Cruz v. Globe Realty Mgmt. Co.*, 2005 WL 3455846, at *3, *6 (N.D. Ill. Dec. 13, 2005) (concluding similar settlement language established prevailing-party status); *Vasquez v. Cty. of Lake*, 2002 WL 31256166, at *1 (N.D. Ill. Oct. 7, 2002) (same).

### 2. Plaintiffs' Fees Were Reasonably Incurred in Obtaining the Final Relief

Plaintiffs' fee request also satisfies the Prison Litigation Reform Act's ("PLRA") requirement that the fees be "directly and reasonably incurred in proving an actual violation" of

Plaintiff's rights under RFRA. 42 U.S.C. § 1997e(d)(1)(A). In the context of a judicially-enforceable settlement agreement, this criterion asks whether the fees were "directly and reasonably incurred in securing the prospective relief—that is, the settlement agreement[]." *Laube v. Allen*, 506 F. Supp. 2d 969, 980 (M.D. Ala. 2007), *accord Lozeau v. Lake Cty.*, 98 F. Supp. 2d 1157, 1163 (D. Mont. 2000) ("[T]he law is well-settled that a party need not obtain relief in the form of a final judgment in order to receive fees under § 1988."). Here, Plaintiffs' fees were directly and reasonably incurred in securing the Settlement Agreement.

Plaintiffs' RFRA challenge implicated nationwide BOP food service policies that, through much of this litigation, the BOP maintained did not permit individual institutions to procure halal-certified meals for inmates. This necessitated a significant investment of time and effort on the part of Plaintiffs' attorneys to litigate what was effectively a nationwide challenge against policies governing every federal prison in the country. Plaintiffs had to depose a dozen BOP officials—including those with expertise in prison security, food services, religious accommodations, and procurement policies—to establish that there were no insurmountable regulatory or policy barriers preventing the BOP from offering Plaintiffs halal-certified meals, either individually or as part of a national program, and to rebut the BOP's arguments that administrative and security interests precluded it from accommodating Plaintiffs' religious beliefs. Any tenable argument that relief for the Plaintiffs was impossible or unduly burdensome has vanished now that the BOP has agreed that it is legally obligated to provide the Halal Diet to Plaintiffs.

The BOP also needlessly extended the length—and cost—of this six-year litigation by aggressively defending this suit, dragging its feet on discovery, and failing to undertake diligent efforts to identify halal vendors and certifiers. Instead, it was left to Plaintiffs and their counsel

to conduct an expansive search to identify viable vendors of halal-certified meals suitable for prison institutions. Even after Plaintiffs identified such vendors, it took *years* for the BOP to actually procure the meals and settle this case. In the meantime, Plaintiffs succeeded in beating back repeated attempts by the BOP to dismiss this litigation. They also diligently prepared for trial, which was scheduled to proceed in July 2018 and then again in September 2019. Both times, the trial was continued just weeks before the Final Pretrial Conference, and only days before the parties were due to exchange or file pre-trial materials. These efforts took time, and all were necessary to drive the BOP toward finding a workable accommodation for Plaintiffs' religious beliefs. To take one brazen example, it was not until the BOP was confronted with its summary judgment briefing deadline—nearly four years into the litigation—that it finally issued RFQs for halal-certified meals from vendors. Those RFQs ultimately led to discussions with Midamar over meal specifications that ultimately resolved this case. Moreover, because of the continued extensions of the trial date, the Plaintiffs needed to engage in supplemental discovery regarding the BOP's ongoing work to provide a halal diet to Plaintiffs.

### B. An Award of $2,462,703.77 in Attorney's Fees Is Reasonable

The PLRA imposes two limitations on the size of the award that the Court may order in this case. First, the hourly rate upon which the award is based must not exceed 150% of the statutory rates established under the Criminal Justice Act for court-appointed counsel. 42 U.S.C. § 1997e(d)(3). Second, the total award must be "proportionately related" to the relief obtained. *Id.* § 1997e(d)(1)(B)(i). Plaintiffs' fee request complies with both requirements.

To determine a reasonable fee award, courts begin by multiplying the number of hours reasonably expended by reasonable hourly rates to determine the lodestar figure. Adjustment to that figure may be made as necessary in a particular case. *Blum v. Stenson*, 465 U.S. 886, 888 (1984). Here, the reasonableness of Plaintiffs' counsel's hourly rates is not at issue, as the PLRA

15

establishes a cap on the hourly rates obtainable, which applies to both attorneys and paralegals. *Perez v. Cate*, 632 F.3d 553, 557 (9th Cir. 2011). The following rates are applicable in this case:[7]

| Date | CJA Rate | PLRA Rate (150% of CJA Rate) |
|---|---|---|
| January 1, 2020 – Present | $152 | $228 |
| February 15, 2019 – December 31, 2019 | $148 | $222 |
| March 23, 2018 – February 14, 2019 | $140 | $210 |
| May 5, 2017 – March 22, 2018 | $132 | $198 |
| January 1, 2016 – May 4, 2017 | $129 | $193.50 |
| January 1, 2015 – December 31, 2015 | $127 | $190.50 |
| March 1, 2014 – December 31, 2014 | $126 | $189 |
| September 1, 2013 – February 28, 2014 | $110 | $165 |

These rates are significantly below what Plaintiffs' attorneys and paralegals would ordinarily charge to paying clients. *See* Leviss Decl. ¶ 7. Plaintiffs' attorneys are employed by a large international law firm, and are all employed in the Washington, D.C. or New York metropolitan areas. With one exception, the market rates for all of the timekeepers on this matter significantly exceed the caps imposed by the PLRA, making the PLRA caps the relevant figure for calculating the lodestar.[8] *Id.*

Given the length and complexity of this litigation, it should come as no surprise that the number of hours expended by Plaintiffs' attorneys is sizeable. Collectively, attorneys and paralegals spent more than 14,000 hours on this case. However, consistent with their obligation to exclude from the fee request any hours that are "excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434, Plaintiffs' counsel have exercised billing judgment to

---

[7] CJA rates in the chart reflect the non-capital rates established for this judicial district. *See* U.S. Dist. Ct. S., Dist. of Ind., *CJA Pay Chart* (Jan. 1, 2020), https://www.insd.uscourts.gov/sites/insd/files/CJA%20Pay%20Chart.pdf.
[8] The sole exception is one paralegal who provided support to the case in 2016 and 2017. Her market hourly rate fell below the PLRA cap, so Plaintiffs have used that lower rate in calculating their fee request for this paralegal's time. *See* Leviss Decl. ¶ 7.

reduce that figure significantly. First, Plaintiffs do not seek fees for any timekeepers who only contributed to discrete projects, and they have therefore eliminated all time entries by individuals who expended fewer than 50 hours on this case. Second, Plaintiffs recognize that, on certain projects, counsel employed multiple timekeepers to ensure appropriate supervision for less experienced attorneys or to provide a learning experience for junior attorneys to observe. For example, depositions that occurred within the firm's office were often attended by multiple attorneys who did not actively participate. And some amount of time expended by the attorneys on this matter was dedicated to the Equal Protection Clause claim that was voluntarily dismissed. However, because the Equal Protection Clause Claim sought identical relief to the RFRA claim and largely involved overlapping legal and factual issues, much of that work was also required for the RFRA claim. Nonetheless, to account for these efforts, and for the duplication of work, counsel has reduced all hours by all remaining timekeepers by 10%. Combined with the omission of timekeepers who worked on discrete tasks, Plaintiffs' fee request reflects a total discount on the total number of hours by approximately 15%, and the requested amount represents an approximately 72% discount off of the amount Plaintiffs' counsel would charge at their market rates for all hours incurred in this case.

This 15% reduction reflects the reality that "the Court 'need not, and indeed should not, become green-eyeshade accountants.'" *Crissen v. Gupta*, 2014 WL 4449928, at *1 (S.D. Ind. Sept. 10, 2014) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). "Instead, the essential goal in shifting fees to either party is to do 'rough justice, not to achieve auditing perfection[;]' the Court may take into account its 'overall sense of [the] suit, and may use estimates in calculating and allocating an attorney's time.'" *Id.* (quoting *Fox*, 563 U.S. at 838)).

The time expended by attorneys and paralegals on this case (up through August 30th, 2020) used to calculate the lodestar is summarized below and supported by detailed contemporaneous timekeeping records.  *See* Leviss Decl. Ex. C.[9]  Plaintiffs note that not all of these timekeepers were staffed on this case at any one time.  Given the extensive length of this litigation, multiple employees joined and left Plaintiffs' counsel's law firm during the pendency of this litigation, resulting in a higher-than-usual number of timekeepers.

| Timekeeper | Title | Years Active[10] | Total Hours | Lodestar |
|---|---|---|---|---|
| **David J. Leviss** | Partner | 2013-2020 | 297.90 | $59,365.50 |
| **Meredith Garagiola** | Counsel | 2016-2019 | 847.80 | $169,030.65 |
| **Brad N. Garcia** | Counsel | 2014-2020 | 1,177.30 | $232,211.40 |
| **Scott Hammack** | Counsel | 2014-2020 | 1,239.90 | $254,688.75 |
| **Jessica Thorn** | Counsel | 2014-2015* | 504.00 | $95,406.00 |
| **Sergei Zaslavsky** | Counsel | 2014-2020 | 1,907.80 | $387,400.80 |
| **Nabil Ansari** | Associate | 2018-2020 | 402.10 | $86,916.00 |
| **Carolyn Appel** | Associate | 2017-2018* | 221.70 | $44,830.20 |
| **Jacob D. Charles** | Associate | 2014-2015* | 187.30 | $35,479.20 |
| **Matthew Gill** | Associate | 2017-2018* | 442.30 | $88,161.45 |
| **Jeremy Girton** | Associate | 2016-2020 | 704.10 | $143,596.35 |
| **Lindsey R. Love** | Associate | 2014-2018* | 1,485.20 | $290,063.85 |
| **John McDermott** | Associate | 2016-2019* | 878.00 | $174,827.40 |
| **Darcy M. Meals** | Associate | 2013-2016* | 774.70 | $143,425.50 |
| **Joanna Nairn** | Associate | 2013-2014* | 170.80 | $28,182.00 |
| **Roger Yang** | Associate | 2018-2019* | 291.20 | $63,457.20 |
| **Mary Cobb** | Staff Attorney | 2017-2018 | 91.90 | $18,196.20 |
| **Allyson Deitrick** | Staff Attorney | 2017* | 99.70 | $19,740.60 |
| **Siddharth Goswami** | Staff Attorney | 2016-2017 | 427.90 | $83,463.30 |
| **Bryan Hayame** | Staff Attorney | 2017 | 53.20 | $10,294.20 |
| **Marla A. Kelly** | Staff Attorney | 2017 | 226.60 | $44,167.05 |
| **Alex Stemkovsky** | Staff Attorney | 2017* | 85.70 | $16,582.95 |
| **Kamilah Williams** | Staff Attorney | 2017* | 57.40 | $11,106.90 |
| **Joanne Wisner** | Staff Attorney | 2017 | 50.90 | $9,872.10 |
| **Kimberly Grotenrath** | Senior Paralegal | 2013-2020 | 566.70 | $114,682.50 |
| **Timothée Charpié** | Paralegal | 2016-2019 | 140.10 | $29,181.75 |
| **Eve Soliman** | Paralegal | 2016-2017* | 213.70 | $21,379.50 |
| *Total* | | | 13,545.90 | $2,675,709.30 |

---

[9] Plaintiffs reserve the right to seek supplemental fees for time spent subsequent to this date.  Time spent attempting to obtain fees is fully recoverable under Section 1988 and is included in the lodestar calculation.  *See Morjal v. City of Chicago*, 774 F.3d 419, 422-23 (7th Cir. 2014).
[10] An asterisk denotes an individual who departed the firm during the pendency of the litigation.

This lodestar figure is a reasonable fee award under the circumstances and is proportional to the relief obtained in this case.  As noted above, the Settlement Agreement afforded Plaintiffs all the relief they sought in their complaint filed nearly seven years ago, primarily the provision of meals that comply with their religious beliefs and the reporting, recordkeeping, and enforcement requirements that ensure such meals will continue to be provided for the remainder of their incarcerations.  Although Plaintiffs did voluntarily dismiss their Equal Protection Claim, that does not limit the success achieved in this case, as both claims sought identical relief.  And Plaintiffs' 15% reduction in the hours used to calculate the lodestar more than accounted for the dismissal of that claim.  Plaintiffs have also included in the requested attorney's fee award, fees in the amount of $54,565.40 for online research services, which "are recoverable as part of an attorney-fee award" in the Seventh Circuit.  *Tchemkou v. Mukasey*, 517 F.3d 506, 513 (7th Cir. 2008).  *See* Leviss Decl. ¶ 8.  This amount also includes a 15% discount.  The Court should award Plaintiffs $2,462,703.77 in attorney's fees and direct the fees to Plaintiffs' counsel per the terms of their Engagement Letters.  *See id*. ¶ 4.

### C.    Plaintiffs Are Entitled to Costs

As prevailing parties, Plaintiffs are also entitled to an award of costs.  28 U.S.C. § 2412(a)(1); *see* Plaintiffs' Bill of Costs, Leviss Decl. Ex. E.  In addition to the costs explicitly enumerated in 28 U.S.C. § 1920, Plaintiffs have included court fees for the admission of attorneys *pro hac vice*, which are generally recoverable costs.  *See United States v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 730 (7th Cir. 2006); *Earls v. Colvin*, 2013 WL 1869025, at *1 (S.D. Ind. May 3, 2013).  Plaintiffs' counsel has certified that the items claimed in the Bill of Costs are correct, the costs have been necessarily incurred in the case, and the services for

which fees have been charged were actually and necessarily performed.  Leviss Decl. ¶ 9.  After

applying a 15% across-the-board discount, Plaintiffs seek an award of costs in the amount of

$53,710.48.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully submit that the Court should award them

attorney's fees and costs under the applicable statutes.

Dated:  September 2, 2020                              Respectfully submitted,


                                                      By: *<u>/s/ David J. Leviss</u>*
                                                      David J. Leviss
                                                      O'MELVENY & MYERS LLP
                                                      1625 Eye Street, NW
                                                      Washington, DC 20006
                                                      Tel: (202) 383-5300
                                                      Fax: (202) 383-5414
                                                      Email: dleviss@omm.com

                                                      *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2020, a true and correct copy of the foregoing

Motion for Attorney's Fees and Costs was filed electronically.  Service of this filing will be

made on all ECF-registered counsel by operation of the Court's electronic filing system.


*/s/ David J. Leviss*
David J. Leviss
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: dleviss@omm.com