UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| BRIAN CARR, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     No. 2:14-cv-00001-JMS-MJD |
| | ) |
| FEDERAL BUREAU OF PRISONS (BOP), | ) |
| Mark S. Inch, Director, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court on Plaintiffs' Motion for Attorney's Fees and Costs.  [Dkt. 338.]  District Judge Jane Magnus-Stinson has designated the undersigned Magistrate Judge to issue a report and recommendation regarding the disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).  [Dkt. 346.]  For the reasons set forth below, the Magistrate Judge recommends that Plaintiffs' motion be **GRANTED IN PART** and **DENIED IN PART**.

**I.  Background**

This case was filed over seven years ago, on January 3, 2014.  In their Amended Complaint, [Dkt. 18], four Plaintiffs,[1] each of whom was incarcerated in a Federal Correctional Institution ("FCI"), alleged that their rights under the Religious Freedom Restoration Act ("RFRA") and the Equal Protection Clause of the Fifth Amendment were being violated by the BOP's refusal to provide them a diet that conformed with their sincere religious beliefs as

---

[1] Reed Berry, one of the five Plaintiffs who filed the original complaint in this case, voluntarily dismissed his claims on April 9, 2014.  [Dkt. 13.]

practicing Muslims.  Plaintiffs sought declaratory and injunctive relief, including a permanent

injunction "ordering the Defendants to provide the Plaintiffs with a nutritionally adequate, halal-

certified diet that fully conforms to their religious beliefs and to ensure that halal-certified meat

products are available for purchase in the Commissary" and "ordering the Defendants to provide

access to information regarding the source(s) of halal certification of their meals so that the

Plaintiffs may ensure the meals conform to their religious beliefs."  [Dkt. 18 at 18].

After over six years of litigation, this case was ultimately resolved by a settlement

agreement (hereinafter "Settlement Agreement").   Plaintiffs summarize the terms of the

settlement as follows:

> [The settlement] legally requires the BOP to provide Plaintiffs with a Halal Diet
> for the duration of Plaintiffs' incarcerations. Settlement Agreement ¶ 3(a).  The
> Settlement Agreement mandates that any meats or food containing meat on the
> Halal Diet be independently certified by a halal certifier as complying with
> Plaintiffs' religious requirements.  *Id.* ¶ 3(d)-(e).  It requires the BOP to provide
> Plaintiffs with halal-certified meat at least seven times per week.  *Id.* ¶ 3(f). It
> requires the BOP to provide the Halal Diet to Plaintiffs even if they are moved to
> different BOP institutions.  *Id.* ¶ 3(a). In addition, the Settlement Agreement
> obligates the BOP to maintain records related to the Halal Diet for two years and
> to provide those records to Plaintiffs upon request.  *Id.* ¶ 3(h).  The requirements
> set forth in the Settlement Agreement are virtually identical to the relief sought by
> Plaintiffs in their complaint in 2014.  *Compare* Am. Compl. (Dkt. 18) ¶¶ 14-20,
> 50-67, Prayer for Relief ¶¶ (c), (d).
>
> The Settlement Agreement also creates a detailed procedure in the event that any
> party breaches the Agreement. Settlement Agreement ¶¶ 14-15.  If the parties are
> unable to resolve a dispute, the Agreement provides for this Court's ongoing
> jurisdiction to enforce the terms of the Settlement Agreement, just as it would
> under a permanent injunction or consent decree.  *Id.* ¶¶ 9, 13, 15.  The Settlement
> Agreement is enforceable by motion; neither party must file a new action to
> enforce the Agreement's terms.  *Id.* ¶ 15.  This Court's dismissal order
> incorporates the same retention-of-jurisdiction requirement.  Dismissal Order at 1.
> Importantly, the parties agreed that the Settlement Agreement would not become
> effective unless and until the Court signed and entered the Dismissal Order
> containing the retention-of-jurisdiction language.  Settlement Agreement ¶ 21.

[Dkt. 338 at 9-10] (describing the Settlement Agreement, which is found at [Dkt. 338-3]).

On June 3, 2020, Judge Magnus-Stinson entered an Order on Stipulation of Dismissal that read as follows:

> The Court, having reviewed the Parties' proposed Stipulation of Dismissal, hereby dismisses this cause against the Defendant without prejudice [330]. The Court retains jurisdiction to enforce the terms of the Settlement Agreement between the Parties and to address any motion for attorneys' fees and costs filed by the Plaintiffs. The parties have waived their rights under Federal Rule of Civil Procedure 65(d) to the extent Rule 65(d) requires the Court's dismissal order to be specific in terms or to describe in reasonable detail and without reference to the Settlement Agreement, the act or acts to be restrained.

[Dkt. 333.]

## II. Discussion

The Settlement Agreement provided that the issue of attorneys' fees and costs would be resolved by the Court following dismissal of the case. In the instant motion, Plaintiffs assert that, pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988, as prevailing parties in this case, they are entitled to an award of attorneys' fees in the amount of $2,462,703.77 and costs in the amount of $51,666.78.[2] Defendant argues that Plaintiffs do not qualify as prevailing parties under the relevant statutes and therefore are not entitled to recover any fees or costs. Alternatively, Defendant argues that the amount of fees sought by Plaintiffs is unreasonable.[3]

---

[2] In their motion, Plaintiffs seek costs in the amount of $53,710.48. Plaintiffs acknowledge in their reply brief that they inadvertently included an improper expense (expert travel expenses) in that total, which they agree should be subtracted. There is no need for Plaintiffs to submit an updated Bill of Costs.

[3] Defendant does not object to the amount of costs sought by Plaintiffs, with the noted adjustment.

### A.  Plaintiffs Are Prevailing Parties

Pursuant to 42 U.S.C. § 1988(b), "[i]n any action or proceeding to enforce a provision of . . . [RFRA] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  The Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b), makes the United States liable for an award of fees and costs "to the same extent that any other party would be liable."

"The Supreme Court has held that a prevailing party is one who has been awarded some relief by a court, as through an enforceable judgment on the merits or a court-ordered consent decree."  *Petersen v. Gibson*, 372 F.3d 862, 865 (7th Cir. 2004) (citing *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Res.,* 532 U.S. 598, 603-04 (2001)) (additional citations omitted).  No judgment on the merits or consent decree was entered in this case.  However,

> a settlement short of a consent decree may qualify if, for instance, the terms of the settlement were incorporated into the dismissal order and the order was signed by the court rather than the parties, or the order provided that the court would retain jurisdiction to enforce the terms of the settlement.  *See T.D. v. LaGrange School Dist. No. 102,* 349 F.3d 469, 478-79 (7th Cir. 2003); *Smalbein v. City of Daytona Beach,* 353 F.3d 901, 905 (11th Cir. 2003) and cases cited therein; *Roberson v. Giuliani,* 346 F.3d 75, 82-83 (2d Cir. 2003).  Correspondingly, we have recognized that mere judicial involvement in the settlement is not enough; "[t]here must be some official judicial approval of the settlement and some continuing judicial oversight." *T.D.,* 349 F.3d at 479.

*Petersen*, 372 F.3d at 866-67.[4]  The Seventh Circuit did not attempt to delineate "the precise boundaries between a settlement that meets the prevailing party definition and one that falls

---

[4] The Court notes that, in addition to the language retaining jurisdiction to enforce the Settlement Agreement, the dismissal order—which was drafted by the parties—also contains the following provision:

short" in *Petersen*, and thus did not specifically address whether the type of dismissal order

entered in this case was sufficient.  In *Sonii v. Gen. Elec. Co.*, 359 F.3d 448, 449-50 (7th Cir.

2004), the Seventh Circuit expressly found that "a dismissal reserving jurisdiction to enforce the

underlying contract" would be "ambiguous," and noted that "neither *Buckhannon* nor *T.D.*

definitively resolves the consequences of an order that suffices to preserve federal jurisdiction to

enforce the pact, see [*Kokkonen*, 511 U.S. 375 (1994)], but still treats it as a private contract

rather than a judgment."[5]

     While the Seventh Circuit has not definitively resolved that ambiguity, other circuits have

squarely addressed the issue.  For example, the Eleventh Circuit has stated:

> The Supreme Court has also held that a federal court may have jurisdiction to
> enforce the terms of a private settlement agreement where a court has embodied
> the agreement in a dismissal order or has specially retained jurisdiction over
> it.  [*Kokkonen,* 511 U.S. at 381-82].  In applying this precedent, we have held in
> this Circuit that even where there has been no formal entry of a consent decree
> following a settlement agreement, a district court may still award attorney's fees
> to the prevailing party as long as: (1) it has incorporated the terms of the
> settlement into the final order of dismissal or (2) it has explicitly retained
> jurisdiction to enforce the terms of the settlement.  *American Disability Ass'n v.*

---

> The parties have waived their rights under Federal Rule of Civil Procedure 65(d)
> to the extent Rule 65(d) requires the Court's dismissal order to be specific in terms
> or to describe in reasonable detail and without reference to the Settlement
> Agreement, the act or acts to be restrained.

[Dkt. 333.] This language is the functional equivalent of incorporating the terms of the
Settlement Agreement by reference; the provision serves no purpose unless the parties intended
the dismissal order serve as an order of the Court effectuating the terms of the settlement.
Defendant cannot now claim that the order does not have that effect because the order does not
explicitly set out the terms of the Settlement Agreement, inasmuch as Defendant waived the right
to make that argument.

[5] In *Kokkonen*, 511 U.S. at 381-82, the Supreme Court observed the following:  "Even when, as
occurred here, the dismissal is pursuant to Rule 41(a)(1)(ii) (which does not by its terms
empower a district court to attach conditions to the parties' stipulation of dismissal) we think the
court is authorized to embody the settlement contract in its dismissal order or, what has the same
effect, retain jurisdiction over the settlement contract) if the parties agree."

*Chmielarz,* 289 F.3d 1315, 1320 (11th Cir. 2002).  Under either option, the district court "clearly establishes 'judicially sanctioned change in the legal relationship of the parties,' as required by *Buckhannon,* because the plaintiff thereafter may return to court to have the settlement enforced." *Id.*  A formal consent decree is unnecessary because the incorporation of the settlement into a court order or the explicit retention of jurisdiction over the terms of the settlement are the "functional equivalent of an entry of a consent decree." *Id.*

*Smalbein*, 353 F.3d at 905; *see also Raab v. City of Ocean City, New Jersey*, 833 F.3d 286, 294 (3d Cir. 2016) ("[A] district court's retaining ancillary jurisdiction over the settlement agreement or incorporating the terms of the settlement agreement in the order of dismissal confers the judicial *imprimatur* that is required for a plaintiff to become a prevailing party under section 1988."); *Roberson*, 346 F.3d at 82 ("Viewed in the light of *Kokkonen,* the district court's retention of jurisdiction in this case is not significantly different from a consent decree and entails a level of judicial sanction sufficient to support an award of attorney's fees."); *but see Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003) ("*Buckhannon,* as indicated, makes it clear that a party prevails only if it receives either an enforceable judgment on the merits or a consent decree. *Buckhannon,* [532 U.S. at 604].  A private settlement agreement is not enough.") (footnotes omitted).

The Seventh Circuit's view of *Buckhannon* clearly is not as limited as the Eighth Circuit's in *Bloomberg.  See Petersen*, 372 F.3d at 866 ("[A] settlement short of a consent decree may qualify if, for instance, the terms of the settlement were incorporated into the dismissal order and the order was signed by the court rather than the parties, or the order provided that the court would retain jurisdiction to enforce the terms of the settlement.").  Rather, it is more consistent with that of the Second, Third, and Eleventh Circuits, all of which would find the order of dismissal in this case sufficient to confer prevailing party status on Plaintiffs.  Accordingly, the Court also so finds.

6

Defendant also argues that Plaintiffs are not prevailing parties in this case because "despite entering into a settlement agreement, the Bureau of Prisons did not materially change its behavior or its policies for the Plaintiffs' benefit." [Dkt. 340 at 12.] Rather, Defendant characterizes the end of this litigation as follows:

> The BOP had been working on implementing a Halal diet for its Muslim population for several years. It successfully implemented one in early 2019, which was available to all inmates at the participating Institutions. The Plaintiffs were welcome to participate in the Halal diet along with other inmates and did. In fact, by the time the Plaintiffs signed the settlement agreement in May 2020, they had already enrolled in and participating in the Halal diet for more than a year, rendering their case moot.

*Id.* It may be that Plaintiffs' lawsuit was not the only impetus for the BOP's decision to develop a Halal diet (although Plaintiffs dispute that assertion), but, as *Buckhannon* teaches, that is not the relevant question. Rather, the relevant question is whether the Settlement Agreement effectuates a "material alteration of the legal relationship of the parties." *Buckhannon*, 532 U.S. at 604. There is no question that the settlement in this case does so. As Plaintiffs note:

> [T]he Settlement Agreement requires the BOP to provide Plaintiffs with the relief they sought from the start: halal meals containing meat independently certified as conforming to their religious beliefs for the duration of their incarcerations. While the BOP began offering these meals prior to the Settlement Agreement, without the Settlement Agreement, the BOP remained free to stop providing the meals to Plaintiffs at any point, or to modify the religious criteria in a way that would cause the meals not to comply with Plaintiffs' religious beliefs. The Settlement Agreement forecloses that possibility by detailing the certification requirements that the Halal Diet must meet. Settlement Agreement ¶ 3(d).

[Dkt. 338 at 13.] In addition, the BOP's Halal Diet is not available at all BOP institutions; under the Settlement Agreement, Defendant would be required to provide Plaintiffs with a Halal diet that meets the criteria set forth in the Settlement Agreement even if Plaintiffs are transferred to a facility at which it is not otherwise offered. Further, even if the BOP eliminates its general Halal

Diet, or changes that diet or the rules governing it[6] such that it no longer complies with the terms of the Settlement Agreement, Plaintiffs will still be entitled to the agreed-upon diet under the agreed-upon terms.  *See* [Dkt. 338-3 at 3] ("Defendant shall maintain and allow the Plaintiffs to participate in all respects in a Halal-certified, processed food component of the BOP's Religious Diet Program ('the Halal Diet') uninterrupted during the duration of their current incarceration within the BOP, whether at their current Institutions, or at any other BOP institution.").

Defendant states that

> [t]he BOP's Chaplaincy and Food Services Departments have determined that if any inmate currently receiving the halal component of the Certified Religious Diet is transferred to another Institution, he will continue to receive halal meals at the new Institution.  (ECF No. 305- 1 ¶ 11; ECF No. 305-4, BOP044877.)  The Food Services Director has also confirmed that the BOP has no intention of withdrawing the Halal line, and intends to expand it to other Institutions based on need. (ECF No. 299-1 ¶ 22.)

[Dkt. 340 at 6-7.]  However, these statements of future intention are not enforceable promises; the Settlement Agreement is.  While the stated intention of the Food Services Director does not create a legal obligation of any kind to the Plaintiffs, the Settlement Agreement does, and therefore the Settlement Agreement clearly altered the parties' legal relationship.

Because the Settlement Agreement materially altered the legal relationship between the parties, and because the Court retained jurisdiction to enforce the Settlement Agreement's terms, thus providing the requisite judicial imprimatur, Plaintiffs are prevailing parties in this case for purposes of section 1988.

---

[6] For example, the Settlement Agreement provides:  "Defendant shall not withdraw Plaintiffs from the Halal Diet or otherwise determine Plaintiffs to be ineligible to receive the Halal Diet as a result of Plaintiffs' purchases of any items from the Commissary, except edible items that are specifically labeled as containing pork or pork by-products."  [Dkt. 338-3 at 3-4.]

**B.  Calculation of Reasonable Fee Award**

The Supreme Court has long instructed that, a "prevailing party 'should ordinarily recover an attorney's fee [pursuant to section 1988] unless special circumstances would render such an award unjust.'" *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989) (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968); *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)).  The statute requires the fee award to be "reasonable."  Determining what fees are reasonable is a "contextual and fact-specific" inquiry.  *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014).  The Supreme Court has cautioned that "the determination of fees 'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437).

> The fee applicant . . . must, of course, submit appropriate documentation to meet the burden of establishing entitlement to an award.  But trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Id.* (internal quotations and citations omitted).

**1.  Plaintiffs' Proposed Lodestar**

In arriving at a reasonable fee award, "the district court generally begins the fee calculation by computing a 'lodestar':  the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate." *Montanez*, 755 F.3d at 553.  While typically a reasonable hourly rate will be the market rate for comparable legal services, in this case there is a cap on the compensable hourly rate, because under the PLRA, a fee award may not be based on an hourly rate that exceeds 150% of the statutory rates established under the Criminal Justice Act

for court-appointed counsel. 42 U.S.C. § 1997e(d)(3). Counsel here seek the maximum

allowable rates,[7] which they correctly calculate as follow:

| Date | CJA Rate | PLRA Rate (150% of CJA Rate) |
|---|---|---|
| January 1, 2020 – Present | $152 | $228 |
| February 15, 2019 – December 31, 2019 | $148 | $222 |
| March 23, 2018 – February 14, 2019 | $140 | $210 |
| May 5, 2017 – March 22, 2018 | $132 | $198 |
| January 1, 2016 – May 4, 2017 | $129 | $193.50 |
| January 1, 2015 – December 31, 2015 | $127 | $190.50 |
| March 1, 2014 – December 31, 2014 | $126 | $189 |
| September 1, 2013 – February 28, 2014 | $110 | $165 |

[Dkt. 338 at 16] (citing U.S. Dist. Ct. S., Dist. of Ind., *CJA Pay Chart* (Jan. 1, 2020),

https://www.insd.uscourts.gov/sites/insd/files/CJA%20Pay%20Chart.pdf.)[8]

With regard to the other half of the lodestar analysis, Plaintiffs' counsel[9] expended more

than 14,000 hours on this case. Plaintiffs implicitly acknowledge that a fee award that included

all of the hours expended would not be reasonable. Plaintiffs explain that,

> consistent with their obligation to exclude from the fee request any hours that are
> "excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434,
> Plaintiffs' counsel have exercised billing judgment to reduce that [14,000] figure
> significantly. First, Plaintiffs do not seek fees for any timekeepers who only
> contributed to discrete projects, and they have therefore eliminated all time entries
> by individuals who expended fewer than 50 hours on this case. Second, Plaintiffs

---

[7] Plaintiffs seek a lower rate for one paralegal, whose normal billing rate was below the
allowable rate under the PLRA. For the remainder of the legal professionals who worked on this
case, the PLRA rate is lower than their normal billing rate for the applicable time. *See* [Dkt. 338
at 16].

[8] The document at this link has been updated and now only includes CJA rates going back to
March 1, 2014, to the present. The Court has confirmed that the applicable rate for September 1,
2013, through February 28, 2014, was $110. *See* https://cjastudy.fd.org/sites/default/files/public-
resources/Ad%20Hoc%20Report%20June%202018.pdf at 54 (last visited August 11, 2021).

[9] For convenience, the Court will use the term "counsel" to refer to all of the legal
professionals—attorneys and paralegals—for which fees are sought.

recognize that, on certain projects, counsel employed multiple timekeepers to ensure appropriate supervision for less experienced attorneys or to provide a learning experience for junior attorneys to observe. For example, depositions that occurred within the firm's office were often attended by multiple attorneys who did not actively participate. And some amount of time expended by the attorneys on this matter was dedicated to the Equal Protection Clause claim that was voluntarily dismissed. However, because the Equal Protection Clause Claim sought identical relief to the RFRA claim and largely involved overlapping legal and factual issues, much of that work was also required for the RFRA claim. Nonetheless, to account for these efforts, and for the duplication of work, counsel has reduced all hours by all remaining timekeepers by 10%. Combined with the omission of timekeepers who worked on discrete tasks, Plaintiffs' fee request reflects a total discount on the total number of hours by approximately 15%, and the requested amount represents an approximately 72% discount off of the amount Plaintiffs' counsel would charge at their market rates for all hours incurred in this case.

[Dkt. 338 at 16-17.] After eliminating counsel who spent fewer than fifty hours on the case, Plaintiffs include 13,545.90 hours in their lodestar calculation. This includes work by 24 lawyers and three paralegals. Plaintiffs then multiply the hours spent by the appropriate hourly rates to arrive at a total of $2,675,709.30, which they have reduced by 10% to arrive at $2,408,138.27. They then add $54,565.40 to that total for online research services, an amount they have reduced by 15% of the total expended. [Dkt. 338 at 19.] Together, these amounts total the $2,462,703.77 Plaintiffs seek for attorneys' fees.

### 2. *Defendant's Objections*

Defendant does not challenge the hourly rates requested by Plaintiffs' counsel, *see* [Dkt. 340 at 14], and the Court agrees that they are reasonable and appropriate under the PLRA. Defendant does, however, dispute the reasonableness of the number of hours expended by Plaintiffs' counsel in this case and the overall reasonableness of the fee award. The Court will examine each of Defendant's arguments, in turn, below.

### a. The fee request does not "shock the conscience"

Defendant notes, correctly, that "[n]umerous appellate courts have held that, in exercising this discretion, a district court may 'deny a request for attorneys' fees in its entirety when the amount of fees requested by the prevailing party is so outrageously excessive as to shock the conscience of the court.'" [Dkt. 340 at 14] (citing *Brown v. Stackler*, 612 F.2d 1057, 1058 (7th Cir. 1980); *Fair Hous. Council of Greater Washington v. Landow*, 999 F.2d 92, 96 (4th Cir. 1993);[10] *Envtl. Def. Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993); *Lewis v. Kendrick*, 944 F.2d 949, 957-58 (1st Cir. 1991)).  The Court has examined the time records submitted by Plaintiffs' counsel and, as discussed below, finds some of the time expended to be unreasonable. However, the Court does not find the overall time spent, or the time billed for any particular work, to be so shockingly excessive that withholding fees entirely would be warranted.

### b. Overstaffing

Defendant's primary argument is that Plaintiffs' counsel overstaffed this case, arguing that "Plaintiffs' fee petition on its face demonstrates the inefficient nature of staffing a case with more than twenty attorneys." [Dkt. 340 at 15.]  Defendant is undoubtedly correct that it would have been more efficient for this case to be litigated by fewer attorneys.  There was undoubtedly a learning curve for new attorneys joining the litigation team midstream, and skill and knowledge lost when an attorney left.  That does not mean that manner in which Plaintiffs' counsel staffed the case was *per se* unreasonable, however.  As Plaintiffs note, this case spanned over six years,

---

[10] The Court notes that the language quoted by Defendant does not appear in *Brown*; rather, it appears in *Landow*.

12

and over that time period twelve of the attorneys who worked on the case (and one of the paralegals) left the law firm, making some of the inefficiency inevitable.

Indeed, the Court notes that Plaintiffs were responsible for much of the delay in this case. The deadlines were stayed in this case in March 2016, following a crash of the BOP's email server that prevented the BOP from producing emails responsive to Plaintiffs' discovery requests. [Dkt. 66.] While the server crash was caused by events outside of the BOP's control (a blizzard), it took an inexplicably long time—nearly ten months—for the server to be restored. During a November 9, 2016, status conference, Defendant reported that the server had finally been restored; however, the discovery responses were not forthcoming for several more months. In an Order dated January 20, 2017, the undersigned noted that:

> During a subsequent telephonic status conference on December 14, 2016, counsel for the United States advised the Court that the Bureau of Prisons did not even begin to run the agreed searches until the week of December 5, 2016 and that counsel for the United States expected to have the raw data available for review and production by the week of January 9, 2017. On January 19, 2017, the Court was advised that the searches would not be completed until the week of January 23, 2017, and that the Bureau of Prisons has assigned only one individual to review approximately 50,000 to 60,000 documents for production. It is difficult to imagine a situation where any other litigant would have been allowed to delay a production for as long as the Bureau of Prisons has delayed its production in this case. Now that the servers have been repaired and the searches have finally been run, it is patently unreasonable for the Bureau of Prisons to further delay its production by assigning an unreasonably small number of individuals to review its documents for production. Accordingly, the Court hereby orders Defendant to complete its production of documents in response to Plaintiffs' pending discovery requests by no later than **February 21, 2017**, or to show cause by no later than **February 23, 2017**, why Defendant should not be sanctioned for its failure to comply with the Court's order.

[Dkt. 128 at 2.] Defendant filed a Notice on February 24, 2017, informing the Court that the BOP had provided Plaintiffs with a hard drive containing approximately 90,000 emails and that they were reviewing another 12,000 emails as potentially privileged. [Dkt. 137.] After the

extraordinary delay in producing the documents, and the Court's demand that the case move forward expeditiously, it was not unreasonable for Plaintiffs to assign a team of lawyers, some of whom were new to the case, to conduct the document review in order to move the aging case along as quickly as possible.

In addition, given the reality of the practice of law in a large law firm, it is not surprising that the firm chose to spread the work of this case among multiple lawyers at any given time, rather than expecting three lawyers (the number Defendant suggests would have been reasonable) to devote massive amounts of time over six years to litigate this case, to the exclusion of work for other clients at far greater hourly rates.

That said, the Court finds that the 10% global reduction offered by Plaintiffs[11] is not sufficient to account for the inefficiencies and duplication of efforts caused by the manner in which this case was staffed.  Rather, the Court finds it very likely that the law firm would have exercised billing judgment to reduce these fees far more substantially if it were billing a paying client for the same work.  Having reviewed the billing records, and recognizing that judges may "take into account their overall sense of a suit," *Fox*, 563 U.S. at 838, the Court determines that a 30% global reduction should be applied.  This will account for the "increased communication in the form of meetings, phone calls, emails, and the like" noted by Defendant, of which there are a great deal, as well as the fact that "each time a new attorney joined the case, that attorney would

---

[11] The Court recognizes that Plaintiffs intended their proposed 10% reduction to account for more than simply the general duplication of work and inefficiencies the resulted from the utilization of so many attorneys.  *See* [Dkt. 338 at 17].  However, the Court finds it more appropriate to remove those time entries that can be readily identified as unreasonable and then apply the global reduction to the remainder to account for general duplication of work, excessive time spent in attorney team meetings, and other such inefficiencies.

have to 'get up to speed' on the factual and legal issues." *See* [Dkt. 340 at 18, 20].  The Court will apply this reduction after making the specific deductions set forth below.  The Court finds that Plaintiffs' proposed 15% reduction in the amount expended for legal research is reasonable to account for any inefficiency and duplication of efforts caused by staffing.

That said, however, while the Court disagrees that the total number of attorneys who worked on the case was *per se* unreasonable, the Court agrees with Defendant that it is not reasonable to award fees for the many instances in which more than one attorney attended status conferences and depositions in this case.  As set forth below, the Court has made deductions to account for those instances.  The Court also agrees with Defendant that it is not reasonable to award fees for hours expended for "training" associates.  *See* [Dkt. 340 at 18].  While such training undoubtedly improved the efficiency of the work done on this case, it also presumably improved the associates' efficiency in all of their work for the firm, and is thus more akin to an overhead expense than something for which the firm would bill a client.  Accordingly, as set forth below, the Court has deducted those amounts as well.

### c. *The Across the Board Reduction Defendant Suggests Is Not Appropriate*

Defendant argues generally that "[t]he Plaintiffs' decision to engage in protracted 'hard-ball' litigation using twenty-four different attorneys should not be rewarded.  Based on analogous cases with far more favorable outcomes, the Court should cap the fees and costs at no more than $200,000.00." [Dkt. 340 at 13-14.]

As an initial matter, the Court notes that the methodology Defendant suggests the Court use to arrive at a fee award of "no more than $200,000.00" is untenable.  Defendant explains:

> Plaintiffs billed approximately $2.4 million for twenty-four attorneys, which is $100,000 per attorney.  If the court determines that Plaintiffs are a prevailing party and permits billings for three attorneys, this results in an award of $300,000.00, which should be further reduced as discussed below.

[Dkt. 340 at 14] n.2.]  This is wholly illogical.  It might be the case that three attorneys could have done all of the work in this case, and that having the work concentrated in just three attorneys would have resulted in efficiencies as those attorneys became experts in the case, but Defendant provides no justification for the conclusion that three attorneys could have litigated this case in just 1578 hours.[12]  While the Court agrees that there is duplicative work that should not be included in the fee award, Defendant's approach assumes that **all** of the work performed by twenty-one of the attorneys who worked on this case was duplicative work.  There is simply no basis for such a finding.

Defendant also urges the Court to compare the fee award sought in this case to the fees awarded (or agreed upon) in three other cases.  However, Defendant makes no serious attempt to demonstrate that the circumstances of those cases are actually comparable to this case.

Finally, the Court notes that Defendant's suggestion that the Court should simply make "a significant across-the-board reduction in Plaintiffs' request" and "generally reduce the hours to achieve a reasonable number," [Dkt. 340 at 22], is inconsistent with the Seventh Circuit's admonition that "[t]he district court must provide a clear and concise explanation for its award, and may not 'eyeball' and decrease the fee by an arbitrary percentage because of a visceral

---

[12] While the total number of hours on the time sheets submitted is 13,545.9, only 12,625.4 of those were expended by the 24 attorneys; the remainder were expended by paralegals.  Applying Defendant's methodology, 12,625.4 attorney hours divided by 24 attorneys = 526 hours per attorney; 526 x 3 = 1578.  It is unclear what Defendant would have the Court do with regard to the paralegal hours expended.

reaction that the request is excessive." *Schlacher v. L. Offs. of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 856-57 (7th Cir. 2009) (citing *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992)).

### d. Objections to Specific Categories of Time Entries

Finally, Defendant specifically objects to several specific categories of time entries.

First, Defendant objects to the fact that two attorneys "spent almost 200 hours between May 2013 and January 2014 researching RFRA, drafting and editing legal memoranda, opening the case in-house, reviewing potential conflicts, drafting the engagement letter, drafting the initial complaint, and reviewing, revising, and discussing it." [Dkt. 340 at 19.]  Defendant does not suggest how many hours he believes would have been reasonable for this work, and the Court does not find the hours expended on any given task during this pre-filing period to be facially unreasonable, with the exception of a trip to Indiana, which the Court addresses below.

The Court agrees with Defendant that hours expended discussing "public relations strategy" are not compensable. The Court has deducted those hours below.

Defendant next complains that Plaintiffs' counsel spent over 150 hours related to "discussing, researching, revising and reviewing the Amended Complaint," which Defendant asserts was unreasonable because "the Amended Complaint did not involve complex, substantive changes, but largely consisted of factual updates regarding the Plaintiffs' new locations." [Dkt. 340 at 19-20.] Defendant's characterization is accurate, but ignores the fact that the complaint was amended in response to Defendant's motion to dismiss the complaint on mootness grounds, based on the transfer of some of the Plaintiffs to new prisons, which was an issue that reasonably required research to address.  That said, the Court agrees that the amount of time expended on the Amended Complaint is unreasonable, and will make deductions accordingly.

17

Next, Defendant points to examples "when multiple attorneys were conducting the same research on the same topics around the same time." Specifically, Defendant points to Entries 2435, 2438, 3076, 3082, and 3246, which Defendant describes as "showing 4 attorneys researching deliberative process." [Dkt. 340 at 20.] The first two cited entries reveal that on February 28, 2016, attorney Brad Garcia spent .9 hour reviewing deliberative process privilege research and discussing the issue with associate Jeremy Girton [Dkt. 338-5] (Entry 2435). The following day, Girton spent 4.4 hours researching the issue for Garcia. *Id.* (Entry 2438). There is nothing unreasonable about an attorney conducting some preliminary research on an issue and then delegating the task of conducting additional research on the issue to another attorney. The next cited entry did not occur "around the same time," but rather almost eight months later, when Garcia spent 1.7 hours researching the deliberative process privilege issue. *Id.* (Entry 3076, dated October 18, 2016.) A few days after that, associate John McDermott billed 4.8 hours for the following: "Attend Status Conference; Review Case File; Research Deliberative Process Privilege [sic]; Draft Talking Points For Status Conference." *Id.* (Entry 3082). Finally, on November 23, 2016, counsel Meredith Garagiola billed 4.7 hours for the following: "Draft And Revise Motion To Compel; Research And Analyze Case Law Regarding Deliberative Process Privilege Application For Motion To Compel." *Id.* (Entry 3246). It does not strike the Court as unreasonable that an attorney might spend some time updating, confirming, or expanding upon prior research relating to an issue in the course of drafting a motion. While, as discussed below, there are many instances of unreasonable duplicative efforts in the time records, these five are not among them.

Defendant also points to the fact that the records "show[] attorneys Love, Charles, Thorn, Meals, and Zaslavsky researching Halal food vendors." [Dkt. 340 at 20.] The Court has

reviewed these entries and does not find them to represent an unreasonable duplication of efforts or expenditure of time, given the importance of the availability of an appropriate Halal food vendor to Plaintiffs' case, particularly in light of Defendant's claimed difficulty identifying such a vendor.

Finally, the Defendant notes that "it appears that numerous attorneys and paralegals were searching PACER for the same items, for which the attorneys of record should have already received a 'free look.'"  [Dkt. 340 at 24.]  Given the small cost of each PACER transaction, the Court finds that Plaintiffs' proposed 15% reduction of all of its expenditures for online research services, which includes the PACER searches, is sufficient to account for this issue.

Next, Defendant complains that "counsel billed approximately $1,500.00 drafting and revising a motion to continue the trial date, which required four attorneys and one paralegal." [Dkt. 340 at 20.]  In fact, the Court's review of the billing records finds fourteen hours were spent discussing and drafting the fairly straightforward motion.  The Court finds that to be excessive, and will make deductions accordingly.

Defendant next argues that Plaintiffs' counsel

> spent hours upon hours preparing for a trial set for June 2019 even though in December 2018 and in mid-2019 the Parties moved to continue the trial and the requests were granted.  (ECF Nos. 278; 282; 283; *see also* ECF No. 309 (granting further extension of trial date).)  It is therefore perplexing why attorneys continued billing for trial preparation.

[Dkt. 340 at 20-21.]  In fact, in April 2018, counsel quite reasonably began gearing up for a trial that was scheduled for July 2018.  Unfortunately, on May 23, 2018, that trial was continued because of the court's criminal trial schedule.  There are just a handful of time entries mentioning trial preparation after May 23, 2018; the Court does not find it unreasonable that some of the

work that had been started with the July 2018 trial date in mind would be wrapped up, so that it would be ready when the trial was rescheduled.

Finally, the Court agrees with Defendant that the time billed for research and communication related to Equal Protection claim that was voluntarily dismissed should be deducted.

### 3. The Court's Deductions to Arrive at the Lodestar

District courts have a great deal of discretion with regard to assessing the reasonableness of the hours expended by counsel. *See Gautreaux v. Chicago Hous. Auth., 491 F.3d 649, 659 (7th Cir. 2007)* ("'If ever there were a case for reviewing the determinations of a trial court under a highly deferential version of the "abuse of discretion" standard, it is in the matter of determining the reasonableness of the time spent by a lawyer on a particular task in a litigation in that court.'") (quoting *Ustrak v. Fairman, 851 F.2d 983, 987 (7th Cir. 1988)*).  In exercising that discretion, the Court has eschewed the proverbial green eyeshades and been mindful of the "essential goal" of doing "rough justice."  *See Fox, 563 U.S. 838*.  To that end, the Court has reviewed the time records submitted by Plaintiffs and determined that the following deductions to the lodestar should be made in addition to a global reduction as proposed by Plaintiffs.  The Court notes that, in light of counsel's use of block billing, there are instances in which the Court has deducted the entire amount of a time entry because part of the time was spent on an excludable activity.

20

*a. Public Relations*

As noted above, the Court agrees with Defendant that hours expended discussing "public relations strategy" are not compensable. The Court has identified time entries totaling $1657.80 that include that topic and will deduct that amount.[13]

*b. Pre-Filing Trip to Indiana*

As noted above, the Court finds that it was an unreasonable duplication of effort for two attorneys to travel to Indiana to conduct pre-filing interviews. The Court will deduct $5,032.50 to account for the duplication.[14]

*c. Time Related to the Voluntary Dismissal of Berry*

After this case was filed, Plaintiff Reed Berry apparently had a change of heart and chose not to proceed with the litigation. Accordingly, Plaintiffs voluntarily dismissed him from the case. [Dkt. 8.] The Court finds the time expended on this issue to be excludable and calculates that amount to be roughly $2,835.00.[15]

*d. Equal Protection Claim*

As noted above, the Court will deduct time specifically expended on Plaintiffs' Equal Protection claim. The billing records that include time on that matter total $4,387.50.[16]

---

[13] *See* [Dkt. 338-5] (Entries 318-20, 324-25, 327, 329, 331, 335, 351-52, and 990).

[14] *See* [Dkt. 338-5] (Entries 111, 113, 129, 132, and134-35).

[15] This is the sum of Entries 388-89, 392-401, 405, 413, 421, 442, 449, 452, 455-57, 467-68, 492-93, and 502.

[16] This is the sum of Entries 577, 622, 625, 630, 646, 648, 1056-57, 1059-60, 4751-52, 4760, and 5422.

*e. Amended Complaint*

By the Court's calculation, the billing records related to the Amended Complaint total almost $24,000.00.[17]  The Court finds that to be excessive for the task.  Accordingly, the Court will reduce that amount to $12,000.00, which the Court finds to be reasonable.

*f. Motion to Continue the Trial*

As noted above, the Court's review of the billing records finds that fourteen hours ($2,940.00) were spent discussing and drafting a relatively simple motion to continue the trial date.[18]  The Court finds that to be excessive, and will reduce the amount awarded to a more reasonable four hours ($840.00), for a reduction of $2,100.00.  Even four hours is too much for an ordinary motion to continue, but in this instance it was based on Plaintiffs' religious observances as well as that of one of Plaintiffs' expert witnesses, which added a layer of complexity.

*g. Training*

As noted above, the Court also agrees with Defendant that it is not reasonable to award fees for hours expended for training.  The Court will deduct $2,805.75 for these activities.[19]

*h. Duplicative Time Related to Court Appearances*

As discussed above, the Court agrees with Defendant that it is not reasonable to award fees for the many instances in which multiple attorneys prepared for and/or attended status

---

[17] *See* [Dkt. 338-5] (Entries 500, 504, 507, 522-23, 527-28, 534, 545, 550, 562, 569, 577, 579-83, 589, 595, 601-02, 605, 609-12, 619-20, 626, 628, 629, 633, 635, 638-40, 642, 654, 657-58, 662, 665-66, 672-73, 678-80, 682-83, 685, 715, 723, 729, 732, 740-43, 745, 748-50, 753, 755, 767, 774-76, 780-786, and 788-790).

[18] *See* [Dkt. 338-5] (Entries 6896, 6900, 6909, 6911-12, 6914, 6922, 6927, 6932, 6939, 6958, 6963, 6965, 6968, 6972-73, 6977, 6979, 6983-84, and 6988-89).

[19] *See* [Dkt. 338-5] (Entries 2221, 2223, 2225, 3370, 3569, 3573, 3578, 3580, and 3588).

22

conferences in this case.[20]  Twenty-six status conferences and one routine hearing on a motion

for time were held in this case.  By the Court's estimate, the time records that appear to include

time spent preparing for and/or attending these conferences total over $98,000.00.[21]  That is

grossly excessive.  The Court determines that, in general, a reasonable amount of time to spend

preparing and attending a status conference or routine hearing is four times the length of the

conference.  In this case, that equates to the following:

|  | Reasonable Time | Applicable Rate | Reasonable Amount |
|---|---|---|---|
| 7/28/14  (initial pretrial conference) [22] | 3 hours | $189.00 | $567.00 |
| 11/25/14  (12 minute conference) | 0.8 hour | $189.00 | $151.20 |
| 2/2/15  (20 minute conference) | 1.4 hour | $190.50 | $266.70 |
| 5/7/15  (12 minute conference) | 0.8 hour | $190.50 | $152.40 |
| 7/27/15  (40 minute conference) | 2.7 hour | $190.50 | $514.35 |
| 3/1/16  (22 minute conference) | 1.5 hour | $193.50 | $290.25 |
| 5/4/16  (9 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 7/6/16  (9 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 8/24/16  (12 minute conference) | 0.8 hour | $193.50 | $154.80 |
| 9/22/16  (9 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 10/19/16  (11 minute conference) | 0.8 hour | $193.50 | $154.80 |

[20] The Court has not made any deductions for the discovery conferences and settlement
conferences that were held in this case, as the Court finds that the time expended for these more
substantive conferences was reasonable.

[21] This includes Entries 848-49, 852-54, 861-63, 867-70, 872, 874-75, 877-78, 902-05, 907-09,
911, 914-16, 918, 921-26, 930-35, 1430-31, 1437, 1447-52, 1630-31, 1636, 1638-39, 1641-43,
1821-31, 2411, 2420-22, 2427, 2431, 2433, 2436, 2439-44, 2446-49, 2626, 2636, 2652-54, 2656-
60, 2824, 2826, 2829-30, 2832-34, 2836-38, 2840, 2959-61, 2963, 2966-67, 3016-19, 3062,
3070, 3072, 3079, 3081-85, 3088, 3109-13, 3172-73, 3176, 3178, 3312, 3317, 3321, 3324-25,
3406, 3412-14, 3416-19, 3463, 3465-66, 3470-71, 3473-76, 3478-79, 3481-83, 3548, 3565,
3570, 3579, 3590, 3592-95, 3597, 3838, 3902, 3912-14, 3916-17, 3923, 3927, 4008, 4022, 4027-
29, 4031, 4125-28, 4280-85, 4442, 4481, 4484-85, 4494-95, 4502-03, 4505, 4875-76, 4886-87,
4889, 5179, 5181, 5190, 5192-94, 5200, 7053, 7056, 7058, 7061, 7067, 7070-78, 7080-82, 7085-
87, 7089, 7091, 7095, 8203, 8205, 8209-21, 8410, and 8412-17.  It is certainly possible the Court
has both included some entries that did not actually relate to status conference preparation and
missed some that did, but the Court feels confident that this list is sufficient to satisfy the "rough
justice" standard.

[22] This was an initial pretrial conference; additional time to confer and prepare a case
management plan was warranted.

| | | | |
|---|---|---|---|
| 10/27/16  (8 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 11/9/16  (9 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 12/14/16  (6 minute conference) | 0.4 hour | $193.50 | $77.40 |
| 1/19/17  (8 minute conference) | 0.6 hour | $193.50 | $116.10 |
| 2/3/17  (18 minute conference) | 1.2 hour | $193.50 | $232.20 |
| 3/9/17  (16 minute conference) | 1.1 hour | $193.50 | $212.85 |
| 4/11/17  (12 minute conference) | 0.8 hour | $193.50 | $154.80 |
| 4/21/17  (6 minute conference) | 0.4 hour | $193.50 | $77.40 |
| 5/2/17  (6 minute conference) | 0.4 hour | $193.50 | $77.40 |
| 5/30/17  (7 minute conference) | 0.5 hour | $198.00 | $99.00 |
| 6/29/17  (7 minute conference) | 0.5 hour | $198.00 | $99.00 |
| 8/23/17  (12 minute conference) | 0.8 hour | $198.00 | $158.40 |
| 10/3/17  (7 minute conference) | 0.5 hour | $198.00 | $99.00 |
| 2/13/19  (9 minute conference) | 0.6 hour | $210.00 | $126.00 |
| 2/21/20  (7 minute conference) | 0.5 hour | $228.00 | $114.00 |
| 8/3/20  (9 minute routine hearing) | 0.6 hour | $228.00 | $136.80 |
| **Total** | | | **$4612.35** |

Accordingly, the Court will deduct $93,387.65 to account for excessive time spent preparing for and attending routine conferences.

    *i.  Duplicative Time Related to Depositions*

      While the Court understands why Plaintiffs' counsel may have wanted to send more than one attorney to a deposition, the Court finds that a reasonable fee award in this case is limited to one attorney (and no paralegal) for each deposition.  In the Court's estimation, the time entries that relate to additional attorneys attending a deposition account for $60,842.25.[23]  The Court will deduct that amount from the lodestar.

---

[23] *See* [Dkt. 338-5] (Entries 4063-64, 4068, 4070-71, 4076-79, 4083-84, 4090-92, 4097, 4102-05, 4112-13, 4186, 4217, 4428, 4598, 5019, 5036, 5042-43, 5460, 7324, and 7333-34).

*j. Bill Review*

The time records contain multiple entries related to routine bill reviews that total $2,395.80.  The Court finds that these are properly excluded from the fee award.[24]

### 4. Lodestar Calculation

The deductions set forth above total $187,444.25.  The lodestar is therefore calculated as follows:  $2,675,709.30 (total of all billing entries) - $187,444.25 (Court's deductions) = $2,488,265.05 x .7 (30% global reduction) = $1,741,785.54 + $54,565.40 (computerized research reduced by 15%) = $1,796,350.94.

### 5. No Adjustment to the Lodestar is Appropriate

Finally, "[a]lthough the lodestar yields a presumptively reasonable fee, the court may nevertheless adjust the fee based on factors not included in the computation, *see [Hensley,* 461 U.S. at 434]."  *Montanez,* 755 F.3d at 553 (additional internal citation omitted).  The lodestar "may be excessive when 'a plaintiff has achieved only partial or limited success.'"  *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 638 (7th Cir. 2018) (quoting *Hensley*, 461 U.S. at 436).

Defendant argues that Plaintiffs' fee award should be reduced because they obtained limited success in this case.  Defendant's position is that

> [w]hen you boil this case down, the Plaintiffs ultimately obtained access to a Halal-certified diet, which they were offered and rejected in 2015.  The BOP moved forward with locating a Halal vendor who could provide pre-packaged Halal-certified meals not only to the four Plaintiffs, but to other inmates in the BOP, and were ultimately successful in 2018 when they launched the Halal Diet at several Institutions.  The Plaintiffs quickly signed up for the diet and have been accommodated since that time.  Moreover, as discussed above, the Plaintiffs did

---

[24] *See* [Dkt. 338-5] (Entries 220, 258, 273, 326, 349, 526, 616, 792, 871, 876, 1016, 1020, 1023, 1025, 1077, 1184, 1425, 1607, and 5980).

not achieve obtaining a court order mandating a particular diet, which was their requested relief, but were merely given permission to participate in the BOP's Halal diet (which they were already doing).

[Dkt. 340 at 21.] However, Defendant describes the 2015 offer as being for "Halal-certified meat two times per week and the meat was certified as being hand-slaughtered by an adult Muslim male." *Id.* at 3. Plaintiffs respond as follows: "Unlike the meals currently being offered to Plaintiffs (as required by the Settlement Agreement), the menus proposed in 2015 'included only two halal-certified entrees per week,' and 'were not certified as complying with traditional hand-slaughtering practices required by Plaintiffs' beliefs,' which is one of the major requirements of the Settlement Agreement." [Dkt. 345 at 7] (quoting [Dkt. 223 at 26]). Therefore, Defendant's assertion that Plaintiffs achieved nothing beyond what they were offered in 2015 is inaccurate. Further, Defendant's statement that the Settlement Agreement only gives the Plaintiffs "permission to participate in the BOP's Halal diet (which they were already doing)" is a mischaracterization of the Settlement Agreement, as it ignores the BOP's obligation to **maintain** the Halal Diet, and to continue providing the diet to Plaintiffs if they are ever moved to a facility at which the Halal Diet is not being offered, which it would not have absent the Settlement Agreement. Other than the time spent on the voluntarily dismissed equal protection claim and the voluntary dismissal of Plaintiff Berry, addressed above, the Court will not reduce the fee award to account for the level of success obtained by Plaintiffs.

### III. Conclusion

For the reasons set forth above, the undersigned **RECOMMENDS** that Plaintiffs' Motion for Attorney's Fees and Costs [Dkt. 338] be **GRANTED IN PART** and **DENIED IN PART** and that Plaintiffs be awarded attorneys' fees in the amount of $1,796,350.94 and costs in the amount of $51,666.78.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure. **The parties are hereby notified that, due to the age of this case, no enlargement of the deadline to object, or to file any briefs with regard to any objection, will be granted.** The parties should plan their schedules to complete any briefing on any objection to this order within those deadlines.

SO ORDERED.

Dated:  13 AUG 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.